189

(Rev. 12/2004)

## PETITION UNDER 28 USC § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Case:2:12-cv-13127
Judge: Roberts, Victoria A.
MJ: Michelson, Laurie J.
Filed: 07-17-2012 At 10:42 AM
HC MARION V BERGHUIS (EB)

| United States District Court | |
|---|---|
| Name (under which you were convicted): Allen Marion | |
| Place of Confinement: | Prisoner No.: |
| Name of Petitioner (include name under which convicted): Allen Marion | v. Name of Respondent (authorized person having custody): Mary Berghuis, Warden of E.C Brooks Correctional Facility |
| The Attorney General of the State of: | |

## PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging: 3rd Circuit Court In Wayne County

   (b) Criminal docket or case number: 09-003275

2. Date of judgment of conviction: July 2, 2009

3. Identify all counts and crimes for which you were convicted and sentenced in this case:
   1. Homicide - Murder - Second Degree
   2. Weapons Felony Firearm
   3. Weapons - Firearms - Possession by Felon

4. Length of sentence for each count or crime for which you were convicted in this case: Count 1: Second Degree Murder 600 to 900 Months, count 2: Felony Firearm 2 yrs to 2 yrs, Count 3: Firearms - Possession by Felon 12 to 60 Months

5. (a) What was your plea?
   - Not guilty ☒
   - Guilty ☐
   - Nolo contendere (no contest) ☐

(b) If you entered a guilty plea to one count or charge, and a not guilty plea to another count or charge, give details:

6. If you went to trial, what kind of trial did you have? (Check one)
(a) Jury ☒
(b) Judge only ☐

7. Did you testify at the trial? Yes ☐ No ☒

8. Did you file a direct appeal to the Michigan Court of Appeals from the judgment of conviction? Yes ☒ No ☐

9. If you did appeal, answer the following:

(a) Date you filed: July 30, 2010

(b) Docket or case number: 09-3275

(c) Result: Affirmed

(d) Date of result: January 11, 2011

(e) Grounds raised: (1.) insufficiency of evidence (2) Brady Violation; (3) Confrontation grounds; (4) Trial Court abuse of Discretion and ineffective assistance of trial counsel; (5) Prosecutorial Misconduct and Ineffective Assistance of trial Counsel.

**Please submit, if available, a copy of any brief filed on your behalf and a copy of the decision by the court.**

(g) Did you seek further review of the decision on appeal by the Michigan Supreme Court? Yes ☒ No ☐

If yes, answer the following:

(1) Date you filed: March 7, 2011

(2) Docket or case number: #24442

(3) Result: Denied Application

(4) Date of result: July 25, 2011

(5) Grounds raised: (1) Insufficiency of Evidence; (2) Brady Violation; (3) Confrontation Grounds; (4) Trial Court Abuse of Discretion and ineffective assistance of trial counsel; (5) Prosecutorial Misconduct and Ineffective assistance of counsel.

**Please submit, if available, a copy of any brief filed on your behalf and a copy of the decision by the court.**

(h) Did you file a petition for certiorari in the United States Supreme Court? Yes ☐ No ☒

If yes, answer the following:

(1) Date you filed: ______

(2) Docket or case number: ______

(3) Result: ______

(4) Date of result: ______

(5) Grounds raised: ______

10. Did you file a motion for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules with respect to the judgment of conviction and sentence? Yes ☐ No ☒

11. If your answer to 10 was "yes," give the following information:

(a) (1) Date you filed: ______

(2) Name of court: ______

(3) Docket or case number: ______

(4) Grounds raised: ______

(5) Did you receive a hearing where evidence was given on your motion? Yes ☐ No ☒

(6) Result: ______

(6) Date of result: ______

**Please submit, if available, a copy of any brief filed on your behalf and a copy of the decision by the court.**

(b) If you sought further review of the decision in the Michigan Court of Appeals, please answer the following:

(1) Date you filed: ______

(2) Docket or case number: ______

(3) Result: ______

(4) Date of result: ______

(5) Grounds raised: ______

**Please submit, if available, a copy of any brief filed on your behalf and a copy of the decision by the court.**

(c) If you sought further review of the decision in the Michigan Supreme Court, please answer the following:

(1) Date you filed: ______

(2) Docket or case number: ______

(3) Result: ______

(4) Date of result: ______

(5) Grounds raised: ______

**Please submit, if available, a copy of any brief filed on your behalf and a copy of the decision by the court.**

12. Other than a direct appeal or a motion for relief from judgment, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal? Yes ☐ No ☒

13. If your answer to 12 was "yes," give the following information: **[Attach additional sheets of paper, if necessary, to answer the following for each petition, application, or motion you filed.]**

(a) (1) Date you filed: ______

(2) Name of court: ______

(2) Docket or case number: ______

(3) Nature of the proceeding: ______

(4) Grounds raised: ______

(5) Did you receive a hearing where evidence was given on your motion? Yes ☐ No ☒

(6) Result: ______

(7) Date of result: ______

**Please submit, if available, a copy of any brief filed on your behalf and a copy of the decision by the court.**

(b) Did you appeal to the highest court having jurisdiction the result of action taken on any petition, application or motion? Yes ☐ No ☒

If yes, please provide the following:

(1) Date you filed: ______

(2) Name of court: ______

(3) Result: ______

(4) Date of result and case number: ______

(5) Grounds raised: ______

**Please submit, if available, a copy of any brief filed on your behalf and a copy of the decision by the court.**

(c) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:
Because my appellate counsel was ineffective for not turning over my transcripts until after my Appeal by Leave.
(See Exhibit "A" ATTACHED).

14. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

GROUND ONE: Prosecutor Ms. Siringas Conspired to Bring "Fraud on the court" with Trial counsel and Appellate Counsel AS co-conspirators.

(a) Supporting FACTS (Do not argue or cite law. Just state the specific facts that support your claim.): For numerous amounts of reasons my due process rights were violated when Ms. Siringas did not disclose any benefits that was given to a witness and for the introduction of false ballistic evidence, and presenting parjury of her main witness testimony and false claims, Trial counsel was ineffective for failure to challenge numorous evidence, and Appellate counsel was ineffective for not raising ineffective claims on trial counsel. (Ground one continues on seperate papers) Next Page →

(b) Direct Appeal of Ground One:

(1) If you appealed from the judgment of conviction, did you raise this issue? Yes ☐ No ☒

(2) If you did not raise this issue in your direct appeal, explain why: Appellate counsel was told by Petitioner about these issues, she failed to raised them and she was ineffective for turning over my transcripts after my appeal. (see Exhibit A ATTACHED)

(c) Post-Conviction Proceedings:

(1) Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules? Yes ☐ No ☒

(2) If your answer to Question (d)(1) is "Yes," state:

Date motion was filed: __________

Name and location of the court where the motion was filed: __________

Docket or case number: __________

Result (attach a copy of the court's opinion and order, if available): __________

Date of result: __________

(3) Did you receive a hearing on your motion? Yes ☐ No ☐

(4) Did you appeal from the denial of your motion? Yes ☐ No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? Yes ☐ No ☐

## STATEMENT OF FACTS

The crux of this Habeas application stems from the murder of Joseph Day on 3/1/2006, which initially went unsolved, 9 months later, the Federal Bureau of Investigation(FBI), amidst an indictment for conspiracy of drugs and gun possession of known habitual liar and informant Ricardo Sims, who happens to be the brother of a female who has a child by Joseph Day, worked with the FBI in exchange for leniency, to cultivate a suspect for the Wayne County murder investigation of Joseph Day. Whereupon December 8, 2006 Ricardo Sims met with the FBI agents and Wayne County detectives and implicated defendant as the murder suspect of Joseph Day.

Based solely on Ricardo Sims' extraordinary falsities, 2 years later on December 9, 2008, defendant was arraigned on Pre-meditated first degree murder, felony firearm and felon in possession of a firearm, which plaintiff alleged at that time and continues to allege, were in direct disregard of the truth.... Primarily disturbing facts that casts grave doubt upon the verdict in this case is the fact that the initial investigation performed by detective Charles Zwicker on the day of 3/15/06 turned up no identifiable suspects and the case basically went cold, because no one actually came forth as a witness to the murder that occurred in front of the Sims' family home, of which belong to Ricardo Sims' mother, assumed to be deceased, who left the home to Ricardo and his siblings, who never participated in the original investigation on 3/1/06 through 3/15/06.

Unfortunately a federal indictment led to Ricardo Sims being taken into custody on 12/8/06, an entire 9 months after the murder of his niece/nephew's father was murdered and he refused to participate as a witness on 3/1/06 and amidst Detroit Police detective Charles Zwicker investigation turning up absolutely no identifiable suspects. On 12/8/06 the FBI, Detroit Police for

the County of Wayne Detective Charles Zwicker, with the use of habitual liar Ricardo Sims, who has motive to lie for leniency, gives corroborating testimony to support "Fraud On The Court," orchestrated by Wayne County Prosecutor's, against defendant. The conduct of the officers of the Court that participated in this case was atrocious and a sham. Nothing can be more disturbing in the judicial system than a conviction obtained by a crooked policeman, a corrupt prosecutor, colluding with an attorney who's presentation to defendant was facile, but eventually found to be conspiratorial with the prosecutor, as well defendant's appellate counsel assumed the exact same position(Jacqueline McCann) when she either purposely or inadvertently assumed that the alibi witnesses offered to her by the defendant had not been offered to trial counsel(Mr. Scharg), where she was wrong in submitting these alibi circumstances, appellate counsel clearly prejudice defendant.

Furthermore, the State will ask the Court to deny defendant an opportunity that is essentially a Constitutional right: to challenge just such a conviction and sentence. But no fair leagal system - and certainly not our American legal system - should allow a conviction based on prosecutorial misconduct, ineffective assistance of trial and appellate counsel stemming from being made aware of, before hand, but still allowing perjured testimony, in the face of defendant repeatedly attempting to assist in showing both trial, appellate counsel and the Court that he had a plausible alibi that could be verified by a friend and a business person whose shop defendant just so happens to have visited during the time in question. With all this information made available to trial and appellate counsel they still chose to sit on their hands with those facts, as the Wayne County prosecutor and the lead police detective mounted evidence that was in direct disregard for the truth, taken from a perjured witness who never came forth originally even

though he was at the scene of the crime, but came forth months later after being indicated by the Federal Government in an attempt to gain leniency, by implicating defendant. Unfortunately defendant is actually and factually innocent of any crime, and if not for these Officers of the Court bringing "Fraud on the Court" defendant would not be convicted in this instance.

Ground ~~two~~ ONE continues:

Petitioner States that his case was back in 2006 from the records in 2008, the crime lab was investigated and Closed down. Police lab Problems (2008 Attached). It is petitioners belief that evidence from the crime scene of Joseph Day was mix up in the technical problem at the crime lab in Detroit. Petitioner state that he never had a chance to challenge the evidence as it would or could have proven petitioner's innocence, stating that had he been able to test the 3-9mm casing for finger prints, DNA or any other remedy he would not have been prejudice by the absents of such evidence, which could of proved his innocences. Prosecutor violated petitioner's due process by introducing false evidence, because this is the reason I never had a pretrial see Exhibit C where the prosecutor Ms. Siringas cancelled the hearing, because she knew she was preparing to bring false evidence of ballistic. Defense and Appellate counsel were ineffective for failing to challenge the false evidence, as both counsels had reports and transcripts; testimony. plus petitioner asked both Trial counsel and Appellate counsel's to do something but to no avail.

# Unsecured lab riles lawyers

## Items left behind could jeopardize cold cases

By STEVE NEAVLING, DAVID ASHENFELTER and GINA DAMRON
FREE PRESS STAFF WRITERS

When the Detroit Police Department closed its crime lab in 2008, investigators were supposed to turn over evidence to State Police, records show.

But the Free Press discovered Detroit police left a lot behind — sealed evidence bags, ballistic tests and records of investigations, among other items.

John Collins, director of the Michigan State Police forensic science division said records and evidence should never be left unattended and accessible.

"We know that any case can be reopened at any time," he said, adding that DNA evidence often triggers new investigations of old cases. "Just leaving records sitting behind isn't something, from our perspective, we would ever do. We control our records just as a matter of principal."

When the city closed its lab in Brush Park, the State Police opened its crime labs to receive material from the city, Collins said, but it was not responsible for removing items from the Detroit building.

Legal experts were livid that the evidence was left behind.

"Evidence preservation is a huge issue," said David Moran, a University of Michigan law professor and co-director of its Innocence Clinic, adding that state law requires that biological evidence that could clear someone of a crime must be preserved as long as the perpetrator is incarcerated. "But beyond biological evidence, it's just a general duty of police to preserve evidence or dispose of it properly. Just leaving it to rot in a building is pretty disturbing."

If any of the material is important, he and other legal experts said, it could be difficult or impossible to crack an unsolved crime.

Detroit Police Chief Ralph Godbee Jr. said he is launching an investigation to determine what happened.

### Time line of police lab problems

**2008**

**April 25:** Then-Detroit Police Chief Ella Bully-Cummings suspends firearms testing at the crime lab pending an audit by the Michigan State Police. Her decision comes after Detroit criminal defense lawyer Marvin Barnett requested independent tests on 42 shell casings in a May 2007 double homicide and learned they were fired by two guns, not one as the crime lab said.

**Sept. 25:** Then-Detroit Mayor Ken Cockrel Jr. and then-Police Chief James Barren shut down all operations at the crime lab after preliminary State Police audit finds a 10% error rate in ballistic evidence at the firearms lab. If the error rate holds, the report says, "the negative impact on the judicial system would be substantial, with a strong likelihood of wrongful convictions and a valid concern about numerous appeals."

**2009**

... Wayne County Prosecutor Kym Worthy says her office had found 147 cases involving convicted and imprisoned people whose crime lab evidence requires retesting. She says defense lawyers identified 30 other cases involving possible evidence mishandling. "This is the tip of the iceberg," Worthy says. State Police says it will handle 20,000 Detroit cases in 2009 on top of its 10,650 other cases, creating a six- to eight-month testing backlog.

**Sept. 8:** Worthy calls for investigation into how more than 10,000 kits containing evidence of possible sexual assaults wound up untested in a police evidence storage facility.

**2010**

**Feb. 18:** Worthy tells state lawmakers that closure of Detroit police crime lab is causing big delays in processing crime scene evidence.

**July:** Detroit police say they plan to create a new crime lab, staffed by State Police, at the new police headquarters at the old MGM Grand Detroit casino downtown. ... she's disgusted that State Police decided not to build a full-service crime lab at the new police headquarters. But State Police says it is working on a more efficient option that involves processing ballistics in Detroit, and fingerprinting, toxicology or DNA elsewhere.

**Thursday:** Free Press reports thousands of rounds of live ammunition, sealed evidence kits and case files lay amid rubble in the Police Department's closed crime lab.

Source: Free Press research

Property of LRF Library

If yes, answer the following:

Date you filed: ____

Name and location of court: ____

Docket or case number: ____

Result (attach a copy of the court's opinion and order, if available): ____

____

Date of result: ____

(d) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: ____

____

____

(e) If you did not exhaust your state remedies on Ground One, explain why: Appellate counsel failed to bring issues and failed to turn over my transcripts after my appeal (see Exhibit "A" ATTACHED).

**GROUND TWO:** Counsel was ineffective for failure to impeach prosecutors main witness Donald Sims for perjury, and for failure to motion for directed verdict.

(a) Supporting FACTS (Do not argue or cite law. Just state the specific facts that support your claim): Donald "Ricardo" Sims came forth in a "ditch effort" to bargain away a crime that Mr Sims was being pursued by the Federal Bureau of Investigation. Mr. Sims committed perjury by testifying that his younger brother Cardell Sims and Neighbor Phillip Yenger could corroborate his story, yet at trial both man testified that they did not see the crime nor could they I.D petitioner in a in-court line-up.

(b) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue? Yes ☐ No ☒

(2) If you did not raise this issue in your direct appeal, explain why: Appellate counsel denied me my transcripts, turning them over to me after my appeal, knowing that I wanted to raise these issues, or she could have raised these issues. (See Exhibit "A" ATTACHED)

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules? Yes ☐ No ☒

(2) If your answer to Question (d)(1) is "Yes," state:

Date motion was filed: __________

Name and location of the court where the motion was filed: __________

Docket or case number: __________

Result (attach a copy of the court's opinion and order, if available): __________

Date of result: __________

(3) Did you receive a hearing on your motion? Yes ☐ No ☐

(4) Did you appeal from the denial of your motion? Yes ☐ No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? Yes ☐ No ☐

If yes, answer the following:

Date you filed: __________

Name and location of court: __________

Docket or case number: __________

Result (attach a copy of the court's opinion and order, if available) : __________

Date of result: __________

(d) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: __________

(e) If you did not exhaust your state remedies on Ground Two, explain why: Appellate Counsel failed to raise these issues and denied me my transcripts, until after my appeal, knowing I could not raise proper standard 4 brief issues. Counsel was ineffective from her actions. (SEE EXHIBIT "A" ATTACHED)

**GROUND THREE:** Prosecutorial Misconduct

(a) Supporting FACTS (Do not argue or cite law. Just state the specific facts that support your claim):
Petitioner experience due process violation due to prosecutorial misconduct in providing consideration to a jailhouse informant. Mr. Sims testified part of a plea agreement on unrelated charges, being in a "ditch effort" under Federal indictment, to illegally convict me.

(b) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue? Yes ☐ No ☒

(2) If you did not raise this issue in your direct appeal, explain why: Appellate counsel was aware of this issue but failed to raise it, and failed to turn over my transcripts so I wouldn't raise it. "It is my belief." (See Exhibit "A" ATTACHED).

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules? Yes ☐ No ☒

(2) If your answer to Question (d)(1) is "Yes," state:

Date motion was filed: ______

Name and location of the court where the motion was filed: ______

Docket or case number: ______

Result (attach a copy of the court's opinion and order, if available): ______

Date of result: ______

(3) Did you receive a hearing on your motion? Yes ☐ No ☐

(4) Did you appeal from the denial of your motion? Yes ☐ No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? Yes ☐ No ☐

If yes, answer the following:

Date you filed: ______

Name and location of court: ______

Docket or case number: ______

Result (attach a copy of the court's opinion and order, if available) : ______

Date of result: ______

(d) Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three: ______

(e) If you did not exhaust your state remedies on Ground Three, explain why: ______

**GROUND FOUR:** Ineffective assistance on trial Counsel for failure to investigate alibi witnesses and to prepare a defense, and for failure to retreive Discovery items before preliminary and before trial.

(a) Supporting FACTS (Do not argue or cite law. Just state the specific facts that support your claim): Trial Counsel was aware and was told about petitioner alibi and his witnesses. he failed to call Charles Lewis to testify at trial and failed to investigate Zahar Murray, Mirage Jewelry Store owner. (See notice of alibi and Affidavit of Charles Lewis and Zahar Murray Affidavit ATTACHED EXHIBIT "B"). Counsel also fail to retreive Discovery items and information. (See registration of Action and ect EX C).

(b) Direct Appeal of Ground Four:

(1) If you appealed from the judgment of conviction, did you raise this issue? Yes ☐ No ☐

(2) If you did not raise this issue in your direct appeal, explain why: ______

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules? Yes ☐ No ☒

(2) If your answer to Question (d)(1) is "Yes," state:

Date motion was filed: ____________________

Name and location of the court where the motion was filed: ____________________

____________________

Docket or case number: ____________________

Result (attach a copy of the court's opinion and order, if available): ____________________

____________________

Date of result: ____________________

(3) Did you receive a hearing on your motion? Yes ☐ No ☐

(4) Did you appeal from the denial of your motion? Yes ☐ No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? Yes ☐ No ☐

If yes, answer the following:

Date you filed: ____________________

Name and location of court: ____________________

Docket or case number: ____________________

Result (attach a copy of the court's opinion and order, if available) : ____________________

____________________

Date of result: ____________________

(d) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: ____________________

____________________

____________________

(e) If you did not exhaust your state remedies on Ground Four, explain why: ____________________

____________________

____________________

____________________

15. Have you previously filed any type of petition, application or motion in a federal court regarding the conviction that you challenge in this petition? Yes ☐ No ☒

If "Yes," state the date of filing, the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available:

16. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, as to the judgment you are challenging? Yes ☐ No ☒

If "Yes," state the date of filing, the name and location of the court, the docket or case number, the type of proceeding, and the issues raised:

17. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: Steven Scharg

(b) At arraignment and plea: Steven Scharg

(c) At trial: Steven Scharg

(d) At sentencing: Steven Scharg

(e) On appeal: Jacqueline McCann

(f) In any post-conviction proceeding: Jacqueline McCann

(g) On appeal from any adverse ruling in a post-conviction proceeding: Jacqueline McCann

18. Do you have any future sentence to serve after you complete the sentence imposed by the judgment you are challenging?
Yes ☐ No ☒

(a) If so, give the name and location of court which imposed the sentence to be served in the future: ______

(b) Give the date the other sentence was imposed: ______

(c) Give the length of the above sentence: ______

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?
Yes ☐ No ☒

19. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

*The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of -

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant him or her the relief to which he may be entitled in this proceeding.

I declare under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on July 2012 (month, date, year).

Allen [signature]
Signature of Petitioner

______________________
Date

______________________
Signature of Attorney (if any)

If the person signing is not petitioner or an attorney, state relationship to petitioner and explain why petitioner is not signing this petition. ______________________

# APPENDIX A

# STATE APPELLATE DEFENDER OFFICE

Main Office: SUITE 3300 PENOBSCOT • 645 GRISWOLD • DETROIT, MICHIGAN 48226-4281
Phone: 313.256.9833 • Fax: 313.965.0372
CLIENT CALLS 313.256.9822

DAWN VAN HOEK
DIRECTOR
DETROIT/LANSING

JONATHAN SACKS
DEPUTY DIRECTOR
DETROIT

LANSING OFFICE
101 NORTH WASHINGTON
14TH FLOOR
LANSING, MICHIGAN 48913-0001
Phone: 517.334.6069 · Fax: 517.334.6987

Website: www.sado.org

April 28, 2011

Mr. Allen Marion
No. 252103
Earnest C. Brooks Correctional Facility
2500 S. Sheridan Drive
Muskegon Heights, MI 49444

Dear Mr. Marion:

I am writing in response to your letter dated February 27, 2011, received here on March 2, 2011. Sorry for the delay in getting back to you.

Enclosed for your records, as you requested, are the transcripts and the circuit court records from your case. Also enclosed are the police reports and other records that I received from your former appellate attorney Gerald Lorence. I do not think that I have Donald Sims' indictment papers or the police report that Hanna Sims made regarding the shooting of her home. I do not believe that your concern over the address of the house that was shot up would provide a meritorious appellate issue. If you wish to raise additional issues in your case, you would be able to do so in a motion for relief from judgment (6.500 motion) filed in the trial court after the direct appeal is over (meaning if the Supreme Court denies our applications for leave to appeal.

Sincerely,

Jacqueline J. McCann
Assistant Defender

Enclosures
cc: File

# APPENDIX B

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

HON. MICHAEL CALLAHAN
CASE NO. 09-3275
Trial Date: June 29, 2009

vs.

ALLEN MARION,

Defendant.
_______________________________/

Athina Siringas
Assistant Prosecuting Attorney

Steven Scharg (P43732)
Attorney for Defendant
615 Griswold, Suite 1125
Detroit, Michigan 48226
(313) 962-4090
_______________________________/

**DEFENDANT ALLEN MARION'S ALIBI WITNESS LIST**

Now Comes the Defendant, Allen Marion, by and through his attorney, Steven Scharg, and pursuant to MCR 6.201, submits the following alibi witness for trial:

1. Charles Lewis-19507 Appoline, Detroit, Michigan 48235

2. Arnell-will furnish additional information upon receipt

Respectfully submitted,

Steven Scharg

Steven Scharg (P43732)
Attorney for Defendant
615 Griswold, Suite 1125
Detroit, Michigan 48226
(313) 962-4090

Dated: June 4, 2009

# AFFIDAVIT OF CHARLES A. LEWIS JR.

STATE OF MICHIGAN )
)ss
COUNTY OF OAKLAND )

I, CHARLES A. LEWIS JR., being duly sworn, states that I have known Allen Marion, since about 2004, in regards to both the music business and as a friend. On March 1, 2006, at about 4 PM, I was picked up on Lauder Street, in the City of Detroit, by Allen Marion. The two of us drove to a jewelry store in Hamtramck Michigan; arriving between 4:45 PM and 5 PM Allen Marion looked at some rings. I saw him choose one and make a down payment on a ring by giving money to the owner and receiving a receipt. Over an hour after being there, we left, which was some time after 6 PM and drove to Rochelle Moore's house on Cheyenne in the City of Detroit, arriving between 6:45 PM and 7 PM. On the way home from the jewelry store, we stopped at a party store and bought some alcohol, which when we got to Cheyenne Street, we drank and socialized. I left Rochelle Moore and Allen Marion at about 7:45 PM, when they drove me to my car which was located at the home of Arnell Carmichael, on Lauder Street in the City of Detroit.

Allen Marion was continuously with me from 4 PM to 7:45 PM on March 1, 2006. All of the above information in this matter was told to Steven Scharg, the Attorney representing Allen Marion, prior to his trial.

Further, Deponent sayeth not.

Charles A. Lewis Jr.
Charles A. Lewis Jr.

Subscribed and Sworn to before
me, this 14th day of Dec, 2009

Jennifer A. Moore
Jennifer A. Moore Notary Public
Oakland County, Michigan
My commission expires: 3-26-2015

STATE OF MICHIGAN
IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN

Plaintiff-Appellee

Court of Appeals No. 293440

Lower Court No. 09-3275-01

-vs-

ALLEN MARION

Defendant-Appellant.

_______________________________________/

**AFFIDAVIT**

STATE OF MICHIGAN )
) ss.
COUNTY OF WAYNE )

ZAHER MURRAY, being first duly sworn, deposes and says that:

1. I am the owner of Mirage Jewelry, located at 9710 Joseph Campau in the city of Hamtramck, MI;
2. I have recently been shown a copy of a receipt from my store and a photograph of a woman wearing a diamond ring (see attached);
3. Regarding the receipt: I can say that the handwriting on the receipt is mine. I can also say that the receipt had to date before 2009 because we have changed the look of our receipts since then;
4. The receipt describes a diamond ring and what was paid for it. The diamond ring the woman in the photograph is wearing is consistent with the description on the receipt and its cost and is also consistent with the rings I was selling at the time and still carry in my store;
5. I was also shown a photograph of the defendant, Mr. Marion and recognized him as a customer of my store.

[signature]
ZAHER MURRAY

Subscribed and sworn to before me
this 19 day of [illegible], 2010

[signature]
Notary Public, Wayne County, Michigan
My commission expires: 6/23/2013

# Mirage Jewelry

9701 Joseph Campau • Hamtramck, MI 48212
Phone: (313) 875-9671 • Fax: (313) 872-3009

NO REFUNDS • EXCHANGE ONLY • NO EXCHANGES AFTER 30 DAYS • NO EXCHANGES ON EARRINGS OR SILVER
NO REFUNDS OR EXCHANGES ON SPECIAL ORDERS OR REPAIRS • NO EXCHANGES ON BROKEN ITEMS
20% RESTOCKING FEE ON LAYAWAY ITEMS

CUSTOMER'S ORDER # | DATE 03-1-06

NAME Allen MARION.

ADDRESS

PHONE NUMBER

| SOLD BY | CASH | C.O.D. | CHARGE | RETURN | PAID OUT |
|---|---|---|---|---|---|
| | | | | | |

| QTY. | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| 1 | 14 KT white Gold Diamond | | |
| | Ring w/ 1.10 CTS in Diamond | | |
| | SI H. Color. #2495 | | 1850.00 |
| | | | |
| | | SUB TOTAL | |
| | | TAX | |
| RECEIVED BY | | TOTAL | |

All claims and returned goods MUST be acc

Thank You



# APPENDIX C

02/17/2009 **Arraignment On Information** (Judicial Officer: Callahan, Michael J.)
Resource: Court Rpt/Rec 37 Goldsmith, Jeffrey
Resource: Courtroom Clerk C5918 Artis, Beulah
*Held*

02/26/2009 **Disposition Conference** (Judicial Officer: Callahan, Michael J.)
Resource: Court Rpt/Rec 37 Goldsmith, Jeffrey
Resource: Courtroom Clerk C5918 Artis, Beulah
*Held*

02/26/2009 **Calendar Conference** (Judicial Officer: Callahan, Michael J.)
Resource: Court Rpt/Rec 37 Goldsmith, Jeffrey
Resource: Courtroom Clerk C5918 Artis, Beulah
*Held*

03/20/2009 **Final Conference** (Judicial Officer: Callahan, Michael J.)
Resource: Court Rpt/Rec 37 Goldsmith, Jeffrey
Resource: Courtroom Clerk C5918 Artis, Beulah
*Held*

03/20/2009 Motion (Judicial Officer: Callahan, Michael J. )
*FOR DISCOVERY -- WITHDRAWN BY DEFENSE;*

05/01/2009 *CANCELED* **Pre-Trial**
*Case Disposed/Order Previously Entered*

05/07/2009 **Pre-Trial** (Judicial Officer: Callahan, Michael J.)
Resource: Court Rpt/Rec 37 Goldsmith, Jeffrey
Resource: Courtroom Clerk C5918 Artis, Beulah
*Adjourned at the Request of the Prosecutor*

05/07/2009 Request to Reschedule (Judicial Officer: Callahan, Michael J. )

05/11/2009 *CANCELED* **Jury Trial**
*Case Disposed/Order Previously Entered*

06/29/2009 **Jury Trial** (Judicial Officer: Callahan, Michael J.)
Resource: Court Rpt/Rec 37 Goldsmith, Jeffrey
Resource: Courtroom Clerk C5948 Parsons, Patricia
*In Progress*

06/30/2009 **Jury Trial in Progress** (Judicial Officer: Callahan, Michael J.)
Resource: Court Rpt/Rec 37 Goldsmith, Jeffrey
Resource: Courtroom Clerk C5948 Parsons, Patricia
*In Progress*

07/01/2009 **Jury Trial in Progress** (Judicial Officer: Callahan, Michael J.)
Resource: Court Rpt/Rec 37 Goldsmith, Jeffrey
Resource: Courtroom Clerk C5948 Parsons, Patricia
*In Progress*

07/02/2009 **Jury Trial in Progress** (Judicial Officer: Callahan, Michael J.)
Resource: Court Rpt/Rec 37 Goldsmith, Jeffrey
Resource: Courtroom Clerk C5948 Parsons, Patricia
*Held*

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

Case No. 09-3275
HON. MICHAEL CALLIHAN

vs.

ALLEN MARION,

Defendant.
_______________________________/

ATHINA T. SIRINGAS (P35761)
Assistant Prosecuting Attorney

Steven Scharg (P43732)
Attorney for Defendant
615 Griswold, #1125
Detroit, Michigan 48226
(313) 962-4090
_______________________________/

withdrawn at this time

DEFENDANT MARION'S MOTION FOR DISCOVERY

Now Comes Defendant, Allen Marion Scott, by and through his attorney, Steven Scharg, and in accordance with Rule 6.201 of the Michigan Court Rules requests the following material and information:

1. Defendant is charged in the Information in Count One: Premeditated Murder First Degree, Count Two: Felon in Possession of a Firearm, and Count Three: Felony Firearm.

2. Witness, Donald Sims, claims to have observed the homicide at issue on or about March 1, 2006.

3. Witness, Donald Sims, was arrested by the United States Drug Enforcement Administration on May 23, 2006 for an Indictment in the United States District Court-Eastern District for Conspiracy to Distribute Marijuana.

4. Witness, Donald Sims, being a felon, had a handgun at his home as well as a stolen car in his driveway when the DEA came to arrest him.

5. That at the time of his arrest agents asked Witness Sims whether he would want to cooperate with law enforcement with regard to the homicide of Joseph Day.

6. At the time of the preliminary examination on February 9, 2009, Witness claimed he did not recall how his cooperation evolved or the number of times he met with federal or local authorities.

7. Defendant, Allen Marion, is requesting that the Wayne County Prosecutor's Office produce the following prior to trial:

a. How many times did Witness Sims meet with Federal Officers and the dates of said meetings;

b. When Witness Sims first claimed to know something about the homicide in question and what dates did he give any information regarding the Day homicide to either Federal or Local Police Agencies.

c. Whether any Federal or Local Police Agency ever rejected any proffered information as untrue or unreliable as to any communication given by Witness Sims with regard to the homicide of Joseph Day.

d. What threats, express or implied, were made to Witness Sims as well as any promises made by any Federal Agent, Attorney, Local Officer, or Prosecutor whether

verbal or in writing.

e. A copy of any Kastigar letter concerning his proffer and cooperation.

f. Whether or not a federal government motion for a substantial assistance departure is contingent on a successful result in this case or any other.

g. Whether or not Witness Sims has provided any information which has proven or determined to be untrue.

Respectfully submitted,

Steven Scharg (P43732)
Attorney for Defendant
615 Griswold, Suite 1125
Detroit, Michigan 48226
(313) 962-4090

Dated: March 18, 2009

Order:

Supreme Court

294421
JJM

# Order

Michigan Supreme Court
Lansing, Michigan

July 25, 2011

142726 & (64)

Robert P. Young, Jr.,
Chief Justice

Michael F. Cavanagh
Marilyn Kelly
Stephen J. Markman
Diane M. Hathaway
Mary Beth Kelly
Brian K. Zahra,
Justices

PEOPLE OF THE STATE OF MICHIGAN,
Plaintiff-Appellee,

v

SC: 142726 & (64)
COA: 293440
Wayne CC: 09-003275-FC

ALLEN MARION,
Defendant-Appellant.

_______________________________________/

On order of the Court, the motion to file pro per supplement to application is GRANTED. The application for leave to appeal the January 11, 2011 judgment of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court.

RECEIVED

JUL 26 2011

APPELLATE DEFENDER OFFICE

SEAL OF THE MICHIGAN SUPREME COURT · LANSING · EXECUTE JUSTITIAM · POSITE

I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

July 25, 2011

Corbin R. Davis
Clerk

h0718

**STATE OF MICHIGAN**

**IN THE SUPREME COURT**

**PEOPLE OF THE STATE OF MICHIGAN**

Plaintiff-Appellee,

**Supreme Court No.** ________

-vs-

**Court of Appeals No.** 293440

**ALLEN MARION**

**Lower Court No.** 09-3275-01

Defendant-Appellant.

_______________________________________/

**WAYNE COUNTY PROSECUTOR**
Attorney for Plaintiff-Appellee

_______________________________________

**STATE APPELLATE DEFENDER OFFICE**
Attorney for Defendant-Appellant

_______________________________________/

# DEFENDANT-APPELLANT'S

# APPLICATION FOR LEAVE TO APPEAL

**STATE APPELLATE DEFENDER OFFICE**

**BY: JACQUELINE J. MCCANN (P58774)**
**Assistant Defender**
3300 Penobscot Building
645 Griswold
Detroit, Michigan 48226
(313) 256-9833

IV. MR. MARION SHOULD BE GRANTED A NEW TRIAL WHERE NEWLY DISCOVERED EVIDENCE THAT CORROBORATES HIS ALIBI WAS DISCOVERED AFTER HIS SENTENCING IN THIS MATTER. IF TRIAL COUNSEL HAD BEEN AWARE OF THIS EVIDENCE BEFORE, TRIAL COUNSEL WOULD HAVE PRESENTED THE ALIBI DEFENSE AT TRIAL. THIS COURT SHOULD REMAND FOR AN EVIDENTIARY HEARING AND TO ALLOW MR. MARION TO MOVE FOR NEW TRIAL. ..... 32

SUMMARY AND REQUEST FOR RELIEF ..... 35

# TABLE OF AUTHORITIES

## CASES

*Berger v United States*, 295 US 78; 55 S Ct 629; 79 L Ed 1314 (1935) ........ 29

*Crawford v Washington*, 541 US 36; 124 S Ct 1354; 158 L Ed 2d 177 (2004) ........ 19

*Darden v Wainwright*, 477 US 168; 106 S Ct 2464; 91 L Ed 2d 144 (1986) ........ 29

*Davis v Washington*, 547 US 813; 126 S Ct 2266; 165 L Ed 2d 224 (2006) ........ 19

*Donnelly v Christoforo*, 416 US 637; 94 S Ct 1868; 40 L Ed 2d 431 (1974) ........ 29

*Kimmelman v Morrison*, 477 US 635; 106 S Ct 2574; 91 L Ed 2d 305 (1986) ........ 20

*People v Bahoda*, 448 Mich 261; 531 NW2d 659 (1995) ........ 29

*People v Boske*, 221 Mich 129 (1922) ........ 30

*People v Bryant*, 483 Mich 132; 768 NW2d 65 (2009) ........ 19

*People v Carines*, 460 Mich 750; 597 NW2d 130 (1999) ........ 16; 21; 23, 26, 28

*People v Clark*, 124 Mich App 410 (1983) ........ 25

*People v Cress*, 468 Mich 678 (2003) ........ 32

*People v Daniel*, 469 Mich 409; 670 NW2d 659 (2003) ........ 18

*People v Darden*, 230 Mich App 597 (1998) ........ 32

*People v Erb*, 48 Mich App 622; 211 NW2d 51 (1973) ........ 30

*People v Ginther*, 390 Mich 436 (1973) ........ 16; 23; 28

*People v Haines*, 105 Mich App 213; 306 NW2d 455 (1981) ........ 29

*People v Humphreys*, 24 Mich App 411 (1970) ........ 30

*People v Kelly*, 231 Mich App 627 (1998) ........ 24

*People v Knox*, 469 Mich 502 (2004) ........ 16; 21; 23, 26

*People v LeBlanc*, 465 Mich 575 (2002) .......... 16; 23; 28

*People v Lester*, 232 Mich App 262 (1998) .......... 32

*People v Lukity*, 460 Mich 484; 596 NW2d 607 (1999) .......... 15; 16; 21, 22; 26

*People v Moore*, 161 Mich App 615; 411 NW2d 797 (1987) .......... 15

*People v Pfaffle*, 246 Mich App 282; 632 NW2d 162 (2001) .......... 28

*People v Pickens*, 446 Mich 298; 521 NW2d 797 (1994) 20; 26; 30

*People v Sabin (After Remand)*, 463 Mich 43 (2000) .......... 24

*People v Sholl*, 453 Mich 730 (1996) .......... 24

*People v Smith*, 106 Mich App 203 (1981) .......... 25

*People v Thomas*, 184 Mich App 480 (1990) .......... 20

*People v Ullah*, 216 Mich App 669 (1996) .......... 20

*People v Williams*, 223 Mich App 409 (1997) .......... 16; 23; 28

*Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984) .......... 16; 20; 21, 23; 26; 28; 30

*United States v Hawkins*, 969 F2d 169 (CA 6, 1992) .......... 32; 34

*United States v Seago*, 930 F2d 482 (CA 6, 1991) .......... 32

*Washington v Hofbauer*, 228 F 3d 689 (CA 6, 2000) .......... 29; 30

**CONSTITUTIONS, STATUTES, COURT RULES**

US Const, Amend. V, XIV .......... 29

US Const, amends VI, XIV .......... 19, 20, 26, 30

Const 1963, art 1, § 20 .......... 19; 20; 26, 29; 30

MCL 750.224(f) .......... 1

MCL 750.227(b) .......... 1

MCL 750.316(1) .......... 1

MCL 750.317 .......... 1

MCL 769.11 .......... 1

MCR 7.302(C)(6); MCR 7.316(7) .......... 32

MRE 103(a) .......... 15

MRE 401 .......... 24

MRE 402 .......... 24

MRE 403 .......... 24

MRE 404b .......... 24

MRE 801(c) .......... 17; 18

MRE 802 .......... 17

MRE 803 .......... 18

MRE 803A .......... 19

And MRE 804 .......... 19

MRE 803A; MRE 804 .......... 18

## JUDGMENT APPEALED FROM AND RELIEF SOUGHT

Defendant-Appellant Allen Marion appeals the January 11, 2011 Court of Appeals' decision affirming his jury trial convictions entered in the Wayne County Circuit Court. *People v Allen Marion,* unpublished opinion per curiam of the Court of Appeals, issued January 11, 2011 (Docket No. 293440)(**Appendix A**). This application raises issues that involve legal principles of major significance to the state's jurisprudence. MCR 7.302(B)(3). Further, the Court of Appeals' decision on these issues is clearly erroneous and will cause material injustice to Mr. Marion. MCR 7.302(B)(5). He asks that this Honorable Court grant leave to appeal or take other appropriate action, including but not limited to remanding for an evidentiary hearing and to allow him to move for new trial. Ultimately, he seeks a new trial.

## STATEMENT OF QUESTIONS PRESENTED

I. IS DEFENDANT MARION ENTITLED TO A NEW TRIAL WHERE HEARSAY WAS ADMITTED THROUGH THE OFFICER-IN-CHARGE'S TESTIMONY, IN VIOLATION OF STATE EVIDENTIARY RULES AND IN VIOLATION OF THE DEFENDANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO CONFRONTATION? IS HE ALSO ENTITLED TO A NEW TRIAL BECAUSE TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE, UNDER THE STATE AND FEDERAL CONSTITUTIONS, IN FAILING TO OBJECT TO THE ADMISSION OF THIS EVIDENCE ON CONFRONTATION GROUNDS AND IF THIS COURT FINDS THAT HE NEEDED TO KEEP OBJECTING ON HEARSAY GROUNDS AFTER THE TRIAL COURT'S RULING ON HIS INITIAL OBJECTION?

Court of Appeals answers, "No".

Defendant-Appellant answers, "Yes".

II. DID THE TRIAL COURT REVERSIBLY ERR IN ADMITTING EVIDENCE THAT GRANDMA HANNAH SIMS' HOME HAD BEEN SHOT AT A FEW DAYS PRIOR TO THE PRELIMINARY EXAMINATION IN THIS CASE ABSENT EVIDENCE THAT DEFENDANT MARION HAD DIRECTED IT? ALTERNATIVELY, DID THE TRIAL COURT REVERSIBLY ERR IN FAILING TO GIVE A LIMITING INSTRUCTION ON HOW THIS EVIDENCE COULD BE CONSIDERED AND DID TRIAL COUNSEL RENDER INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO REQUEST ONE?

Court of Appeals answers, "No".

Defendant-Appellant answers, "Yes".

III. DID THE PROSECUTOR'S MISCONDUCT IN CLOSING ARGUMENT, USING OFFICER-IN-CHARGE ZWICKER'S TESTIMONY COMPLAINED OF IN ISSUE I FOR THE TRUTH OF THE MATTER ASSERTED AND IMPROPERLY BOLSTERING AND VOUCHING FOR HER MAIN WITNESS'S CREDIBILITY, VIOLATE DEFENDANT MARION'S STATE AND FEDERAL CONSTITUTIONAL DUE PROCESS RIGHTS TO A FAIR TRIAL? IS DEFENDANT MARION ALSO ENTITLED TO A NEW TRIAL BECAUSE TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE, UNDER THE STATE AND FEDERAL CONSTITUTIONS, IN FAILING TO OBJECT TO THE IMPROPER ARGUMENTS?

Court of Appeals answers, "No".

Defendant-Appellant answers, "Yes".

**IV. SHOULD MR. MARION BE GRANTED A NEW TRIAL WHERE NEWLY DISCOVERED EVIDENCE THAT CORROBORATES HIS ALIBI WAS DISCOVERED AFTER HIS SENTENCING IN THIS MATTER? IF TRIAL COUNSEL HAD BEEN AWARE OF THIS EVIDENCE BEFORE, TRIAL COUNSEL WOULD HAVE PRESENTED THE ALIBI DEFENSE AT TRIAL. SHOULD THIS COURT REMAND FOR AN EVIDENTIARY HEARING AND TO ALLOW MR. MARION TO MOVE FOR NEW TRIAL?**

Court of Appeals answers, "No".

Defendant-Appellant answers, "Yes".

# STATEMENT OF FACTS

On July 2, 2009, Defendant-Appellant Allen Marion was jury convicted of second-degree murder,[1] MCL 750.317, felon in possession of a firearm, MCL 750.224(f), and felony firearm, MCL 750.227(b), in the Wayne County Circuit Court, before the Honorable Michael J. Callahan. (T IV 57-58).[2] On July 21, 2009, the trial court sentenced Mr. Marion, as a habitual offender – third, MCL 769.11, to concurrent prison terms of 600 to 900 months (50 to 75 years) for the murder conviction and 12 to 60 months for the felon in possession conviction, consecutive to the mandatory two-year prison term for the felony firearm conviction, with credit for time served. (Judgment of Sentence; S II 6).[3] The charges arose after Donald "Ricardo" Sims was arrested by federal authorities on drug charges in May 2006, and offered up information in December 2006 that, on March 1, 2006, he had witnessed the shooting of Joseph Day, whom he thought of as his brother-in-law.

On March 1, 2006, around 5:40 pm, two Detroit Police officers arrived at 19614 Pelkey Street in response to a dispatch about a shooting in the area. (T II 12-13). It was a high crime area known for drugs and with many vacant houses. (T II 20). Upon arrival, they observed an uncommunicative Joseph Day lying on the sidewalk in front of the 19614 address suffering from gunshot wounds, with between ten to fifteen people standing around him. (T II 13-15, 21-22). A neighbor, Phillip Yeager, told one of the officers that he had heard three to four gunshots, from inside his home on Manning street, which intersects Pelkey street, and when he

---

[1] Defendant was acquitted of the original charge of first-degree premeditated murder, MCL 750.316(1)(a). (T IV 57).

[2] Trial transcript references will be as follows: "T I" refers to the first day, June 29, 2009; "T II" refers to the second day, June 30, 2009; "T III" refers to the third day, July 1, 2009; and "T IV" refers to the fourth day, July 2, 2009.

[3] Sentencing transcript references will be as follows: "S I" refers to the first day, July 17, 2009; and "S II" refers to the second day, July 21, 2009.

went outside he observed Mr. Day lying on the sidewalk. (T II 13-14, 25-28, 32). None of the others present in the area around Mr. Day offered any information about the shooting to the police officers. (T II 14, 17, 24). Four individuals standing in front of 19600 Pelkey, next door, refused to give the police any information. (T II 24, 29). Despite canvassing the surrounding area, including homes, to find possible eyewitnesses, the police were unable to elicit any information relating to the identity of the assailant, how the assailant came to be there, or anything else helpful to their investigation. (T II 17, 28-29). And no one they spoke with acknowledged knowing the shooting victim or where he lived. (T II 28-29). In the police report, the officers indicated the suspected shooter was "unknown." (T II 22).

At the scene, the police recovered and preserved three - 9 mm cartridge casings from the ground beside Mr. Day. (T II 16, 25, 29, 31). The casings still had "9mm" embroidered into them. (T II 25). No casings from an AK-47 firearm were found in the surrounding area by the responding officers. (T II 26, 30-31). No evidence technicians were called to the scene because it was not a homicide case at the time. (T II 30-31). Yet, at trial, a Michigan State Police ballistics expert, Reinhard Pope, testified that the evidence presented to him supposedly from this shooting scene consisted of one fired .380 bullet and three .380 cartridge casings. (T III 5). Pope could not say whether or not one or two weapons had fired the .380 bullet and .380 casings. (T III 6-7). Neither 9 mm nor .380 bullets can be fired from an AK-47. (T II 25; T III 12). Pope testified that an AK-47 would typically eject cartridge cases as it was fired, and can eject them a distance of up to 9 to 10 feet away. (T III 12-13).

Joseph Day suffered three gunshot wounds: one to the lower left abdomen, one to the right lower buttock, and one to the back of his right calf. (T II 7-9). He died twelve days after being shot as the result of multiple medical complications caused by his bullet wounds. (T II 7-8).

On May 23, 2006, Donald "Ricardo" Sims' home was searched and he was arrested on drug and weapons charges by federal law enforcement authorities.[4] (T II 109-110, 167, 169). At Mr. Marion's trial, Ricardo claimed that he explained to his arresting officers that he had a gun in his home for protection because his brother-in-law had just been killed. (T II 110). Ricardo claimed that he told the officer that he had witnessed the killing but that he did not want to say more. (T II 110-112, 177). The authorities also found a stolen car in Ricardo's garage. (T II 170).

Joseph Day was the father of the children of Ricardo's sister. (T II 114, 144). Ricardo testified that he had known Mr. Day for about 15 years, they were close to each other, and he would see Mr. Day whenever Mr. Day came to Detroit. (T II 114, 144). Ricardo testified that Mr. Day was in the business of selling marijuana. (T II 115, 145). Ricardo acknowledged that he had been in the same line of work, selling large quantities at one time, until his federal indictment. (T II 145).

In regard to the day of Mr. Day's shooting, March 1, 2006, Ricardo testified that he was present along with a bunch of other people when Mr. Day was shot in broad daylight between 1 and 2 pm on Pelkey Street by Defendant Marion and another man. (T II 112-113, 132). Ricardo testified that his sister had just moved out of 19600 Pelkey, but that his family and Mr. Day still frequented the home. (T II 113). Mr. Day lived in Battle Creek, Michigan, however. (T II 114).

[4] Following his arrest on May 23, 2006 by federal authorities, Ricardo was eventually released on a personal bond and remained on bond until sentencing. (T II 176).

Ricardo had met Mr. Marion on two or three prior occasions, at the Pelkey house, in 2004 and/or 2005. (T II 143-144).

According to Ricardo, the events that led to Mr. Day's death began the day before. (T II 115). Ricardo testified that Mr. Day told him that something had happened and he needed Ricardo to accompany him to Battle Creek. (T II 114-115). The two men rented a car and left the Detroit area for Battle Creek around 10 pm. (T II 115). Ricardo testified that Mr. Day told him the following: Mr. Day had been to Arizona recently to buy marijuana and brought it back to Battle Creek; Mr. Day was supposed to deliver the marijuana to Mr. Marion, aka "Black"; Mr. Day's friend "Pee Wee" or "Sweet Pea" had broken into the homes of two women (Shanell and Erin), who acted as Mr. Day's drug mules in the driving trips between Arizona and Michigan, in Battle Creek and taken the marijuana; Mr. Day wanted Ricardo to go to Battle Creek with him to look for Pee Wee and the missing drugs. (T II 115-121, 123, 125). Ricardo testified that he and Mr. Day arrived at a Denny's restaurant parking lot in Battle Creek around 11 pm or midnight, where Mr. Marion and a few others were waiting in an old short Chevy van. (T II 118-119). Ricardo saw Mr. Day speak with Mr. Marion, but Ricardo was not a party to the conversation. (T II 121). Ricardo went into the Denny's and used the restroom. (T II 121). Ricardo testified that Mr. Day told him that Mr. Marion and the others with him in the van were looking for the missing drugs. (T II 121-122).

Ricardo testified that he never spoke with Mr. Marion about drugs; Ricardo only spoke with Mr. Day about the drugs. (T II 123). Ricardo acknowledged that he was not present whenever Mr. Day spoke with Mr. Marion and that no one can verify the truth of what he is saying about what Mr. Day told him. (T II 151).

Ricardo testified that after the meeting in the Denny's parking lot, they all drove around Battle Creek to a couple different locations where Pee Wee was supposed to be found. (T II 124). At one point, Ricardo told Mr. Marion that he needed to have Mr. Day take them to the home of the mother of Pee Wee's children. (T II 124). Ricardo testified that Mr. Marion stated that Mr. Day was playing. (T II 124). That was the only conversation that Ricardo had with Mr. Marion. (T II 126). Mr. Day and Ricardo then escorted Mr. Marion's group to back to the entrance to the I-94 freeway and Mr. Marion's group departed. (T II 126). Mr. Day and Ricardo were themselves only in Battle Creek for 30 to 40 minutes. (T II 126).

Ricardo and Mr. Day then drove to Lansing following the two mules, Shanell and Erin, who were driving in a separate vehicle. (T II 126). During this drive, Mr. Day told Ricardo that he (Day) had actually taken the marijuana that was missing in retaliation for Mr. Marion not giving him as much money as Mr. Day believed he was entitled to for the drug runs. (T II 158-159). Ricardo returned to Detroit by himself. (T II 126).

Ricardo testified that the next morning, on March 1, 2006, Mr. Day called him and asked Ricardo pick him up at an exit of I-696. (T II 127). Ricardo picked Mr. Day up around 11 am and they went over to Pelkey Street in Detroit. (T II 127). Ricardo testified that Mr. Day had told him, on the drive from Battle Creek to Lansing the night before, that "they" thought that Mr. Day had given the missing marijuana to Ricardo. (T II 127, 151-152). Ricardo testified that he called Mr. Marion and asked him what was going on and that Mr. Marion told him that he would be over to Pelkey Street in a minute. (T II 128).

Ricardo testified that a short time later, Mr. Marion arrived in the same van from the night before and parked across the street from the house, and that a gold Cadillac pulled up with the van and parked behind it. (T II 128). According to Ricardo, as Mr. Marion walked up to the

house, Ricardo grabbed his arm and told him that he wanted his name out of this business. (T II 129, 153). Ricardo testified that Mr. Marion replied that his man just did not know who Ricardo was, and then Mr. Marion walked into the house where Mr. Day was waiting. (T II 129, 153, 156-157). Ricardo remained outside with ten to fifteen other people. (T II 129, 153-154).

After about five minutes, the two men came outside and Mr. Marion walked to the van. (T II 130). Ricardo testified that Mr. Day told him that he was going to go and follow Mr. Marion and the others in his own car. (T II 130). According to Ricardo, "they" told Mr. Day that he was taking too long and to come along. (T II 130). Ricardo testified that Mr. Marion and another man got out of the van and walked towards Mr. Day while holding handguns. (T II 131-132).

Ricardo testified that Mr. Marion and the other man reached out for Mr. Day and then, when Mr. Day pulled away, one or the other, or both of them, shot Mr. Day three to four times. (T II 132, 159, 161-162). According to Ricardo, two other men got out of the van holding AK-47 assault rifles and one of them started firing the assault rifle. (T II 133, 162). The crowd ran, including Ricardo. (T II 133, 135). At trial, Ricardo identified one of the two assault rifle gunman as a man named Jamal Jackson aka Jay Diego. (T II 133-134).

Ricardo testified that Phillip Yeager had been standing right by Mr. Day when Mr. Day was shot. (T II 135). Mr. Yeager was the neighbor who told the responding police officers that he heard the shots from inside his home at the intersection of Manning and Pelkey Streets. (T II 13-14, 25-28, 32). Ricardo testified that multiple people were present when Mr. Marion and the other man shot Mr. Day, including Yeager, Karey Sims (Ricardo's cousin), and Carnell Sims. (T II 135-136, 153). Ricardo returned to the shooting scene a short time later and saw Mr. Day laying on the ground, alive, but not speaking or moving. (T II 135).

Ricardo claimed that when the police arrived, he spoke with the police, identified himself to them, and told them this was his home. (T II 136). Ricardo claimed that while standing in the driveway of his mother's house (19600 Pelkey) the police asked him what happened, and he told them that some guys pulled up, had a few words, and shot Day. (T II 136-137). Someone identified Mr. Day by name to the police. (T II 164). Ricardo testified that he did not tell the police anyone else's identity though, including that he did not identify Mr. Marion. (T II 137, 165). No one accompanied Mr. Day to the hospital. (T II 164).

Ricardo testified that while Mr. Day was in the hospital Mr. Marion called him and told him that he did not want Mr. Day to die, and that Mr. Marion asked Ricardo why Mr. Day had tried "to play him like that." (T II 123). Ricardo answered that he did not know. (T II 123). Ricardo claimed that Mr. Marion threatened that if anyone came his way as a result of the shooting, Mr. Marion would release the gorillas. (T II 142). Ricardo testified that they later saw each other at a cabaret and had a similar conversation, though in this one, Mr. Marion told him that his cousin shot Mr. Day. (T II 141).

* On December 8, 2006, 9 months after the shooting and almost 7 months after his arrest on federal charges, Ricardo gave a statement to the officer in charge of this case, Officer Zwicker, and, for the first time, identified Mr. Marion to the police as one of the people who shot Mr. Day.[5] (T II 137-138, 166-167). At this meeting with Officer Zwicker, Ricardo identified Mr. Marion's photograph from a photo array. (T II 138-139). Ricardo only gave the names of Phillip Yeager and Carnell Sims, Ricardo's brother, to Zwicker as people who could confirm his story. (T II 79, 182). Ricardo acknowledged that but for his arrest, he probably never would have given the police information about Mr. Day's shooting. (T II 188).

---

[5] Ricardo claimed that he had told his sister, who was the mother of Mr. Day's children, that Mr. Marion shot Day back on the day of the shooting. (T II 183-184).

At first Ricardo testified that at the time of his December 8, 2006 statement, he had no formal agreement with law enforcement authorities and was not yet cooperating with them. (T II 138). On cross-examination, Ricardo acknowledged that his statement to Officer Zwicker was part of a debriefing about his past that was part of his Rule 11 plea agreement and attended by his attorney. (T II 176). Ricardo's plea agreement, called a Rule 11 plea agreement, with federal authorities included a term that his truthful cooperation on other investigations would be taken into account in the final determination of his sentence in the federal system. (T II 139-140, 176, 178). Ricardo had pled guilty to a conspiracy that lasted from 1998 to 2004 to sell large quantities of marijuana in the Detroit area. (T II 146). Ricardo understood that his current sentence of 84 months could be reduced in the final determination based on his cooperation in the instant case. (T II 140, 180).

At trial, Philip Yeager testified that when Mr. Day was shot on March 1, 2006, he (Yeager) was neither in his home[6] down the street at the corner of Manning and Pelkey, as a police officer who responded to the scene recalled him saying,[7] nor standing anywhere near Mr. Day, as Ricardo Sims claimed. (T II 34, 38-40). Mr. Yeager testified that in actuality he was outside, but that he was three houses down the block at the corner of Manning and Pelkey, when Mr. Day was shot. (T II 38-40, 44, 57). Mr. Yeager thought he recalled seeing Ricardo Sims down in the area where Mr. Day was shot beforehand, but Yeager did not actually go down there until after Mr. Day was shot. (T II 39). Mr. Yeager observed a van pull down the street, heard raised voices as if there was an argument, saw people who were armed with guns come from a vehicle further down the street, saw one person in particular come around the last vehicle parked

[6] It was actually his mother's home. (T II 34).

[7] Mr. Yeager testified that he did not believe that he told the responding officers that he was inside his/his mom's house when he heard the shots. (T II 54).

in the street and start shooting, and heard 3 to 4 shots. (T II 42, 46-47, 59-64, 78). But, Mr. Yeager could not identify the shooter or shooters. (T II 43, 46, 52). Mr. Yeager testified that he called 9-1-1 after the shooting and went to assist. (T II 43, 48-50). After the shooting, Mr. Yeager saw Ricardo and Carnell Sims at the scene along with a lot of other people. (T II 49).

Almost two years after the shooting, on January 18, 2008, Mr. Yeager, along with Carnell Sims, went to the home of Grandma Hannah Sims, and spoke with Officer Zwicker, who was at the house with Ricardo Sims. (T II 72-74, 103-104). At trial, Mr. Yeager testified that he told Officer Zwicker there that he did not see the shooting, did not know what had happened, and could not remember some things. (T II 42, 74-75). Mr. Yeager testified that Zwicker kept asking him questions that he could not answer, put words in his mouth, and that he eventually just signed the statement. (T II 42, 44, 48, 75-78). Mr. Yeager testified that as an example he had no recollection of what kind of van it was, but nonetheless the officer wrote in the statement that it was a Chevy. (T II 77-78). The officer wrote out the statement and Mr. Yeager signed it. (T II 70-71, 74-76). Mr. Yeager testified that he did not read it over before he signed it, but that it appeared to him now to be generally, though not entirely, consistent with his recollection. (T II 75-79). In his police statement on January 18, 2008, Mr. Yeager described the shooter as short and black. (T II 48). Mr. Yeager testified that he is 6' 1", so everyone is short to him. (T II 75).

Carnell Sims, 24-years-old, testified that he had known Joseph Day, the father of Carnell's sister's children, for almost 20 years and cared for him. (T II 80, 97). When the prosecution called him to the stand, he denied that he gave and signed a statement to the police in January 2008 at his grandmother's house, though his alleged statement accurately noted his date of birth, his social security number, and the fact that he had one child, named Ryan. (T II 82-83, 85-86, 103). The alleged statement lacked Carnell's signature and did not accurately list his

place of employment. (T II 84). The prosecutor read Carnell's alleged statement to the jury and into the record, which stated that a green van and a gold SPS pulled up, "Black" exited the van, Black went inside the house with Mr. Day, Black came outside again and spoke with men in the van, one of those men pointed an assault rifle at the people present, Black and another man stood in front of Mr. Day, Black had a handgun, Carnell heard shots and ran away with his brother Ricardo, and the fourth man from the van started shooting at them, and which also indicated that Carnell identified Black in a photo array that he was shown. (T II 86-90). Carnell denied any recollection of such events or giving such a statement, though he acknowledged that he, Ricardo, and many others were present when Mr. Day was shot. (T II 86-89, 95-96). Carnell denied having been shown the photo array before and denied that he identified Mr. Marion's photo as that of Black. (T II 90-93).

Carnell denied seeing the shooting and denied knowing who shot Mr. Day. (T II 98-100). Carnell testified that he was actually a little ways down the street when the shooting occurred, and did not see it. (T II 99, 101). Carnell denied that he had ever seen Mr. Marion before, and testified that he did not know whether or not Mr. Marion was present at Mr. Day's shooting. (T II 104-105). Carnell also denied knowing whether or not Mr. Day and/or Ricardo were drug dealers. (T II 97-98).

Officer-in-charge Zwicker testified that he was assigned to the case on March 12, 2006 after Mr. Day died. (T III 14-15). He and other officers returned to the shooting scene and did not find any shell casings for an AK-47. (T III 44).

Over objection, Officer Zwicker testified that early on in his investigation family members of Mr. Day, e.g. his parents and a cousin or two, gave him information they had learned about a possible suspect's nickname, "Black", and possible witnesses, Ricardo Sims, another

Sims, and Yeager. (T III 16-18). Based on the information provided by Mr. Day's family, Zwicker ran Mr. Marion's name through LEIN back on March 24, 2006 and obtained his photograph. (T III 24-25). Zwicker testified that he also received information from these same family members about two women, Shanell Nelms and Erin Crim, in regard to a possible motive that involved a narcotics transaction originating in Arizona and ending in Battle Creek. (T III 19-20). As a result, Zwicker contacted the Battle Creek Police Department and that police agency sent him copies of police reports on March 28, 2006 that were in regard to breaking and enterings at two residences associated with Erin Crim that occurred on February 28, 2006. (T III 20-21, 42). Zwicker testified that somebody was looking for something at Erin Crim's residence. (T III 20). Mr. Marion's name is not mentioned in the Battle Creek police reports, and Zwicker had nothing official that said Mr. Marion was involved in those breaking and enterings. (T III 37-38). According to Zwicker, Erin Crim and Shanell Nelms had left Michigan and he never spoke with them. (T III 29). Based on information that he received from others, Zwicker believed that the two women were drug mules. (T III 29). Zwicker testified that Ricardo Sims' statement to him on December 8, 2006 at the federal building confirmed that information that he had received from Day's family and from the Battle Creek Police Department. (T III 21-22).

At some point, Zwicker found a photograph of Mr. Marion and Jay Diego, aka Jamal Jackson, on the internet, and placed Jackson's photo in a photo array to show Ricardo; Ricardo identified Jackson as being the man who shot the AK-47 at the scene of Mr. Day's shooting. (T III 47-49). An arrest warrant was obtained for Jamal Jackson, but he had not yet been arrested. (T III 49).

Zwicker confirmed that he eventually spoke with Carnell Sims at the home of a Sims' family member (Grandma), and testified that Ricardo may have been walking around in the house while they spoke. (T III 26-28, 44). Zwicker testified that the answers he wrote on Carnell Sims' statement came from Carnell and that Carnell signed the statement. (T III 27). Zwicker testified that the same was true of Phillip Yeager, though Yeager did not have much to say. (T III 27-28). According to Zwicker, Carnell identified Mr. Marion as the shooter from a photo array he showed him during the questioning. (T III 31-32).

Over objection, Grandma Hannah Sims was allowed to testify regarding her home being shot at on February 7, 2009, two days before the preliminary examination in this case was scheduled to take place. (T II 3-4, 106-108, 188-190; T III 50-57). Grandma Sims testified that there were 18 shell casings on her porch from bullets fired at her front door, but the police who responded found no shell casings and only five bullet holes. (T III 52, 55; T IV 8-9). Beyond the significance of the date, there was no evidence connecting the shooting at Grandma Sims' home to this case. Ricardo Sims had given information to the federal authorities on other matters too. (T III 37). The trial court also denied the defense's motion for mistrial based on the admission of this evidence. (T IV 3-5).

The parties stipulated that Mr. Marion had a prior felony conviction and was thus ineligible to possess a firearm. (T II 58).

Mr. Marion appealed by right. The Court of Appeals denied his motion to remand in an order dated November 30, 2010 and upheld his convictions in an opinion dated January 11, 2011. (Appendix A, COA Opinion, 1/11/11; Appendix B, COA Order, 11/30/10). Mr. Marion now seeks leave to appeal, or other appropriate relief, in this Honorable Court.

## I. DEFENDANT MARION IS ENTITLED TO A NEW TRIAL WHERE HEARSAY WAS ADMITTED THROUGH THE OFFICER-IN-CHARGE'S TESTIMONY, IN VIOLATION OF STATE EVIDENTIARY RULES AND IN VIOLATION OF THE DEFENDANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO CONFRONTATION. HE IS ALSO ENTITLED TO A NEW TRIAL BECAUSE TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE, UNDER THE STATE AND FEDERAL CONSTITUTIONS, IN FAILING TO OBJECT TO THE ADMISSION OF THIS EVIDENCE ON CONFRONTATION GROUNDS AND IF THIS COURT FINDS THAT HE NEEDED TO KEEP OBJECTING ON HEARSAY GROUNDS AFTER THE TRIAL COURT'S RULING ON HIS INITIAL OBJECTION.

**Introduction**

Improper hearsay evidence was admitted through the testimony of the officer-in-charge, Officer Zwicker, to try to corroborate the testimony of the prosecution's main witness Donald "Ricardo" Sims. Ricardo Sims came forward, gave information, and testified as part of a plea agreement with federal authorities, and the defense vigorously challenged his testimony that accused Mr. Marion of being involved in an elaborate drug operation that went wrong and killing Joseph Day. However, Mr. Marion had no opportunity to confront and challenge those individuals who allegedly gave information, much of that already second hand from an unknown source or sources, to Officer Zwicker. This non-confronted hearsay testimony denied Mr. Marion a fair trial.

**Factual Background**

Officer Zwicker testified that early on in his investigation he spoke with family members of Mr. Day, e.g. his parents and a cousin or two, and they gave him information they had learned about a possible suspect's nickname, "Black".[8] (T III 16-17). Defense Counsel objected on

---

[8] Ricardo Sims testified that Mr. Marion was known to him as Black.

hearsay grounds and asked that the answer be stricken. (T III 17-18). The trial court acknowledged that there was no investigation exception to the rule prohibiting the admission of hearsay, but indicated to counsel that the information was not really being admitted for the truth of the matter asserted. (T III 17-18). The trial court asked the officer to try to limit his testimony to what he did, but the court did not strike the officer's testimony. (T III 17-18).

Officer Zwicker continued to offer hearsay testimony, but trial counsel did not reiterate his objection. Zwicker testified that Mr. Day's family had supplied him with a suspect's nickname and also supplied him with information that Ricardo Sims, another Sims, and Yeager were possible witnesses. (T III 18). Later Zwicker testified that based on the information provided by Mr. Day's family, he ran Mr. Marion's name through LEIN back on March 24, 2006 and obtained his photograph. (T III 24-25).

Zwicker also testified that he received information from these same family members about two women, Shanell Nelms and Erin Crim, in regard to a possible motive for Mr. Day's shooting that involved a narcotics transaction originating in Arizona and ending in Battle Creek. (T III 19-20). Zwicker testified that, as a result, he contacted the Battle Creek Police Department and that police agency sent him copies of police reports on March 28, 2006 that were in regard to breaking and enterings at two residences associated with Erin Crim that occurred on February 28, 2006.[9] (T III 20-21, 42). Zwicker testified that somebody was looking for something at Erin Crim's residence. (T III 20). According to Zwicker, Erin Crim and Shanell Nelms had left Michigan and he never spoke with them. (T III 28-29). He testified that, based on information that he received from others, Zwicker believed that the two women were drug mules. (T III 29-

[9] Mr. Marion's name is not mentioned in the Battle Creek police reports, and Zwicker had nothing official that said Mr. Marion was involved in those breaking and enterings. (T III 37-38).

30). Zwicker further testified that Ricardo Sims' statement to him on December 8, 2006 at the federal building confirmed the information that he had received from Mr. Day's family and from the Battle Creek Police Department in March 2006. (T III 21-22).

**Issue Preservation/Standards of Review**

As explained above, the trial court did not sustain trial counsel's initial hearsay objection and did not grant his request to strike the testimony. (T III 16-18, attached as Appendix C). It appears that given this initial ruling, trial counsel believed that any further hearsay objection in the same vein would be futile. Thus, this Court should consider the hearsay challenges raised in this issue to be preserved as to all the following hearsay testimony in the same vein as well. MRE 103(a)("Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal"); see *People v Moore,* 161 Mich App 615, 411 NW2d 797 (1987).

This Court reviews the admission of this evidence for an abuse of discretion, but must remember that the underlying legal question of whether a rule of evidence precluded its admission is reviewed de novo, and that if the trial court erred on that legal question, then the trial court by definition abused its discretion. "The decision whether to admit evidence is within the trial court's discretion; this Court only reverses such decisions where there is an abuse of discretion. However, decisions regarding the admission of evidence frequently involve preliminary questions of law, e.g., whether a rule of evidence or statute precludes admissibility of evidence. This Court reviews questions of law de novo. It is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *People v Lukity,* 460 Mich 484, 488; 596 NW2d 607 (1999).

If this Court finds that the alleged errors were preserved and that the trial court abused its discretion in admitting this evidence, then this Court must reverse Mr. Marion's convictions if he demonstrates that it is more probable than not that the hearsay error(s) affected the verdict. *Lukity, supra.* If this Court finds the hearsay errors were not preserved, then Mr. Marion's convictions must be reversed if he can show plain error that affected his substantial rights and that the error(s) affected the fairness, integrity, or public reputation of the proceedings. *People v Knox,* 469 Mich 502, 508 (2004) (citing *People v Carines,* 460 Mich 750, 763 (1999)). Additionally, if this Court finds that trial counsel failed to adequately object on hearsay grounds, then this Court reviews Mr. Marion's claim of ineffective assistance of counsel de novo based upon the existing record. *People v LeBlanc,* 465 Mich 575, 579 (2002); see *People v Williams,* 223 Mich App 409, 414 (1997); *People v Ginther,* 390 Mich 436, 443 (1973). And this Court must reverse if trial counsel rendered objectively deficient performance and there is a reasonable probability that the outcome of the trial would have been different but for trial counsel's error. *Strickland v Washington,* 466 US 668, 687-688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *LeBlanc, supra.*

Regarding the additional assertion that the officer-in-charge's testimony violated Mr. Marion's state and federal confrontation rights, defense counsel did not raise that challenge at trial and thus it is unpreserved. Again, Mr. Marion's convictions must be reversed if he can satisfy the plain error test discussed above or the test for ineffective assistance of counsel discussed above. *Knox, supra; Carines, supra; LeBlanc, supra; Williams, supra; Strickland, supra.*

**Discussion**

*Hearsay Violations*

"'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). "Hearsay is not admissible except as otherwise permitted by the rules of evidence." MRE 802.

Contrary to the trial court's initial ruling, Zwicker's testimony about information he had received from Mr. Day's family members and Battle Creek Police Department reports was offered for the truth of the matter asserted, i.e. that Mr. Marion was involved in a drug operation that went bad and he killed Mr. Day. The People extensively used this hearsay evidence for the truth of the matter asserted in closing argument as corroboration of Ricardo Sims's testimony:

> But the truth was coming through, at least to family members of the victim because as of two weeks when Homicide took over the investigation, as of two weeks of this homicide, we already knew or had information that is later corroborated by an eye witness, Ricardo Sims, that this Defendant was in fact the individual that caused the death of Mr. Day.
>
> You have a lien being run by Officer Zwicker on the 24th of March. This shooting occurred on March 1 and the Defendant died, I mean the victim died about twelve days later. So information is being filtered through to cause Officer Zwicker to continue an investigation and try to get to the truth when people don't want to tell him. [T IV 14].

* * *

> And does that statement that he [Ricardo Sims] gives Officer Zwicker on December 8th, does that line up with the information that Officer Zwicker had already developed [about] why this happened? Over a drug deal, that's the motive, the alleged motive. And a couple of girls are involved possibly in transporting narcotics, marijuana into Battle Creek. The belief that the narcotics are stolen by somebody named PeeWee. And you heard Ricardo Sims tell you that PeeWee's girlfriend on the side was this Erin Crim, one of the mules, one of the girls that brought back the drugs allegedly.

> And do we have corroboration for that that they're looking for the drugs that PeeWee stole? We have two breakins on the day before the shooting. Two homes ransacked. You have reports sent to Officer Zwicker of two breakins. And he has those not after Ricardo Sims tells him, he has that information a month after the homicide. Because he told you in his file he has a faxed copy of the report of the B&E at Erin Crim's two different homes. He has that as of March 28, 2006. That's a good seven months before Ricardo Sims comes forward and tells the truth, ladies and gentlemen, and gives a statement to Officer Zwicker.
>
> So you have that corroboration. [T IV 17-18]
>
> * * *
>
> . . . Confirmation, and this is on the night where you have information of B&E's at these two locations associated with PeeWee's girlfriend, Erin Crim's house. So there's corroboration for what Mr. Sims tells you. [T IV 19].
>
> * * *
>
> On March 24th, twenty four days after Mr. Day was shot, Officer Zwicker ran the name Allen Marion as a suspect in this case, ladies and gentlemen. He said the information was given to him through family members and that's why he ran that name. Donald [Ricardo] Sims was not arrested until May 23rd. [T IV 41].

As the trial court correctly indicated, there is no investigation exception to rule prohibiting the admission of hearsay. And the People did not even try to suggest that the information met any hearsay exclusion or exception.

The complained of hearsay evidence did not meet any of the actual exclusions or exceptions to the rule precluding the admission of hearsay. MRE 801(d); MRE 803; MRE 803A; MRE 804. These were not the prior statements of a witness at trial or admissions by a party-opponent. See MRE 801(d). None of the exceptions under MRE 803 are applicable by their own terms. MRE 803(1)-(24). The closest one, at least in regard to information from the Battle Creek Police Department's reports, MRE 803(8) Public Records and Reports, specifically excludes police reports. See *People v Daniel,* 469 Mich 409, 670 NW2d 659 (2003). And in the

case of the police reports, those would include multiple layers of hearsay, i.e. the declarant of the report was some police officer from Battle Creek who was reporting information declared by some other person or persons. MRE 803A is inapplicable as this did not involve a sex act, etc. And MRE 804 cannot be used as there was no showing, or even hint, that any of the declarants were legally unavailable. MRE 804(a). Further, the hearsay evidence did not satisfy the terms of any of the exceptions under MRE 804 even if a declarant had been legally unavailable. MRE 804(b).

*Confrontation Violations*

A criminal defendant has a state and federal constitutional right to confront the witnesses against him. US Const, Ams VI, XIV; Const 1963, art 1, § 20. It is impermissible to allow out-of-court "testimonial" statements to be admitted as evidence against a defendant unless the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine them. *Crawford v Washington,* 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004); *Davis v Washington,* 547 US 813, 126 S Ct 2266, 165 L Ed 2d 224 (2006); *People v Bryant,* 483 Mich 132, 138-139, 768 NW2d 65 (2009). Here, there was no showing that any of the declarants, those family members of the victim who supplied information to Officer Zwicker directly and those persons who supplied information to the Battle Creek Police Department for their police reports on the alleged break-ins, which were forwarded to Offier Zwicker, were legally unavailable. Moreover, Mr. Marion had had no prior opportunity to cross-examine them.

Statements made to the police in the course of criminal investigations are testimonial unless necessary to meet an on-going emergency. *Crawford, supra* at 52-53; *Davis, supra* at 822, 822 n1; *Bryant, supra* at 138-142. Statements describing past events, rather than events as they are actually happening are testimonial. *Davis, supra* at 826-827; *Bryant, supra* at 143.

Here, the statements, information supplied by the victim's family members to Detroit Police Officer Zwicker and the Battle Creek Police Department police reports were clearly testimonial as there was no on-going emergency and the statements were describing past events.

*Deficient Performance by Trial Counsel*

Trial defense counsel rendered ineffective assistance of counsel in failing to object to these confrontation violations and, if this Court finds that additional hearsay objections were required for preservation, in failing to continue to object on hearsay grounds. An accused is entitled to the effective assistance of counsel under both the state and federal constitutions. US Const, Ams VI, XIV; *Strickland v Washington,* 466 US 668, 104 S Ct 2052; 80 L Ed 2d 674 (1984); Const 1963, art 1, § 20; *People v Pickens,* 446 Mich 298; 521 NW2d 797 (1994)(adopting the federal *Strickland* standard for claims brought under the Michigan constitution as well).

There is no reasonable strategy for allowing in evidence that incriminates your client in violation of his constitutional rights to confrontation and/or in violation of state evidentiary rules. The failure to object to inadmissible evidence that harms the defendant's case is deficient performance. See e.g., *Kimmelman v Morrison,* 477 US 635; 106 S Ct 2574; 91 L Ed 2d 305 (1986) (counsel's conduct in failing to move to suppress evidence seized in a warrantless search of defendant's home was constitutionally deficient); *People v Thomas,* 184 Mich App 480, 481 (1990) (counsel rendered ineffective assistance in failing to challenge the statement made after what was revealed at the preliminary examination to be an illegal arrest); *People v Ullah,* 216 Mich App 669, 684-686 (1996)(counsel rendered ineffective assistance in failing to move for preclusion of inadmissible similar acts evidence).

(+)

*Prejudice*

Mr. Marion was unfairly prejudiced by the improper admission of the complained of evidence and he is entitled to a new trial under *Lukity* test for preserved non-constitutional error,[10] the *Carines* test for unpreserved constitutional or non-constitutional error,[11] and/or the *Strickland* prejudice prong[12] for the test for ineffective assistance of counsel. The prosecutor used the improperly admitted evidence to corroborate the otherwise unsupported testimony of the prosecution's main witness Donald "Ricardo" Sims accusing Mr. Marion of being involved in an elaborate drug operation that went bad and of killing Joseph Day as a result. (See the excerpts from the prosecutor's closing argument, quoted above, from T IV 14, 17-19, 41.) Ricardo Sims only came forward out of his own self-interest, testifying as part of a plea agreement with federal authorities, and the defense vigorously challenged the veracity of his testimony. The only other eyewitnesses that Ricardo identified to the authorities, and who were allegedly supposed to corroborate his claims, testified at trial that they could not identify Mr. Marion as being involved in the killing of Mr. Day. (T II 43, 46, 52; T II 90-93, 104-105). In this case, whether taken individually or cumulatively, the errors deprived Mr. Marion of a fair trial and this Court must grant him a new trial.

---

[10] If this Court finds that the alleged errors were preserved and that the trial court abused its discretion in admitting this evidence, then this Court must reverse Mr. Marion's convictions if he demonstrates that it is more probable than not that the hearsay error(s) affected the verdict. *Lukity, supra*.

[11] If this Court finds the confrontation errors or hearsay errors were not preserved, then Mr. Marion's convictions must be reversed if he can show plain error that affected his substantial rights and that the error(s) affected the fairness, integrity, or public reputation of the proceedings. *People v Knox*, 469 Mich 502, 508 (2004) (citing *People v Carines*, 460 Mich 750, 763 (1999)).

[12] To establish prejudice under *Strickland*, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, supra* at 694. A defendant need not show that counsel's error more likely than not affected the outcome. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome. A reasonable probability is simply a probability sufficient to undermine confidence in the outcome. *Id.*

## II. THE TRIAL COURT REVERSIBLY ERRED IN ADMITTING EVIDENCE THAT GRANDMA HANNAH SIMS' HOME HAD BEEN SHOT AT A FEW DAYS PRIOR TO THE PRELIMINARY EXAMINATION IN THIS CASE ABSENT EVIDENCE THAT DEFENDANT MARION HAD DIRECTED IT. ALTERNATIVELY, THE TRIAL COURT REVERSIBLY ERRED IN FAILING TO GIVE A LIMITING INSTRUCTION ON HOW THIS EVIDENCE COULD BE CONSIDERED AND TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO REQUEST ONE.

**Issue Preservation/Standard of Review**

The trial court overruled defense counsel's objections made prior to the witness's testimony. (T II 3-4, 106-108, 188-190).[13] Additionally, the trial court also denied the defense's motion for a mistrial based on the admission of this evidence after the witness's testimony. (T IV 3-5).[14] This Court generally reviews the admission of evidence for an abuse of discretion, but must remember that any underlying legal questions, e.g. whether a rule of evidence precluded its admission, are reviewed de novo. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). Further, if the trial court erred on an underlying legal question, then the trial court by definition abused its discretion in admitting the evidence. *Id.* If the trial court erred by admitting the complained of evidence, this Court must reverse if the defendant demonstrates that it is more probable than not that the error affected the verdict. *Id.*

Defense counsel did not specifically request a cautionary instruction after the court overruled his pre-trial objections and motion for mistrial. Therefore, this Court reviews the trial court's failure to give a cautionary instruction for plain error that affected Mr. Marion's substantial rights and reverse if it finds that the error affected the fairness, integrity, or public

[13] See transcript excerpts, T II 3-4, 106-108, 188-190; T IV 3-5, attached as Appendix D.
[14] Please see prior footnote.

reputation of the proceedings. *People v Knox*, 469 Mich 502, 508 (2004) (citing *People v Carines*, 460 Mich 750, 763 (1999)).

This Court reviews Mr. Marion's claim of ineffective assistance of counsel de novo based upon the existing record. *People v LeBlanc*, 465 Mich 575, 579 (2002); see *People v Williams*, 223 Mich App 409, 414 (1997); *People v Ginther*, 390 Mich 436, 443 (1973). And this Court must reverse if trial counsel rendered objectively deficient performance and there is a reasonable probability that the outcome of the trial would have been different but for trial counsel's error. *Strickland v Washington*, 466 US 668, 687-688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *LeBlanc*, *supra*.

**Discussion**

Over objection, Grandma Hannah Sims was allowed to testify regarding her home being shot at by unidentified gunmen on February 7, 2009, two days before the preliminary examination in this case took place.[15] (T II 3-4, 106-108, 188-190; T III 50-57). Beyond the significance of the date, there was no evidence connecting the shooting at Grandma Sims' home to this case. Ricardo Sims, Hannah's grandson, had given information to the federal authorities on other matters, such that Mr. Marion was not the only person who would have a motive for such a shooting. (T II 107; T III 37). Mr. Marion was incarcerated at the time of the shooting, and no evidence was introduced that connected the shooters to Mr. Marion. (T II 4, 190).

The trial court overruled the objections that the shootings were unrelated, irrelevant, and more prejudicial than probative. (T II 3-4, 106-108, 188-190). The court held that "[t]here is no such thing as coincidence", the court believed that Witnesses Phillip Yeager and Carnell Sims were frightened when they testified at trial, and their alleged police statements had been taken at

Grandma Sims' home. (T II 106-108). The court stated that it's ruling "has nothing to do with" Defendant Marion, and explained that the shooting was relevant and the lawyers were free to argue what it meant. (T II 107-108).

The morning after Hannah Sims' testimony, defense counsel moved for a mistrial due to her testimony being allowed, stating it was akin to other prior act evidence under MRE 404b, but that no cautionary instruction could adequately protect Mr. Marion's interests. (T IV 3-4). The prosecutor responded that the shooting was not 404b evidence offered against Mr. Marion, but was only offered to show why prosecution witnesses were fearful. (T IV 4). The trial court denied the motion for mistrial. *Id.* No limiting instruction, however, was given to the jury on how they were to consider the evidence of the shooting at Hannah Sims' home.

Relevant evidence is generally admissible absent the danger that unfair prejudice will substantially outweigh its probative value; relevance depends on materiality (evidence related to a fact of consequence to the action) and probativeness (evidence tending to make the existence of a fact of consequence more or less probable than it would be without the evidence). *People v Sabin (After Remand),* 463 Mich 43, 57 (2000); MRE 401; MRE 402; MRE 403.

Evidence that a defendant tried to persuade a witness not to testify against him generally is relevant and admissible to show a consciousness of guilt. *People v Sholl,* 453 Mich 730, 740 (1996); *People v Kelly,* 231 Mich App 627, 640 (1998). That was not the case here, where Mr. Marion was incarcerated awaiting trial at the time of the incident and no evidence showed that he somehow directed the shooting. The timing of the shooting alone is not enough to show that Mr. Marion directed it or to show a consciousness of guilt on his part. The trial court erred in

[15] Grandma Sims testified that there were 18 shell casings on her porch from bullets fired at her front door, but the police who responded found no shell casings and only five bullet holes. (T III 52, 55; T IV 8-9).

admitting this evidence.

Absent that crucial connection to the defendant, evidence that a third-party threatened or tried to intimidate a witness may only be admitted for the limited purpose of offering an explanation for a difference in the witness's trial testimony and earlier statements and/or earlier testimony. See *People v Clark*, 124 Mich App 410, 412-413 (1983); *People v Smith*, 106 Mich App 203, 214-215 (1981). However, here, there was no showing that Witnesses Phillip Yeager and Carnell Sims were even aware of the shooting at Grandma Sims' home, its relation in time to the preliminary examination in this matter, at which neither man was called to testify, or even that it caused them any fear. Neither witness was asked about the incident during their trial testimony. Further, Yeager's trial testimony was consistent with the key point that he told the police at the scene of Joseph Day's earlier shooting just after it occurred, i.e. he could not identify the shooters, and Carnell Sims denied making the January 2008 police statement that Officer Zwicker attributed to him. Thus, evidence of a shooting at Grandma Sims' home in February 2009 was not even relevant for the limit purpose for which third-party threats or intimidation unconnected to the defendant are allowed. The trial court erred in admitting this evidence.

Further, even if admissible, evidence that a third party threatened or bribed a witness not to testify or to change his or her testimony is unfairly prejudicial to the defendant if the jury may infer that the defendant is responsible, absent evidence to support that inference. Though a cautionary instruction normally would be sufficient to protect a defendant from such unfair prejudice, *People v Clark*, 124 Mich App 410, 412-413 (1983), by limiting the jury to considering the incident only for its affect on any change in witnesses stories, no such cautionary instruction was requested or given here.

Appellant Marion asserts that the failure to give a limiting instruction was plain error on the part of the trial court. Moreover, once defense counsel lost the battle for keeping out evidence of the shooting at Grandma Sims' home, he should have requested one. Mr. Marion was entitled to the effective assistance of counsel, and there is no reasonable strategy for not requesting a limiting instruction. US Const, Ams VI, XIV; *Strickland v Washington,* 466 US 668, 104 S Ct 2052; 80 L Ed 2d 674 (1984); Const 1963, art 1, § 20; *People v Pickens,* 446 Mich 298; 521 NW2d 797 (1994)(adopting the federal *Strickland* standard for claims brought under the Michigan constitution as well).

Mr. Marion was unfairly prejudiced by the improper admission of the complained of evidence and he is entitled to a new trial under *Lukity* test for preserved non-constitutional error,[16] the *Carines* test for unpreserved constitutional or non-constitutional error,[17] and/or the *Strickland* prejudice prong[18] for the test for ineffective assistance of counsel. The prosecutor used this evidence in closing argument against Mr. Marion, including urging the jury to convict Mr. Marion to send a message that shooting up Hannah Watson's house to intimidate witnesses was unsuccessful. (T IV 14-16, 42-43). The prosecution's case otherwise largely rested on the questionable testimony of Ricardo Sims, who only came forward out of his own self-interest,

---

[16] If this Court finds that the alleged errors were preserved and that the trial court abused its discretion in admitting this evidence, then this Court must reverse Mr. Marion's convictions if he demonstrates that it is more probable than not that the hearsay error(s) affected the verdict. *Lukity, supra.*

[17] If this Court finds the confrontation errors or hearsay errors were not preserved, then Mr. Marion's convictions must be reversed if he can show plain error that affected his substantial rights and that the error(s) affected the fairness, integrity, or public reputation of the proceedings. *People v Knox,* 469 Mich 502, 508 (2004) (citing *People v Carines,* 460 Mich 750, 763 (1999)).

[18] To establish prejudice under *Strickland,* the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, supra* at 694. A defendant need not show that counsel's error more likely than not affected the outcome. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome. A reasonable probability is simply a probability sufficient to undermine confidence in the outcome. *Id.*

testifying as part of a plea agreement with federal authorities, and the veracity of his testimony was vigorously challenged. The only other eyewitnesses that Ricardo identified to the authorities, and who were allegedly supposed to corroborate his claims, testified at trial that they could not identify Mr. Marion as being involved in the killing of Mr. Day. (T II 43, 46, 52; T II 90-93, 104-105). The improper admission of the complained of evidence was outcome determinative error. This Court must reverse and remand for a new trial.

## III. THE PROSECUTOR'S MISCONDUCT IN CLOSING ARGUMENT, USING OFFICER-IN-CHARGE ZWICKER'S TESTIMONY COMPLAINED OF IN ISSUE I FOR THE TRUTH OF THE MATTER ASSERTED AND IMPROPERLY BOLSTERING AND VOUCHING FOR HER MAIN WITNESS'S CREDIBILITY, VIOLATED DEFENDANT MARION'S STATE AND FEDERAL CONSTITUTIONAL DUE PROCESS RIGHTS TO A FAIR TRIAL. DEFENDANT MARION IS ALSO ENTITLED TO A NEW TRIAL BECAUSE TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE, UNDER THE STATE AND FEDERAL CONSTITUTIONS, IN FAILING TO OBJECT TO THE IMPROPER ARGUMENTS.

**Issue Preservation/Standards of Review**

There were no objections to the prosecutor's remarks. This Court reviews allegations of prosecutorial misconduct de novo. *People v Pfaffle,* 246 Mich App 282, 288; 632 NW2d 162 (2001). Regarding unpreserved claims of prosecutorial misconduct, the defendant must show a plain error that affected substantial rights, seriously affecting the fairness, integrity, or public reputation of the judicial proceedings to prevail. *People v Carines,* 460 Mich 750, 763, 774; 597 NW2d 130 (1999).

This Court reviews Mr. Marion's claim of ineffective assistance of counsel de novo based upon the existing record. *People v LeBlanc,* 465 Mich 575, 579 (2002); see *People v Williams,* 223 Mich App 409, 414 (1997); *People v Ginther,* 390 Mich 436, 443 (1973). And this Court must reverse if trial counsel rendered objectively deficient performance and there is a reasonable probability that the outcome of the trial would have been different but for trial counsel's error. *Strickland v Washington,* 466 US 668, 687-688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *LeBlanc, supra.*

**Discussion**

Prosecutors are public officials who have an obligation to ensure that justice is done rather than to simply obtain a conviction. *Berger v United States,* 295 US 78, 88-89; 55 S Ct 629; 79 L Ed 1314 (1935); *People v Bahoda,* 448 Mich 261; 531 NW2d 659 (1995). As a public official, it is the prosecutor's duty to ensure that the accused receives a fair trial, so far as it is in his power to afford him one. *Id.* While a prosecutor is clearly authorized to strike hard blows in an earnest and vigorous prosecution, he is "not at liberty to strike foul ones." *Berger, supra.* Prosecutorial misconduct may deny the accused of a fair trial, which is guaranteed by the due process clauses of the Federal and State Constitutions. US Const, Amend. V, XIV; Const 1963, art 1, sec 17; *Berger, supra; Donnelly v Christoforo,* 416 US 637, 642; 94 S Ct 1868; 40 L Ed 2d 431 (1974); *Darden v Wainwright,* 477 US 168; 106 S Ct 2464; 91 L Ed 2d 144 (1986); *Bahoda, supra.*

In closing argument, the Prosecutor used Officer-in-Charge Zwicker's testimony regarding information that Joseph Day's family members had told him and information he received from Battle Creek Police Department reports for the truth of the matters asserted in this out-of-court statements. (T IV 14, 17-18, 41). *See the quoted passages set forth earlier in this brief in Issue I, at pp 17-18, incorporated here in by reference.* The trial court had ruled Zwicker's testimony was admissible for the limited purpose of explaining Zwicker's actions in regard to how he proceeded in the investigation and that it was <u>not</u> being admitted for the truth of the matters asserted and was thus not hearsay.[19] (T III 16-18, attached as Appendix A.) Thus, it was improper for the Prosecutor to use that evidence in her closing argument for the truth of the matter asserted. *Washington v Hofbauer,* 228 F 3d 689, 699-700 (CA 6, 2000); *People v Haines,* 105 Mich App 213, 218; 306 NW2d 455 (1981).

In closing argument, the Prosecutor also vouched for her main witness, Donald "Ricardo" Sims, with the prestige of her office and that of various federal authorities:

> But in receiving that benefit, he had to get on the stand and testify truthfully, ladies and gentlemen, not come up with some lie. And before agreements are made, there's [sic] processes at the U.S. Attorney's Office, the DEA, the Wayne County Prosecutor's Office, where we try to test the credibility of the witness. And so that happens before deals are made. . . . [T IV 17].

A prosecutor may not attest to or vouch for the credibility of witnesses. *People v Erb*, 48 Mich App 622, 632-633; 211 NW2d 51 (1973). Nor may a prosecutor vouch for a witness with the prestige of another government official's knowledge or opinion. See *People v Boske*, 221 Mich 129, 134 (1922)(sheriff's opinion); *People v Humphreys*, 24 Mich App 411, 418 (1970)(opinion of the police).

These instances of prosecutorial misconduct were plain errors that affected substantial rights, seriously affecting the fairness, integrity, or public reputation of the judicial proceedings under the circumstances of this case. Further, Mr. Marion was entitled to the effective assistance of counsel, and there is no reasonable strategy for not objecting to this sort of misconduct in closing argument. US Const, Ams VI, XIV; *Strickland v Washington*, 466 US 668, 104 S Ct 2052; 80 L Ed 2d 674 (1984); *Washington v Hofbauer, supra*; Const 1963, art 1, § 20; *People v Pickens*, 446 Mich 298; 521 NW2d 797 (1994)(adopting the federal *Strickland* standard for claims brought under the Michigan constitution as well). Defense counsel objected to the admission of the complained of testimony from Zwicker because, in addition to its admission being improper under the law, it was prejudicial to the defense. There is no acceptable excuse for allowing the prosecutor to do further damage by using that evidence beyond the limited

---

[19] Appellant challenges that ruling in Issue I, *supra*.

purpose for which it was admitted.[20] Further, in regards to both the misuse of Zwicker's testimony and the vouching, this denied Mr. Marion a fair trial because, as explained in the prior two issues, *supra*, the prosecutor's case was largely dependent on whether the jury believed Ricardo Sims and this misconduct goes to that determination. This Court must grant a new trial.

[20] Please see prior footnote.

## IV. MR. MARION SHOULD BE GRANTED A NEW TRIAL WHERE NEWLY DISCOVERED EVIDENCE THAT CORROBORATES HIS ALIBI WAS DISCOVERED AFTER HIS SENTENCING IN THIS MATTER. IF TRIAL COUNSEL HAD BEEN AWARE OF THIS EVIDENCE BEFORE, TRIAL COUNSEL WOULD HAVE PRESENTED THE ALIBI DEFENSE AT TRIAL. THIS COURT SHOULD REMAND FOR AN EVIDENTIARY HEARING AND TO ALLOW MR. MARION TO MOVE FOR NEW TRIAL.

**Issue Preservation/Standard of Review**

A motion for new trial based on newly discovered evidence must be raised in the trial court to preserve it for appeal, and the trial court's decision is reviewed for an abuse of discretion. *People v Darden,* 230 Mich App 597, 605-606 (1998). Here, the Court of Appeals denied Defendant-Appellant's motion to remand, which raised this issue and sought remand for an evidentiary hearing and to allow him to move for new trial on this issue. (Appendix B, COA order, 11/30/10). This Honorable Court should now remand for an evidentiary hearing and to allow Mr. Marion to move for a new trial. MCR 7.302(C)(6); MCR 7.316(7).

**Discussion**

The test for granting a new trial based on newly discovered evidence involves a finding that: 1) the evidence itself, not merely its materiality, was newly discovered; 2) the evidence is not cumulative; 3) the party offering the evidence could not with reasonable diligence have discovered and produced it at trial; and 4) the evidence is such as to render a different result probable on retrial. *People v Cress,* 468 Mich 678, 692 (2003); *People v Lester,* 232 Mich App 262, 271 (1998); *United States v Seago,* 930 F2d 482 (CA 6, 1991); *United States v Hawkins,* 969 F2d 169 (CA 6, 1992). For the reasons discussed below, this Court should remand for an evidentiary hearing and to allow Mr. Marion to move for new trial.

Allen Marion was charged with murder in 2008 almost two years after the killing of Joseph Day in 2006. Mr. Marion's defense counsel, Steven Scharg, filed a timely alibi notice, but chose not to run the alibi defense at the trial, in 2009, as he had no independent corroboration of the alibi witnesses to present. (Alibi Witness list, June 4, 2009; Attorney Scharg's affidavit attached as Appendix E; Alibi witness, Charles Lewis' affidavit attached as Appendix F). Newly discovered evidence has come to light that provides independent corroboration of the alibi, which if it had been available to Attorney Scharg at the time of trial would have caused him to run the alibi defense. (Appendix E).

The killing occurred shortly before the police run of 5:40 pm, on March 1, 2006. The alibi is that on March 1, 2006, Mr. Marion picked Charles Lewis up around 4 pm; they went to a jewelry store in Hamtramck, arriving between 4:45 pm and 5 pm; Mr. Marion shopped for about an hour there, picking out an engagement ring; they stopped at a party store, before driving to Mr. Marion's fiancé's house in Cheyenne St, in Detroit, arriving between 6:45 pm and 7 pm; the three of them socialized before Mr. Marion and his fiancé dropped Mr. Lewis back off at home around 7:45 pm. (Appendix F – Charles Lewis' affidavit).

Months after Mr. Marion was sentenced, his fiancé discovered a receipt that provides independent corroboration of the alibi. (Rochelle Moore's affidavit attached as Appendix G; Mirage Jewelry receipt attached as Appendix H; Zaher Murray's affidavit & photo depicting ring attached as Appendix I; Linda Borus' affidavit attached as Appendix J). Ms. Moore discovered the receipt only by happenstance; her home had been burglarized and she came across it as she was searching for receipts to help support her homeowners' insurance claim. (Appendix G). The receipt for the engagement ring shows a purchase date of March 1, 2006. (Appendix H). The jewelry store owner has authenticated the receipt as being from his store and being in his

own handwriting. (Appendices I & J). Further, the jewelry store owner recognizes Mr. Marion as a customer. (*Id*). If Attorney Scharg had had the receipt and been able to verify its authenticity has been done since, he would have presented the alibi defense at trial. (Appendix E).

Mr. Marion's convictions are largely based on the word of Donald "Ricardo" Sims, who only offered information after his arrest on unrelated charges by federal authorities in order to secure a plea deal in his federal case. The only other eyewitnesses that Ricardo identified to the authorities, and who were allegedly supposed to corroborate his claims, testified at trial that they could not identify Mr. Marion as being involved in the killing of Mr. Day. It is more probable than not that an independently corroborated alibi on Mr. Marion's behalf would result in an acquittal.

## SUMMARY AND REQUEST FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Defendant-Appellant asks that this Honorable Court grant leave to appeal or take other appropriate action, including but not limited to remanding for an evidentiary hearing and to allow him to move for new trial. Ultimately, Defendant-Appellant seeks a new trial.

Respectfully submitted,

**STATE APPELLATE DEFENDER OFFICE**

BY:________________________________

**JACQUELINE J. MCCANN (P58774)**
Assistant Defender
3300 Penobscot Building
645 Griswold
Detroit, Michigan 48226
(313) 256-9833

Dated: March 7, 2011

# APPENDIX A

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ALLEN MARION,

Defendant-Appellant.

UNPUBLISHED
January 11, 2011

No. 293440
Wayne Circuit Court
LC No. 09-003275-FC

Before: FORT HOOD, P.J., and MURRAY and SERVITTO, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of second-degree murder, MCL 750.317, possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, and felon in possession of a firearm, MCL 750.224f. Defendant was sentenced, as a third habitual offender, MCL 769.11, to 50 to 75 years' imprisonment for the second-degree murder conviction, two years' imprisonment for the felony-firearm conviction, and one to five years' imprisonment for the felon in possession of a firearm conviction. We affirm.

Defendant first argues that a new trial is warranted because the trial court erred in admitting hearsay testimony of the officer in charge of this case. We disagree. We review a trial court's ruling to admit or exclude evidence for an abuse of discretion. *People v Starr*, 457 Mich 490, 494; 577 NW2d 673 (1998). Where a trial court's decision is within the principled range of outcomes, no abuse of discretion will be found, and the reviewing court may properly defer to the trial court's judgment. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). We review preliminary questions of law pertinent to the admission of evidence de novo. *People v Washington*, 468 Mich 667, 670-671; 664 NW2d 203 (2003). A trial court necessarily abuses its discretion when it admits evidence that is inadmissible as a matter of law. *People v Katt*, 468 Mich 272, 278; 662 NW2d 12 (2003).

"Hearsay is an unsworn, out-of-court statement that is offered to establish the truth of the matter asserted." *People v Stamper*, 480 Mich 1, 3; 742 NW2d 607 (2007). Such a statement "is generally inadmissible unless it falls under one of the hearsay exceptions set forth in the Michigan Rules of Evidence." *Id.* In this case, defendant challenges as hearsay the testimony of the officer in charge regarding the nickname of a possible suspect in the shooting that he learned from the victim's family members. In response to the prosecution's question regarding whether the victim's family members named a potential suspect, the officer stated that they told him a

possible suspect's nickname. Defense counsel objected on hearsay grounds and requested that the statement be stricken from the record. Although the trial court never explicitly ruled on the objection, it impliedly sustained it, instructing the officer to limit his testimony to what he did, yet it never ordered the statement stricken from the record. We agree with defendant that the statement constituted hearsay and that no exception or exclusion applied to make its admission permissible. Further, this is not a case in which defense counsel simply failed to make the request for the testimony to be stricken. See e.g., *People v Brown*, 21 Mich App 579, 580-581; 175 NW2d 782 (1970). As such, the trial court abused its discretion in failing to order the testimony stricken from the record.

This does not end our inquiry, however, as we must still determine whether the error requires reversal and a new trial. The Michigan Supreme Court, in *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999), set forth the harmless error standard applicable in cases involving preserved, nonconstitutional error. Reversal is proper only where the defendant shows that the error resulted in prejudice. *Id.* at 495. In approaching this inquiry, "the effect of the error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error." *Id.*

Defendant argues that the error resulted in prejudice because the prosecution reiterated the hearsay testimony in closing argument. In closing argument, the prosecution told the jury that the officer received information from the victim's family regarding a suspect and eventually ran defendant's name through the database. Yet defense counsel did not object to *this* argument by the prosecutor; the error at issue is the statement made during the officer's testimony, not during the prosecution's closing argument. With respect to this error, it cannot be concluded that it is more probable than not that a different outcome would have resulted without the error. When the officer narrowed his testimony to explain what he did, rather than what individuals told him, the jury received the same information—namely, that the officer, one way or another, learned the nickname of a suspect. The jury also learned that a key witness later identified defendant, whom he knew by this nickname, as the individual who shot the victim. Thus, defendant has not shown that it is more probable than not that the jury would have acquitted him absent the trial court's failure to order the hearsay testimony stricken from the record. Further, although defendant acknowledges that the key witness was the only individual able to identify defendant as the shooter and had a personal interest in cooperating with authorities, the jury knew of these circumstances independent of the officer's testimony. In light of the record, it does not follow that a different result would have been more probable than not had the court stricken the hearsay testimony.

Defendant's other hearsay challenges are not properly preserved, and our review is limited to plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Reversal is proper only where the error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings, independent of the defendant's innocence. *Id.* Defendant challenges as hearsay the testimony of the officer in charge regarding the name of possible witnesses that he obtained from the victim's family, and his decision to run defendant's name through the database and acquire his photograph. We disagree. In this portion of the officer's testimony, the officer merely described what he did, not what anyone told him. We also disagree with defendant's assertion that the officer's testimony regarding information that he received from the victim's

family members about female drug mules and a possible motive for the shooting constituted hearsay. The officer deduced a possible motive for the shooting from the information that he gathered. In other words, the officer's statements described his action and thought processes; they were not recitations of what an out-of-court declarant told him.

In his last hearsay challenge, defendant argues that the trial court erred in allowing the officer to reference police reports of break-ins. We disagree. The officer's testimony that he reviewed the police reports and deduced that someone was snooping in one of the drug mule's homes did not contain any out-of-court statement offered to prove the truth of the matter asserted. Rather, following the trial court's instruction, the officer merely described the actions in which he engaged.

Even assuming that these statements constituted hearsay, moreover, defendant has not shown plain error affecting his substantial rights. *Carines*, 460 Mich at 763. Had the trial court excluded the alleged hearsay testimony, the jury would still have had the key witness's testimony implicating defendant in the shooting on which to rely. Defendant has not shown, therefore, that the alleged errors resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id.*

Defendant next argues these alleged instances of hearsay denied him his constitutional right to confront the witnesses against him. This claim, too, is not properly preserved, and our review is limited to plain error affecting substantial rights. *Carines*, 460 Mich at 763. Criminal defendants have a state and federal constitutional right to be confronted with the witnesses against them. *People v Chambers*, 277 Mich App 1, 10; 742 NW2d 610 (2007); US Const, Am VI; Const 1963, art 1, § 20. "The Confrontation Clause prohibits the admission of all out-of-court testimonial statements unless the declarant was unavailable at trial and the defendant had a prior opportunity for cross-examination." *Chambers*, 277 Mich App at 10. Statements made during a police interrogation are testimonial where the circumstances objectively indicate that the investigation's primary purpose is to establish past events potentially relevant to a later criminal prosecution, and not to meet an ongoing emergency. *People v Bryant*, 483 Mich 132, 139; 768 NW2d 65 (2009).

As mentioned above, most of the challenged testimony did not constitute hearsay, and thus, the Confrontation Clause is not implicated. "The Confrontation Clause . . . bars the admission of testimonial *hearsay* unless the declarant is unavailable and the defendant has had a prior opportunity for cross-examination." *People v Payne*, 285 Mich App 181, 197; 774 NW2d 714 (2009) (emphasis added). We agree with defendant, however, that it violated defendant's right to confront the witnesses against him when the officer testified regarding the nickname that the victim's family members told him. The testimony constituted hearsay, it was testimonial in nature, the family members offered the nickname during the course of a criminal investigation, and the information was not necessary to meet an ongoing emergency. Further, there is no indication that the victim's family members were unavailable, and defendant never had an opportunity to cross-examine them. Nonetheless, for the same reasons outlined above, defendant has not shown that the error affected his substantial rights.

Defendant next argues that the trial court erred in admitting evidence of a shooting that occurred at the home of the key witness's grandmother just two days before the preliminary

examination in this matter, overruling defense counsel's objection that the evidence was irrelevant and more prejudicial than probative. We review a trial court's ruling to admit or exclude evidence for an abuse of discretion, *Starr*, 457 Mich at 494, and preliminary questions of law pertinent to the admission of evidence de novo, *Washington*, 468 Mich at 670-671.

The Michigan Rules of Evidence define relevant evidence as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401; *People v Yost*, 278 Mich App 341, 355; 749 NW2d 753 (2008). Relevant evidence is generally admissible, but may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403; *People v McGhee*, 268 Mich App 600, 637; 709 NW2d 595 (2005).

Defendant emphasizes that, aside from the timing of the shooting, no evidence exists connecting defendant, who was incarcerated at the time, to the shooting that occurred at the home of the key witness's grandmother. Defendant also points out that, because the key witness was cooperating with authorities in other matters, individuals other than defendant had a motive to carry out the shooting, making the evidence irrelevant or overly prejudicial. We disagree that admitting the evidence was improper on these grounds.

The admissibility of evidence on relevancy grounds is a matter of judicial discretion. *People v Flores*, 92 Mich App 130, 134; 284 NW2d 510 (1979). Threats against witnesses are relevant and generally admissible to demonstrate the defendant's consciousness of guilt, and it is for the jury to determine the significance of a threat in conjunction with the other evidence presented. *People v Sholl*, 453 Mich 730, 740; 556 NW2d 851 (1996). This is true, however, only where there is evidence connecting the defendant to such threats. *People v Walker*, 150 Mich App 597, 603; 389 NW2d 704 (1985). We agree with defendant that the timing of the shooting offers a rather tenuous connection between him and the shooting, particularly considering that defendant was incarcerated when it occurred. Nonetheless, even absent a sufficient connection, third-party threats are relevant and admissible to explain why a witness has provided inconsistent statements. *People v Clark*, 124 Mich App 410, 412-413; 335 NW2d 53 (1983).

Defendant points out that there is no evidence that the two witnesses who appeared fearful at trial knew that the shooting occurred. In addition, defendant argues, neither man testified at the preliminary examination, and they were never questioned regarding the shooting during their testimony at trial. Even considering these circumstances, however, in our view, the trial court reasonably determined that the shooting was relevant given its proximity to the preliminary examination and its observation of the witnesses' noticeably fearful demeanor at trial. Even from the trial transcript, it is clear that the witnesses were reluctant to testify. The circumstances that defendant highlights go to the weight of the evidence, not its admissibility, which is a matter properly reserved for the trier of fact. See *People v Wager*, 460 Mich 118, 126; 594 NW2d 487 (1999). Further, contrary to defendant's assertion, the evidence did help to explain inconsistencies in the witnesses' statements. For instance, one of the fearful witnesses previously provided a detailed statement to police, yet at trial insisted that he could not recall anything that took place on the day of the incident, denied ever making the earlier statement, and

maintained that he had never seen defendant before seeing him in the courtroom. The trial court, therefore, did not abuse its discretion.

Defendant next argues that a new trial is warranted because the trial court erred in failing to provide a limiting instruction regarding how the jury could consider the evidence of the shooting. We disagree. For unpreserved allegations of nonconstitutional error, as here, our review is limited to plain error affecting substantial rights. *People v Gonzalez*, 468 Mich 636, 643; 664 NW2d 159 (2003). As this Court held in *Lopez v GMC*, 224 Mich App 618, 635; 569 NW2d 861 (1997), where the party alleging an error related to the unlimited admission of evidence failed to request a limiting instruction in the trial court, and such instruction would have cured the error, the issue is considered waived on appeal. Here, a cautionary instruction would have corrected the alleged error. Moreover, the lack of an instruction did not prejudice defendant. Indeed, even without a limiting instruction, during closing argument, the prosecution urged the jury to consider the evidence only as an explanation for why the two fearful witnesses presented inconsistent testimony. In addition, even had the evidence of the shooting at the home of the key witness's grandmother never been presented to the jury, the jury would still have been permitted to rely on the key witness's testimony implicating defendant as the shooter to support his conviction. Accordingly, a new trial is not warranted.

Defendant next argues that statements made during the prosecution's closing argument denied him a fair trial. We disagree. Because this claim is not properly preserved, we review the alleged misconduct for plain error affecting substantial rights. *People v Ackerman*, 257 Mich App 434, 448; 669 NW2d 818 (2003).

Prosecutors are permitted to argue the evidence and all reasonable inferences derived from that evidence as it relates to their theory of the case. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). "[A] prosecutor's comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial." *People v Callon*, 256 Mich App 312, 330; 662 NW2d 501 (2003). For claims of prosecutorial misconduct, the question for the court is whether the prosecution's statements deprived the defendant of a fair trial. *Bahoda*, 448 Mich at 263-264.

To support this claim, defendant first argues that the prosecution, during closing argument, improperly offered testimony of the officer in charge relating to police reports and what the victim's family members told him. With respect to the reports, they were not being offered to show that the individuals who reported break-ins to the police were telling the truth, but merely that reports of break ins were made, that the officer reviewed them, and that they tend to corroborate the key witness's story about a drug transaction gone bad. Similarly, with respect to the prosecution's reference to what family members told the officer, the prosecution did not make the reference in order to establish that the family's identification of a possible suspect was accurate, but only to explain why the officer decided to run defendant's name through the database. Because the prosecution did not offer any out-of-court statements for the truth of the matter asserted, on this ground, no misconduct occurred.

Defendant's second allegation of misconduct is that the prosecution improperly bolstered the key witness's credibility. Prosecutors may vouch for witnesses' credibility so long as they do not imply that they have special knowledge or support their voucher with the authority or

prestige of the prosecutor's office. *Bahoda*, 448 Mich at 276; *People v Smith*, 158 Mich App 220, 232; 405 NW2d 156 (1987). The alleged error relates to the following passage from the prosecution's closing argument:

> But in receiving that benefit, [the key witness] had to get on the stand and testify truthfully, ladies and gentlemen, not come up with some lie. And before agreements are made, there's [sic] processes at the U.S. Attorney's Office, the DEA, the Wayne County Prosecutor's Office, where we try to test the credibility of the witness. And so that happens before deals are made.

In reviewing this passage in context, we conclude that the prosecution's statement that the key witness had an incentive to tell the truth because his cooperation with authorities would ultimately benefit him did not constitute misconduct. A prosecutor does not imply that he or she has special knowledge simply by arguing that a witness has no reason to lie. *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004). The prosecution's second statement, however, presents a closer case.

In *Smith*, 158 Mich App at 231-232, this Court found error requiring reversal where the prosecutor argued that the prosecutor's office would never have offered the witness a plea bargain if the witness had perpetrated the crime. This Court held that the prosecutor improperly bolstered the witness's credibility by stating that the prosecutor's office and the police engage in a careful investigation of murder charges before cutting deals. *Id.* at 232. Although the statement here is arguably not as offensive as the one in *Smith*, we hold that the prosecutor's statement about how the prosecutor's office tests the credibility of witnesses before cutting deals amounted to misconduct.

Nonetheless, a curative instruction could have removed any risk of prejudice that the tainted statement created, yet defense counsel neglected to request one. "No error requiring reversal will be found if the prejudicial effect of the prosecutor's comments could have been cured by a timely instruction." *Ackerman*, 257 Mich App at 449. Further, with respect to the impropriety created, the trial court's instruction, that arguments of attorneys are not evidence, worked to dispel any prejudice. *Bahoda*, 448 Mich at 281. For these reasons, defendant has not shown plain error affecting his substantial rights, and a new trial is unwarranted.

In his next argument on appeal, defendant claims that he is entitled to a new trial because he received ineffective assistance of counsel. We disagree. Whether a defendant received effective assistance from his trial counsel presents a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). We review findings of fact for clear error, and questions of constitutional law de novo. *Id.* In reviewing an ineffective assistance of counsel claim, "[a] judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *Id.* For unpreserved claims, as here, however, our review is limited to errors apparent on the record. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

In *People v Pickens*, 446 Mich 298, 308-327; 521 NW2d 797 (1994), the Michigan Supreme Court adopted the federal standard for ineffective assistance of counsel set forth in *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984), for which the

defendant must establish two requirements. First, the defendant must show that he received deficient assistance from counsel, meaning that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 US at 687-688. Second, the defendant must show that counsel's deficient performance resulted in prejudice, meaning that, but for counsel's errors, a reasonable probability exists that a different outcome would have resulted. *Id.* at 687, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Defendant argues that he received ineffective assistance with respect to all of the allegations of impropriety presented on appeal, either because defense counsel failed to object to the admission of impermissible evidence, failed to request a limiting instruction from the trial court regarding such evidence, or failed to object to improper prosecutorial statements during closing argument. As outlined above, however, many of the errors that defendant alleges are without merit. Trial counsel cannot be expected to argue meritless positions. *People v Rodriguez*, 212 Mich App 351, 356; 538 NW2d 42 (1995). Moreover, defendant offers no argument in his brief to overcome the strong presumption that counsel's failure to make objections or ask for limiting instructions constituted sound trial strategy, *e.g.*, to avoid emphasizing the tainted evidence or improper line of argumentation to the jury. *People v Lawless*, 136 Mich App 628, 635; 357 NW2d 724 (1984). Finally, for the same reasons previously mentioned, defendant has not shown that the alleged errors have caused him prejudice such that a reasonable probability exists that the result would have been different in their absence.

Defendant raises two additional issues in his supplemental brief on appeal. First, defendant argues that the prosecution presented insufficient evidence that he perpetrated the crimes. We review the record in a claim alleging insufficient evidence de novo to determine whether the evidence presented at trial, when viewed in the light most favorable to the prosecution, was sufficient to justify a rational trier of fact in finding the defendant guilty beyond a reasonable doubt. *People v Johnson*, 460 Mich 720, 723; 597 NW2d 73 (1999).

To support a conviction of second-degree murder, the prosecution must establish four elements: "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998). Identity of the defendant as the person who committed the alleged offense is an essential element in every criminal prosecution. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). "Identity may be shown by either direct testimony or circumstantial evidence . . . ." *People v Kern*, 6 Mich App 406, 409-410; 149 NW2d 216 (1967). Reasonable inferences arising from circumstantial evidence can provide sufficient proof for conviction. *Carines*, 460 Mich at 757.

Defendant argues that, other than inadmissible hearsay and innuendo offered during the testimony of the officer in charge and the key witness in this case, the prosecution presented no direct evidence connecting him to the crime. Defendant also contends that no circumstantial evidence exists to support an inference that he perpetrated the crime. We disagree. First, as previously discussed, the officer's testimony either did not constitute hearsay or resulted in harmless error. Second, the statements that defendant alleges amounted to mere innuendo relate to the suspected motive for the shooting, not the identification of defendant as the perpetrator. Motive, however, is not an element of murder. *People v Herndon*, 246 Mich App 371, 412-413;

633 NW2d 376 (2001). Although motive may be relevant to establish the requisite intent of the crime, it is not essential, and defendant does not challenge the element of malice as lacking, but only his identity as the perpetrator. *Id.* at 412. Here, the key witness identified defendant, at trial, as the shooter, another witness identified defendant as the shooter in his statement to the police, and the victim's family members provided defendant's nickname as a potential suspect to the officer in charge. Viewing the evidence in the light most favorable to the prosecution, we must take the statements of these witnesses as true. As such, sufficient evidence existed for a reasonable jury to find that defendant perpetrated the crime beyond a reasonable doubt.

In his final claim on appeal, raised in his supplemental brief, defendant argues that instances of prosecutorial misconduct entitle him to a new trial or an evidentiary hearing. For unpreserved claims, allegations of prosecutorial misconduct are reviewed for plain error affecting substantial rights. *Ackerman*, 257 Mich App at 448. Under plain error review, this Court will reverse only where the complained misconduct "resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings, independent of defendant's innocence," and where a curative instruction could not have alleviated the prejudicial effect. *Id.* at 448-449.

Defendant first argues that the prosecution suppressed testimony of the victim's family members, whom the officer in charge testified had identified defendant as a potential suspect in the shooting. A defendant's right to due process is offended where the prosecution suppresses material evidence that is favorable to him and may have affected the outcome of the trial. *People v Tracey*, 221 Mich App 321, 325; 561 NW2d 133 (1997); *People v Canter*, 197 Mich App 550, 568-569; 496 NW2d 336 (1992). Defendant's argument is unavailing given that the victim's family members implicated defendant in the crime. The evidence being inculpatory, rather than exculpatory, suppressing the testimony did not offend defendant's due process rights, and an evidentiary hearing is unwarranted. *Tracey*, 221 Mich App at 325.

Further, to support this claim, defendant simply alleges that the victim's family members would most likely offer exculpatory testimony. A defendant, however, must make some showing that the issue raised has enough merit to justify remanding the case for an evidentiary hearing. MCR 7.211(C)(1)(a); *People v LaPlaunt*, 217 Mich App 733, 735-737; 553 NW2d 692 (1996). Unsupported allegations, as here, are insufficient to warrant remand. Moreover, we conclude it nearly inconceivable that the murder victim's family members would profess in court that defendant, whom they previously identified as the shooter, is actually innocent. Defendant being the only suspect in this case, his conviction promises their only source of justice.

In his second allegation of prosecutorial misconduct, defendant argues that the prosecution intentionally delayed indicting him in order to gain a tactical advantage in the case, and that he suffered substantial prejudice thereby, entitling him to a new trial or an evidentiary hearing. The Supreme Court, in *United States v Lovasco*, 431 US 783, 791; 97 S Ct 2044; 52 L Ed 2d 752 (1997), found that prosecutors have no duty to file charges immediately upon finding probable cause of a suspect's guilt when they are not yet satisfied that they will be able establish proof beyond a reasonable doubt at trial. Unlike in cases where the prosecution intentionally delays indicting a suspect to gain a tactical advantage, "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Id.* at 796.

In *People v Crear*, 242 Mich App 158, 166; 618 NW2d 91 (2000), overruled in part on other grounds *People v Miller*, 482 Mich 540; 759 NW2d 850 (2008), this Court stated the following regarding claims of prearrest delay:

> Before dismissal may be granted because of prearrest delay there must be actual and substantial prejudice to the defendant's right to a fair trial and an intent by the prosecution to gain a tactical advantage. To be substantial, the prejudice to the defendant must meaningfully impair his ability to defend against the charges against him in such a manner that the outcome of the proceedings will likely be affected. Proof of "actual and substantial" prejudice requires more than just generalized allegations. [Internal citations omitted.]

Here, defendant's only support for his claim of delay is that the prosecution took two and a half years to produce probable cause to arrest him. Defendant has shown neither actual prejudice nor an intent to gain a tactical advantage. Instead, it appears that defendant "rel[ies] solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost," which is not alone enough to establish a due process violation. *United States v Marion*, 404 US 307, 325-236; 92 S Ct 455; 30 L Ed 2d 468 (1971). This Court acknowledged as much in *People v Patton*, 285 Mich App 229, 236-237; 775 NW2d 610 (2009), stating that "[m]ere delay between the time of the commission of an offense and arrest is not a denial of due process." Here, a mere delay in time is all that defendant sets forth in his brief to support his claim, and a new trial or evidentiary hearing is unwarranted.

Affirmed.

/s/ Karen M. Fort Hood
/s/ Christopher M. Murray
/s/ Deborah A. Servitto

# APPENDIX B

24442 T
JJM

# Court of Appeals, State of Michigan

## ORDER

People of MI v Allen Marion

Docket No. 293440

LC No. 09-003275-FC

Brian K. Zahra
Presiding Judge

Michael J. Talbot

Karen M. Fort Hood
Judges

---

The Court orders that the motions to remand pursuant to MCR 7.211(C)(1) are both DENIED for failure to persuade the Court of the necessity of a remand at this time.

Presiding Judge

RECEIVED
DEC 01 2010
APPELLATE DEFENDER OFFICE

COURT OF APPEALS OF THE STATE OF MICHIGAN 1965

A true copy entered and certified by Sandra Schultz Mengel, Chief Clerk, on

November 30, 2010
Date

Sandra Schultz Mengel
Chief Clerk

# APPENDIX C

did you have initially?

A Fatal shooting, that's it, over on Pelkey.

Q Okay, at the time of the shooting, do you have the information or do you have any paperwork that shows that the Homicide Section was notified at the time of the shooting, March 1st, and that any homicide investigators went out to the scene?

A No, the information we have is the shooting was a temporary serious shooting. At least that's how it was reported originally and it was being handled by the precinct. So when he finally passed away and now it's a homicide case, it was up to me to go to the precinct or the section, whatever they call it, in district and get the paperwork and find out what they had and we start from there.

Q And what information did you have at the beginning?

A They recovered a few casings. It was a broad daylight shooting. There was a bunch of people around but nobody was talking, that kind of stuff. And so I had to start with the family.

Q Okay, and when you say the family, what family did you start with?

A I believe her name was Leona Lipscomb,, I believe was her last name. That's Joe Day's mom. And I was in constant contact with his dad who was in another state on the phone. I talked to him like once a day for a while. And a cousin



PENGAD/INDY, MUNCIE, IN 47302
SF-ERL

or two, something like that.

Q And from talking to the family of the victim were you able to gather any information that assisted you in your investigation?

A Yes ma'am.

Q Okay, and did they direct you as far as potential witnesses, potential suspects that they became aware of?

A Exactly that. They told me, they gave me originally I think maybe even the first or second day I talked, they had the name Black, a guy called -

MR. SCHARG: Your Honor, I'm going to object. I believe that's hearsay.

MS. SIRINGAS: It goes to the nature of his investigation your Honor. It's not being offered for the -

THE COURT: Well there's no investigation but, there's no investigation exception to the hearsay rule. But there certainly, why is this offered even for the truth, what's the difference between this and say a police run?

MR. SCHARG: Well your Honor, it's going to the truth of, they're trying to investigate who the alleged or possible shooter was in the situation and they're getting information that is from somebody else's -

THE COURT: Right, but the information is what leads him on, isn't it?

MR. SCHARG: Well he could say that he got



SF-ERL PENGAD/INDY. MUNCIE, IN 47302

information, he doesn't have to say exactly what these people told him because that would be hearsay. And I would ask it be stricken.

THE COURT: Alright, Officer, just tell us, well, tell us what you did. That's the best way to foreshorten the objection.

A Okay.

Q Based on your discussions with family members, sir, did you get names of possible suspects and possible witnesses?

A Yes ma'am.

Q Okay, and the possible suspect that you had, you said you had a nickname?

A Correct.

Q And did you get names of possible witnesses that were involved and may have some knowledge about what occurred?

A Yes I did.

Q And what witness's names did you obtain?

A Donald Ricardo Sims, another kid named Sims, his first name started with a C, I can't even think of his nickname, a couple of guys named Sims, a guy named Phillip Yaeger.

Q So those were names, were those names that you received early on in your investigation as you became involved in trying to find out what happened?

A That's correct.

Q And did you attempt to make contact with these individuals?



PENGAD/INDY. MUNCIE, IN 47302 SF-ERL

# APPENDIX D

June 30, 2009

Detroit, Michigan

P R O C E E D I N G S

* * *

THE CLERK: People versus Allen Marion. Counsel.

MR. SCHARG: Good morning your Honor.

MS. SIRINGAS: Athina Siringas, your Honor, on behalf of the People.

MR. SCHARG: Steven Scharg on behalf of Mr. Marion. Your Honor, just two quick things I'd like to put on the record. One is yesterday Ms. Siringas asked me if my client would accept a plea to second degree murder and I just want to put on the record that I did inform my client that that offer was made and at this time he indicated he did not want to accept that. Is that true, Mr. Marion?

MR. MARION: Yes sir.

MR. SCHARG: And the second request is, your Honor, it was mentioned at the preliminary exam that when the witness, Donald Ricardo Sims, testifies that his mother's house was shot at, some people drove by the house and shot at the house. And I believe the People are intending to bring that in and I was going to ask the Court for a motion in limine to keep that out.

THE COURT: How is it relevant?

MS. SIRINGAS: Your Honor, it would be, the preliminary exam was scheduled to be held on Monday, February 9th,



PENGAD/INDY. MUNCIE, IN 47302 SF-ERL

I believe. And on Saturday, that Saturday a couple of masked gunmen went by the grandmother's house and shot up the grandmother's house. I think that's relevant as to the state of mind of the witness and fear, intimidation. And it would go to the witness's state of mind.

THE COURT: Where was he living at the time?

MS. SIRINGAS: Oh, he was not there but his fear is for his family and the threat is, he's locked up, my witness is locked up. There is a couple of other witnesses that I don't know if they're going to appear.

MR. SCHARG: I'd just like to add that my client was incarcerated at the time as well your Honor. It happened while Mr. Sims was incarcerated.

THE COURT: Well, it's kind of springing it on me late. What happened at the preliminary exam, nothing in relation to the shooting, just that it happened in proximity to the exam?

MR. SCHARG: Correct.

MS. SIRINGAS: It was the weekend before the preliminary exam.

THE COURT: I don't know if the prosecutor will be able to lay a foundation but you can object timely. I don't know what I'm going to do yet. I have to hear it in a context.

MR. SCHARG: No problem your Honor, thank you.

MS. SIRINGAS: And I would approach, your Honor, before I spring it on defense counsel, I would approach.



SP-ERL PENGAD/INDY, MUNCIE, IN 47302

free to go.

(Whereupon the witness was excused at 11:41 a.m.)

THE COURT: Ladies and gentlemen, I'll excuse you for your lunch break. It's a quarter to twelve. Be back at a quarter of one. Do not discuss the case.

(Whereupon the jury was excused for their lunch break)

(On the record without the jury)

THE COURT: We have something for the record. We're out of the presence of the jury.

MS. SIRINGAS: Your Honor, I'm going to move to add a witness to my witness list and that would be Hannah Sims, who is, there was a motion in limine made originally by defense counsel relating to her testimony or at least what happened at her home.

THE COURT: Well, let me fore-shorten this because, is this the home on Waltham?

MS. SIRINGAS: Yes.

THE COURT: And it was shot up two days before the exam?

MS. SIRINGAS: Yes, it was.

THE COURT: I'll allow it over objection.

MS. SIRINGAS: Thank you.

THE COURT: There is no such thing as coincidence in my life. Additionally, both witnesses who have testified this morning, Mr. Yaeger and Mr. Sims, in this Court's view, and I



PENGAD/INDY. MUNCIE, IN 47302 5F-ERL

find were extraordinarily frightened. I have no question that there was, that the shooting up of the house was not a coincidence.

MR. SCHARG: Can I just make one thing for the record.

MS. SIRINGAS: Counsel has had the exhibit. He's had it from the time of the preliminary exam so there's no surprise, just for the record.

MR. SCHARG: Oh, I'm not denying that I've had it. I only wanted to say, your Honor, excuse me, can I talk for a second. Your Honor, I just want to state for the record that at the preliminary exam Mr. Sims testified that he did cooperate in a federal case not only against Mr. Marion but other people. And –

THE COURT: You can bring it up.

MR. SCHARG: Okay.

THE COURT: We need Mr. Sims from in back before you bring the jury.

MR. SCHARG: But I just wanted to say, your Honor, the fact that there was other people that he cooperated, it doesn't mean that my client was the one or coincidentally it just happened –

THE COURT: It has nothing to do with your client. My ruling has nothing to do with your client, let me be clear. It has to do with the fact that these statements were taken at



PENGAD/INDY. MUNCIE. IN 47302 SF-ERL

the Waltham house and the shooting of the house was two days before the exam. The jury's entitled to know that. It's entirely relevant. The lawyers are free to argue what it means.

MS. SIRINGAS: Thank you your Honor.

(Whereupon the jury entered the courtroom)

THE COURT: Sir, you have to stand up. Mr. Sims, would you raise your right hand.

DONALD RICARDO SIMS

having been duly sworn on his oath at 1:00 p.m. was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SIRINGAS:

Q Sir, give us your name, please.

A Donald Sims.

Q Are you also known as Ricardo Sims, sir?

A Yes ma'am.

Q Is that your middle name?

A Yes ma'am.

Q And a lot of times you go by that name?

A Yes.

Q Now Mr. Sims, are you currently in federal custody?

A Yes.

Q And how long have you been in federal custody?

A Fourteen months now.

Q Are you currently under sentence?



PENGAD/INDY. MUNCIE, IN 47302 SF-ERL

Q Mr. Sims, if you didn't get arrested by the U.S. Marshals, the federal agents on May 23rd, 2006 -

A Yes.

Q Would you have ever told the Detroit Police Department about Mr. Marion as the shooter of your brother-in-law?

A Probably not.

Q Nothing further your Honor.

THE COURT: Thank you.

(Whereupon the witness's testimony was concluded at 2:26 p.m.)

THE COURT: Ladies and gentlemen, that will conclude our session for today. Please be back at nine o'clock tomorrow morning. You've been very prompt. My great thanks for your promptness. I had a very unruly jury last time and I couldn't get them here on time. I don't know what happened but I took no action but don't count on my kindness in the near future. Don't discuss the case, be back at nine.

(Whereupon the jury was excused for the day)

(On the record without the jury)

THE COURT: - with the federal government. I will allow him to be discharged from the writ and subpoena in this case hearing no objections. Thank you.

MS. SIRINGAS: Thank you your Honor.

\- - -

THE COURT: Now Ms. Siringas asked to add a witness and that is the homeowner or the grandmother of parties involved



PENGAD/INDY, MUNCIE, IN 47302 SF-ERL