in this case?

MS. SIRINGAS: Yes your Honor.

THE COURT: And I didn't really deal with that problem at the time. What, Mr. Scharg, what's your position on that?

MR. SCHARG: Your Honor, I believe, my position is that she was not on the witness list to begin with. I did have all the reports, I mean it was mentioned at the preliminary exam that there, some shots were fired prior to Mr. Sims testifying at the preliminary exam. They have no, as far as I know, nothing's been happening since that time period.

THE COURT: I understood it to be more than shots fired. It was masked men firing shots, wasn't it?

MR. SCHARG: I don't have the report in front of me.

THE COURT: Well in any event, I'll allow the witness to testify, the grandmother. What's her name?

MS. SIRINGAS: It is Hannah Sims, your Honor.

THE COURT: I'll allow Hannah Sims to be added to the People's witness list. And all I can say to the defense portion of the case that obviously you're free to argue it was coincidental or accidental or unrelated. Thank you.

MR. SCHARG: I'd like to put my objection on the record your Honor.

THE COURT: Right, well do you need further



PENGAD/INDY. MUNCIE, IN 47302
SF-ERL

objection? I mean I know what your objection is. Your objection is it's unrelated and therefore irrelevant.

MR. SCHARG: And I think it's more prejudicial than probative because Mr. Marion was locked up at the time, at the time that this happened and so was the victim. I mean the --

THE COURT: Why would it be more prejudicial if it's unrelated?

MR. SCHARG: Because they're bringing this up, they're trying to show that that's the reason why the other witnesses were scared to testify.

THE COURT: I'll allow it over objection. If that's the argument, I'll be very interested in hearing that.

(Matter concluded)



SF-ERL PENGAD/INDY. MUNCIE, IN 47302

July 2, 2009

Detroit, Michigan

P R O C E E D I N G S

* * *

THE COURT: People versus Allen Marion. Counsel, your appearances.

MS. SIRINGAS: Athina Siringas, your Honor, on behalf of the People.

MR. SCHARG: Steven Scharg on behalf of Mr. Marion, your Honor.

THE COURT: The jury is present in the jury room and the defense attorney indicated he had three matters. Go ahead.

MR. SCHARG: Two matters, your Honor.

THE COURT: Two matters.

MR. SCHARG: Your Honor, just briefly, after the benefit of the evening to think about this, the added witness yesterday of Hannah Sims without adequate notice over objection claiming that is it presumable 404 b evidence. We believe it's highly and unfairly prejudicial to Mr. Marion especially given the lack of evidence connecting Mr. Marion to the shooting itself of her home. As you know from Donald Sims's involvement with criminal activity in federal court and his cooperation there as well, there are any number of people that would have motive to do this.



PENGAD/INDY. MUNCIE, IN 47302 9F-ERL

THE COURT: I already ruled on it so what do you want me to do?

MR. SCHARG: I was just going to ask the Court, let the Court, it's my position that there was no cautionary instruction now regarding 404 b evidence which can protect Mr. Marion from any prejudice. So therefore, I was going to ask the Court for a mistrial at this time.

THE COURT: From the People?

MS. SIRINGAS: Your Honor, this is not 404 b evidence offered against Mr. Marion. It's offered to show why witnesses are fearful and have not testified in this case and that's the reason that the testimony is being offered. It's not being offered against Mr. Marion. I certainly don't intend to make an argument that he did because he was locked up. But for it was intended to intimidate and scare witnesses from testifying in this case.

THE COURT: Motion for a mistrial is denied. What's next?

MR. SCHARG: Your Honor, the only other thing I want to add I think the Court indicated yesterday that you were going to give them an instruction for aiding and abetting and mere presence. I would object to that instruction being given.

THE COURT: Why is that?

MR. SCHARG: I don't believe that there was any record made that Mr. Marion was aiding and abetting anyone that



SF-ERL PENGAD/INDY, MUNCIE, IN 47302

day.

THE COURT: Two people were shooting and that's the reason for the aiding and abetting. The prosecutor mentioned it in her opening statement as a theory of the case. I'll give it over objection.

MR. SCHARG: Thank you, Judge, nothing further. I think the officers are here.

THE COURT: Bring in the jury. Mr. Scharg, you can call your first witness.

MR. SCHARG: Thank you your Honor.

JON WEISS

having been duly sworn on his oath was examined and testified as follows: —

DIRECT EXAMINATION

BY MR. SCHARG:

Q Sir, can you state your name for the record, please?

A Officer Jon Weiss.

Q Officer Weiss, are you employed at this time?

A Yes.

Q And who are you employed with?

A City of Detroit.

Q Do you work with the police department?

A Yes.

Q Okay, back on, I think it would be March 7th, 2009 sometime in the evening hours were you working as a Detroit Police



SF-ERL PENGAD/INDY, MUNCIE, IN 47302

# APPENDIX E

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN

PLAINTIFF-APPELLEE

COURT OF APPEALS NO. 293440

LOWER COURT NO. 09-3275-01

-VS-

ALLEN MARION

DEFENDANT-APPELLANT.

______________________________/

## AFFIDAVIT

STATE OF MICHIGAN )
) SS.
COUNTY OF WAYNE )

STEVEN SCHARG, BEING FIRST DULY SWORN, DEPOSES AND SAYS THAT:

1. I WAS ALLEN MARION'S TRIAL ATTORNEY IN THE ABOVE CAPTIONED CASE;
2. ON JUNE 4 2009 I SUBMITTED AN ALIBI WITNESS LIST ON BEHALF OF DEFENDANT MARION, THAT INCLUDED CHARLES LEWIS AND ARNELL; .
3. THESE WERE INDIVIDUALS, WHOSE NAMES MR. MARION PROVIDED ME WITH, WHO COULD POSSIBLY HAVE PROVIDED HIM WITH AN ALIBI;
4. AT THE TIME, HOWEVER, NONE OF THE PROSPECTIVE WITNESSES, INCLUDING MR. MARION, COULD CORROBORATE WHERE THEY BELIEVED THEMSELVES TO HAVE BEEN AT THE TIME OF INCIDENT WHICH OCCURRED ON MARCH 1ST, 2006, ALMOST THREE YEARS EARLIER;
5. I HAVE NOW BEEN MADE AWARE OF A MIRAGE JEWELRY STORE RECEIPT RECENTLY DISCOVERED AFTER SENTENCING BY ROCHELLE MOORE, MR. MARION'S WIFE;
6. THE RECEIPT , VERIFIED, I AM TOLD BY THE OWNER OF MIRAGE JEWELRY, INDICATES THAT MR. MARION PURCHASED A DIAMOND RING ON MARCH 1ST, 2006;

7. THIS RECEIPT ALLOWS FOR CORROBORATION OF AN IMPORTANT PART OF MR. MARION'S DESCRIPTION OF HIS ACTIVITIES AND THE ACTIVITIES OF OTHERS HE WAS WITH ON MARCH 1ST, 2006;
8. HAD I BEEN ABLE TO VERIFY THE AUTHENTICITY OF THE RECEIPT AS HAS BEEN PRESENTLY DONE, I CERTAINLY WOULD HAVE RUN A NOW VERY CREDIBLE ALIBI DEFENSE ON MR. MARION'S BEHALF.

Steven Scharg

STEVEN SCHARG

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 26 DAY OF August, 2010.

______________________
NOTARY PUBLIC, Wayne COUNTY, MICHIGAN
MY COMMISSION EXPIRES: 6/23/2013

# APPENDIX F

# AFFIDAVIT OF CHARLES A. LEWIS JR.

STATE OF MICHIGAN )
)ss
COUNTY OF OAKLAND )

I, CHARLES A. LEWIS JR., being duly sworn, states that I have known Allen Marion, since about 2004, in regards to both the music business and as a friend. On March 1, 2006, at about 4 PM, I was picked up on Lauder Street, in the City of Detroit, by Allen Marion. The two of us drove to a jewelry store in Hamtramck Michigan; arriving between 4:45 PM and 5 PM Allen Marion looked at some rings. I saw him choose one and make a down payment on a ring by giving money to the owner and receiving a receipt. Over an hour after being there, we left, which was some time after 6 PM and drove to Rochelle Moore's house on Cheyenne in the City of Detroit, arriving between 6:45 PM and 7 PM. On the way home from the jewelry store, we stopped at a party store and bought some alcohol, which when we got to Cheyenne Street, we drank and socialized. I left Rochelle Moore and Allen Marion at about 7:45 PM, when they drove me to my car which was located at the home of Arnell Carmichael, on Lauder Street in the City of Detroit.

Allen Marion was continuously with me from 4 PM to 7:45 PM on March 1, 2006. All of the above information in this matter was told to Steven Scharg, the Attorney representing Allen Marion, prior to his trial.

Further, Deponent sayeth not.

Charles A. Lewis Jr. [signature]
Charles A. Lewis Jr.

Subscribed and Sworn to before
me, this 14th day of Dec, 2009

Jennifer A. Moore [signature]
Jennifer A. Moore Notary Public
Oakland County, Michigan
My commission expires: 3.26.2015

# APPENDIX G

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN

PLAINTIFF-APPELLEE

COURT OF APPEALS NO. 293440

LOWER COURT NO. 09-3275-01

-VS-

ALLEN MARION

DEFENDANT-APPELLANT.
______________________________/

## AFFIDAVIT

STATE OF MICHIGAN )
) SS.
COUNTY OF WAYNE )

ROCHELLE MOORE, BEING FIRST DULY SWORN, DEPOSES AND SAYS THAT:

1. IN THE FALL OF 2009, MY HOME WAS BURGLARIZED. MY ENGAGEMENT RING WAS AMONG THE ITEMS STOLEN.
2. I LATER SEARCHED MY HOME FOR RECEIPTS TO HELP SUPPORT A CLAIM ON MY HOMEOWNERS' INSURANCE POLICY FOR MY LOSSES.
3. I DISCOVERED THE RECEIPT FOR THE ENGAGEMENT RING THAT ALLEN MARION HAD BOUGHT FOR ME.
4. THE RECEIPT FOR THE DIAMOND RING WAS FROM MIRAGE JEWELRY STORE, LISTED ALLEN MARION'S NAME AND WAS DATED MARCH 1, 2006.

Rochelle Moore
ROCHELLE MOORE

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 20 DAY OF October, 2010.

______________________________
NOTARY PUBLIC, Wayne COUNTY, MICHIGAN Oakland acting in Wayne
MY COMMISSION EXPIRES: 6/23/2013

# APPENDIX H

# Mirage Jewelry

9701 Joseph Campau • Hamtramck, MI 48212
Phone: (313) 875-9671 • Fax: (313) 872-3009

NO REFUNDS • EXCHANGE ONLY • NO EXCHANGES AFTER 30 DAYS • NO EXCHANGES ON EARRINGS OR SILVER
NO REFUNDS OR EXCHANGES ON SPECIAL ORDERS OR REPAIRS • NO EXCHANGES ON BROKEN ITEMS
20% RESTOCKING FEE ON LAYAWAY ITEMS

CUSTOMER'S ORDER #

DATE 03-1-06

NAME Allen MARION.

ADDRESS

PHONE NUMBER

| SOLD BY | CASH | C.O.D. | CHARGE | RETURN | PAID OUT |
|---|---|---|---|---|---|
| | | | | | |

| QTY. | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| 1 | 14 KT White Gold Diamond | | |
| | Ring w/ 1.10 CTS in Diamond | | |
| | VS1 H. Color. #2455 | | 1350.00 |
| | | SUB TOTAL | |
| | | TAX | |
| RECEIVED BY | | TOTAL | |

All claims and returned goods
MUST be acc

Thank You

STATE OF MICHIGAN
IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN

Plaintiff-Appellee

Court of Appeals No. 293440

Lower Court No. 09-3275-01

-vs-

ALLEN MARION

Defendant-Appellant.

_______________________________/

**AFFIDAVIT**

STATE OF MICHIGAN )
) ss.
COUNTY OF WAYNE )

**ZAHER MURRAY,** being first duly sworn, deposes and says that:

1. I am the owner of Mirage Jewelry, located at 9710 Joseph Campau in the city of Hamtramck, MI;
2. I have recently been shown a copy of a receipt from my store and a photograph of a woman wearing a diamond ring (see attached);
3. Regarding the receipt: I can say that the handwriting on the receipt is mine. I can also say that the receipt had to date before 2009 because we have changed the look of our receipts since then;
4. The receipt describes a diamond ring and what was paid for it. The diamond ring the woman in the photograph is wearing is consistent with the description on the receipt and its cost and is also consistent with the rings I was selling at the time and still carry in my store;
5. I was also shown a photograph of the defendant, Mr. Marion and recognized him as a customer of my store.

[signature]
ZAHER MURRAY

Subscribed and sworn to before me
this 15 day of July, 2010

[signature]
Notary Public, Wayne County, Michigan
My commission expires: 6/23/2013



# APPENDIX J

**STATE OF MICHIGAN**

**IN THE COURT OF APPEALS**

**PEOPLE OF THE STATE OF MICHIGAN**

Plaintiff-Appellee

**Court of Appeals No.** 293440

**Lower Court No.** 09-3275-01

-vs-

**
**ALLEN MARION**

Defendant-Appellant.
_____________________________________/

**AFFIDAVIT**

STATE OF MICHIGAN )
) ss.
COUNTY OF WAYNE )

**LINDA BORUS,** being first duly sworn, deposes and says that:

1. I am the Chief Investigator for the State Appellate Defender Office;
2. On July 8, 2010, I went to the Mirage Jewelry Store in Hamtramck with a copy of a jewelry receipt from the store indicating that Allen Marion had purchased a diamond ring on March 1, 2006;
3. I was there to authenticate the receipt had been discovered after trial by Rochelle Moore, Mr. Allen's wife and to ask to see the original;
4. Mr. Zaher Murray, the store's owner was able to identify the writing on the receipt as his at this time and to verify the receipt as coming from his store;
5. However, Mr. Murray informed me that since the store does not put receipt information on their computer and does not keep a copy of the paper receipt for more than six months, the original or store copy was no longer available.

_____________________________
**LINDA BORUS**

Subscribed and sworn to before me
this 5th day of August, 2010.

_____________________________
Notary Public, Macomb County, Michigan
My commission expires: 8/1/2012

STATE OF MICHIGAN

IN THE SUPREME COURT

**PEOPLE OF THE STATE OF MICHIGAN**

Plaintiff-Appellee,

-vs-

**ALLEN MARION**

Defendant-Appellant.

______________________________/

**Supreme Court No. ________**

Court of Appeals No. 293440

Circuit Court No. 09-3275-01

**DEFENDANT-APPELLANT'S *PRO PER***
**SUPPLEMENTAL APPLICATION FOR LEAVE TO APPEAL**

**ALLEN MARION** hereby requests that this Honorable Court grant leave to appeal or take other appropriate action, and grant him a new trial or at least remand for an evidentiary hearing and to allow him to move for new trial for the reasons raised in his attached *pro per* Motion to Remand and Supplemental Brief on Appeal previously filed in the Court of Appeals pursuant to Standard 4, Administrative Order 2004-6. He incorporates his prior motion and supplemental brief by reference into this supplemental application for leave to appeal.

Respectfully submitted,

Jacqueline J. McCann (P58774), **signing for**
**ALLEN MARION**
No. 252103
Earnest C. Brooks Correctional Facility
2500 S. Sheridan Drive
Muskegon Heights, MI 49444

Dated: March 7, 2011

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee, C.O.App.No. 293440

Vs. Lower C.No.09-3275-01

Allen Marion,

Defendant-Appellant. /

## MOTION FOR REMAND

NOW COMES Defendant, Allen Marion, and he moves this Court to grant the Motion for an Evidentiary Hearing, and says, in support pursuant to MCR 7.211(D) thereof that:

1. He is the defendant in the above styled case, who during trial was represented by Trial Attorney-Mr.Scharg.

2. This same Attorney was ineffective at defendant's trial, for numerous reasons, one of which was for failing to Motion for the " DIRECTED VERDICT OF ACQUITTAL," After the prosecutor rested its Case-In-Chief.

3. Because, where the prosecutor 'did not,' and 'could not,' support it's own theory of probable cause to believe that the Defendant Mr. Marion, committed the shooting of Mr. Day on March 1, 2006 Because, the corpus delicti has not been proved to the court; and, there are no connections between the

prosecution's alleged actions of Mr. Marion with any "Substantial or Fundamental" facts that can show any allegation that Mr. Marion, when take in a light most favorable to the prosecution, still can not be said to have been at the scene of the crime in question for any other reason than to help the victim find a "bunch of people when Mr. Day was shot in broad daylight between 1 and 2 pm on Pelkay Street by (T II 112-113, 123)." There was/is, a violation of MRPC-Rule 3.8(A).

4. Under MCR 7.211(C)(1)(a)-(d), this request for remand should be granted, because the prosecution committed misconduct by withholding of exculpatory evidence in nature, which extended to a violation of Brady v. Maryland, 373 U.S. 83 (1963). The purpose of this Motion For Remand, is to allow the appellant the opportunity for an Evidentiary Hearing, to have expansion of the record for the following reasons:

a. From an examination of the record, it is apparent that the prosecutor actions and statements constituted misconduct in the following ways:

b. It was unprofessional conduct for the prosecution to present to the jury "Testimony from Mr. Ricardo, because the Prosecutor Knowingly and intentionally had him making perjured testimonies, that started with the false claim that Donald Ricardo Sims had some type of evidence that was probative in nature; when in fact, even if the defendant Marion, was to admit to every word testified to by Mr.Ricardo, there is nothing within his testimonies that would or could be probative in nature as

being against Marion's interest in not being falsely accused. (T II 43, 46, 52; T II 90-93, 104-105).T21). **In re Winship**, 397 U.S. 358, 364 (1973). **Brady v. Maryland**, Id.

5. There are other matters which are not contained in the record which also demonstrate's prosecutorial misconduct of suppressing the evidence; and, withholding facts showing:

a. The prosecution misled the jury by not telling that the Statements made against Mr. Marion describing past events, rather than events as they are actally happening are testimonial; thus, there was no legitimate reason for the prosecutor at trial to withhold these witnesses from the jury. Because, there was no showing that any of the declarants, those family members of the victim who supplied misleading information, and gave the innuendos to Officer Zwicker directly and those persons that the prosecutor mentioned in order to fabricate the corpus delicti for the jury, must be confront at the **Brady**-Hearing hereby requested.

b. The prosecutor relied on knowingly relied upon false information give by out of court witnesses that would not have been willing to swear under oath to such lies, and the prosecutor intentionally withheld these family members and others from coming to court deliberetrly.

A development of a factual record is required for consideration of these claims. Once an Evidentiary Hearing is held on these issues, the defendant will most likely be able to

prove that the prosecutor at trial knew that the charges brought against Mr. Marion was not supported by probable cause.

For these reasons, Allen Marion asks this Honorable Court to GRANT the said motion, and remand this case to the trial court for an Evidentiary Hearing on the issue of Prosecutorial misconduct; and thereafter, allow him to file a motion for a new trial.

Dated: Oct 18, 2010.

Respectfully submitted,

Allen Marion

STATE OF MICHIGAN

IN THE COURT OF APPEALS

People of the State of Michigan,

Plaintiff-Appellee,

Court of App. 293440

-vs-

Lower Court No. 09-3275-01

Allen Marion,

Defendant-Appellant /

PRO PER DEFENDANT-APPELLANT'S

SUPPLEMENTAL BRIEF ON APPEAL

( ORAL ARGUMENT REQUESTED )

BY: ALLEN MARION #

Michigan Reformatory

1342 West Main St.

Ionia, MI 48846

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.....................................ii,iii

STATEMENT OF QUESTIONS PRESENTED.............................iv

STATEMENT OF JURISDICTION.....................................v

STATEMENT OF FACTS............................................1

ARGUMENT:

I. SHOULD THE PROSECUTOR HAVE REFRAINED FROM PROSECUTING THE MURDER CHARGE THAT THE PROSECUTOR KNEW WAS NOT SUPPORTED BY PROBABLE CAUSE TO PROVE SUFFICIENT EVIDENCE OF DEFENDANT'S GUILT.................................2

II. DID THE PROSECUTION SUPPRESS EXCULPATORY, AND FAVORABLE EVIDENCE FROM BEING VIEWED BY THE JURY........................................6

RELIEF REQUESTED..............................................9

# INDEX OF AUTHORITIES

## State Cases


People v. Bulmer, 256o Mich. App. 33, (2003).............2
People v. Cotton, 191 Mich. App. 377; 478 N.W. 2d 681 (1991)... 3
People v. Carines, 460 Mich. 750 (1999).........................4
People v. Davenport, 39 Mich. App. 252 (1972).................3
People v. Hampton, 407 Mich. 354, 366 (1979).................2
People v. Hawkins, 245 Mich. App. 439 (2001)..................2
People v. Saunders, 189 Mich. App. 494 (1991)................3
People v. Wolfe, 440 Mich. 508 (1992)..........................4


## Federal Cases


Brady v. Maryland, 373 U.S. 83 (1963)..................2,3,6,7,8
Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497; 53 L.Ed. 2d 594 (1977)......................................2
Jackson v. Virgina, 443 U.S. 307; 99 S.Ct. 2781; 61 L.Ed. 2d 560 (1979).........................................2
In re Winship, 397 U.S. 358 (1970)...........................2,3
Donnelly v. DeChristorforo, 416 U.S. 637; 94 S.Ct. 1868; 40 L.Ed. 2d 431 (1974)...................................6
Berger v. United States, 295 U.S. 78; 55 S.Ct. 629; 79 L.Ed. 2d 314 (1935)..........................................6
United States v. Sutherland, 656 F.2d 1181, 1203 (5th Cir. 1981)......................................................6
Davis v. Alaska, 415 U.S. 308, 315; 94 S.Ct. 405; 39 L.Ed. 2d 347 (1973)..........................................7


## Statutes


MCL 600.308(1).............................................v
MCL 770.3..................................................v
28 U.S.C. § 1746...........................................3

Rules

MCR 7.211(D)....................................................1
MCR 6.425(F)(3)..................................................v
MCR 6.414(G)....................................................7
MRPC-Rule 3.8(A)................................................2

Other Authorities

Ad. Order 2004-6 Standard 4.....................................v

Constitutions

U.S. Const, Amend. V, XIV.......................................2
U.S. Const, Amend. VI, XIV......................................2
Const. 1963, Art 1, § 17........................................2
Const. 1963, Art 1, § 20........................................2

## STATEMENT OF QUESTIONS PRESENTED

I.

SHOULD THE PROSECUTOR HAVE REFRAINED FROM PROSECUTING THE MURDER CHARGE THAT THE PROSECUTOR KNEW WAS NOT SUPPORTED BY PROBABLE CAUSE TO PROVE SUFFICIENT EVIDENCE OF DEFENDANT'S GUILT.

Trial Court Answers, "No"

Defendant-Appellant Answers, "Yes"

Prosecutor-Appelle Answers "No"

II.

DID THE PROSECUTION SUPPRESS EXCULPATORY, AND FAVORABLE EVIDENCE FROM BEING VIEWED BY THE JURY.

Trial Court Answers, "No"

Defendant-Appellant Answers, "Yes"

Prosecutor-Appellee Answers "No"

## STATEMENT OF JURISDICTION

Pro Per Defendant-Appellant was convicted in the Wayne County Circuit Court by Jury Trial, and a Judgment of Sentence was entered on July 21, 2009. A claim of Appeal was filed on August 4, 2009 by the trial court pursuant to the indigent defendant's request for the appointment of appellate counsel dated July 21, 2009, as authorized by MCR 6,425(F)(3). This Court has jurisdiction in this appeal as of right provided for by Mich. Const. 1963, Art. 1, § 20, pursuant to MCL 600.308(1); MCL 770.3; and he seeks to now file his Ad. Order 2004-6 Standard 4. in Propria Persona Brief.

## STATEMENT OF FACTS PRESENTED

The Pro Per-Appellant accepts his appellate attorney's statement of facts as being an accurate account of what took place.

ARGUMENT

I.

THE PROSECUTOR DID NOT REFRAIN FROM PROSECUTING THE MURDER CHARGE THAT THE PROSECUTOR KNEW WAS NOT SUPPORTED BY PROBABLE CAUSE TO PROVE SUFFICIENT EVIDENCE OF DEFENDANT'S GUILT.

STANDARD OF REVIEW

To prove that there was Sufficient Evidence of Probable Cause to believe that the defendant committed the crime of murder did not exist, is reviewed de novo. Jackson v. Virgina, 443 U.S. 307; 99 S.Ct. 2781; 61 L.Ed. 2d 560 (1979); People v. Bulmer, 256 Mich. App. 33, (2003); when considering such a challenge to the sufficiency of evidence, the evidence is viewed in a light most favorable to the prosecutor in determining whether a (unprejudiced person) rational trier of fact could find that the required Probable Cause to connect the defendant to the crime were proven beyond a reasonable doubt, People v. Hampton, 407 Mich. 354, 366 (1979); In re Winship, 397 U.S. 358 (1970).

PRESERVATION OF ISSUE: Claims of insufficient evidence to support a conviction may be raised on appeal without having first been raised before the trial court, People v. Hawkins, 245 Mich. App. 439 (2001).

## DISCUSSION

Defendant does not dispute that the prosecutor proved that a Murder took place on Pelkey street in Detroit, Michigan on March 1, 2006. Defendant does dispute that he was not the person who committed the crime; because there is clearly no Corpus delicti or Probable Cause to believe defendant committed the crime.

Officer Zwicker summarized within his testimony that he had no Corpus Delicti to connect Mr. Marion to any involvement in the Murder of Mr. Day. **However,** Officer Zwicker's Innuendo, and Inadmissible Hearsay(s), to Provide the Probable Cause needed to connect the Defendant to the Crime(s). (T III 37-38).

In People v. Saunders, 189 Mich. App. 494 (1991), the Court stated: "When reviewing the issue of the sufficiency of the evidence, this Court views the evidence in a Light most Favorable to the Prosecution and determines whether a rational trier of fact could have found that; "as in People v. Cotton, 191 Mich. App. 377; 478 N.W. 2d 681 (1991): "In order for a District Court to bind over a defendant for trail, there must be evidence amounting to probable cause to believe that a defendant comitted the crime." In this case at hand, the Prosecutor obtained the bind over by using factual errors. In re Winship, Id.

Some panels of this Court have held that the Prosecutor must negate every reasonable theory of innocence. People v. Davenport, 39 Mich. App. 252 (1972), and cases cited therein... The prosecutor is not required to present direct evidence liking the defendant to the crime. Circumstantial evidence and reasonable inferences arising from the evidence may constitute satisfactory proof of the elements of the offense.

**People** v. **Carines**, 460 Mich. 750 (1999).

In Making defendant's claim of insufficiency of evidence, defendant is not requesting this court to interfere with the jury's role in determining credibility of witnesses and weighing the evidence. See **People** v. **Wolfe**, 440 Mich. 508 (1992).

Defendant asserts that the evidence before the jury, even if believed, was insufficient to prove his guilt beyond a reasonable doubt that he was the killer. There was no direct evidence linking defendant to the crime other than Inadmissible Hearsay(s), Innvendos, and Fabrications given by Officer Zwicker, and Mr. Ricardo. There was no circumstantial evidence that would lead to inferences of defendant's guilt.

Ricardo grabbed defendant's arm and told him that he wanted his name out of his business. ( T II 129, 153 ). Thus, if we believe Ricardo at the scene of the crime, Ricardo testified the Defendant Mr. Marion replied that his man just did not know who Ricardo was, and then Mr. Marion walked into the house where MR. Day was waiting.

Therefore, the only thing that can rationally be drawn from the evidence allegedly made against the defendant are innuendo's and witnesses speculating that there may have been some people that took some marijuana from both Mr.Day and Mr. Marion. Even if the worst inference possible is drawn from the evidence presented at trial, such evidence altogether would amount to no more then innuendos.

In a criminal proceeding, the State may not, and it has been said, in this connection, that the proper administration of the criminal law cannot be left merely to the stipulation of the

parties.

Where, in a prosecution for homicide, it appeared from the record that defense counsel had failed to Motion for a directed verdict of acquittal, after the witnesses that were called by the prosecutor at trial failed and/or refused to directly or indirectly support or substantiate the prosecutor's theories.

On review, the trial court's decision to admit innuendos, and inadmissible evidence will not be reversed unless it is clearly erroneous. Defendant asserts that his connection with the crime is simply stipulation by the Prosecution which was a mistake of erroneous corpus delicti that was unduly suggestive, and innuendos.

defendant's convictions and sentence must therefore be set aside and a New Trial Ordered.

## ARGUMENT

## II.

## THE PROSECUTION SUPPRESSED EXCULPATORY, AND FAVORABLE EVIDENCE FROM BEING REVIEWED BY THE JURY.

### STANDARD OF REVIEW

To prevail on a claim of prosecutorial misconduct, Mr. Marion must demonstrate that the prosecutor's actions "so infected the trial with unfairness as to make the resulting conviction a denial of Due Process." Donnelly v. DeChristorforo, 416 U.S. 637; 94 S.Ct. 1868; 40 L.Ed. 2d 431 (1974); Brady v. Maryland, 373 U.S. 83 (1963).

Court's focus in on "the fairness of the trial, not the culpability of the prosecutor." Berger v. United States, 295 U.S. 78; 55 S.Ct. 629; 79 L.Ed. 2d 314 (1935).

PRESERVATION OF ISSUE: It was/is, a due process violation in this case, in part, by the prosecution use of innuendos testimony. that was directly contradicted by earlier witnesses testimony in front of Jury; **Moreover**, in other parts, it can be shown if and when this Honorable Court Grant the Evidentiary Hearing, that as set forth in Mooney, Giglio and their progeny, counsel will have to establish that the witness in question (1) gave testimony, and (2) the prosecutor knew or should have known of its falsity. United States v. Sutherland, 656 F.2d 1181, 1203 (5th Cir. 1981).

DISCUSSION

The confrontation Clause of the U.S. Sixth Amendment guarentees a criminal defendant the right to confront the witnesses against him. **Davis v. Alaska**, 415 U.S. 308, 315; 94 S.Ct. 405; 39 L.Ed. 2d 347 (1973).

In so far as **Davis**, apply's to this case at hand, once the Prosecutor argued in her closing argument the hearsay evidence that Zwicker testified to, Mr. Marion had right to cross confront these persons mentioned. MCR 6.414(G).

"To ensure that the Jurors will not be exposed to sources of information of opinion, or subject to influences, which might tend to affect their ability to render an impartial verdict on the evidence presented in court..." As here, the suppression of the witnesses that Zwicker testified for, and the Prosecutor used on closing argument, would have most likely been exculpatory witnesses instead of hearsay inculpatory evidence, the same as the front two witnesses that the Prosecutor called. **Brady**, Id.

The United States Supreme Court reversed, nothing that the Sixth Amendment speedy trial provision has no application until the putative defendant in some way becomes an accused. The Court noted that the various statutes of limitation do not always protect a persons rights regarding pre accusation delay and therefore:

The Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the preindictment delay in this case caused substantial prejudice to appellant's right to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.

The Prosecution took 2½ years trying to come up with Probable Cause to arrest the Defendant. The Motion attached hereto is necessary to determine if the Prosecutorial suppression of evidence was intentionally withhold of witnesses that they used to create a theory for the Jury.

This Court may remand the case to the Trial court for entry of findings of fact, which are necessary for the Appellate Courts determination of any claim raised regard Ineffective Assistant of Counsel also.

There were Police Officers for Battle Creek, that could have also testified at trial. Brady, Id. These government official were clearly Favorable to the Defendant, but unwarrantedly withheld for the Jurors.

## SUMMARY AND REQUEST FOR RELIEF

WHEREFORE, for the foragoing reasons, Defendant-Appellant ALLEN MARION asks that this Honorable Court reverse his convictions and Remand for an Evidentiary Hearing, and/or a New Trial.

Dated:October 18 ,2010.

Respectfully Submitted,

By: Allen Marion

Allen Marion
(RMI) Pri. #257103
1342 West Main Street
Ionia, MI 48846

**STATE APPELLATE DEFENDER OFFICE**

**Main Office:** SUITE 3300 PENOBSCOT • 645 GRISWOLD • DETROIT, MICHIGAN 48226-4281
Phone: 313.256.9833 • Fax: 313.965.0372
CLIENT CALLS 313.256.9822

**DAWN VAN HOEK**
DIRECTOR
DETROIT/LANSING

**JONATHAN SACKS**
DEPUTY DIRECTOR
DETROIT

**LANSING OFFICE**
101 NORTH WASHINGTON
14TH FLOOR
LANSING, MICHIGAN 48913-0001
Phone: 517.334.6069 · Fax: 517.334.6987

**Website: www.sado.org**

April 28, 2011

Mr. Allen Marion
No. 252103
Earnest C. Brooks Correctional Facility
2500 S. Sheridan Drive
Muskegon Heights, MI 49444

Dear Mr. Marion:

I am writing in response to your letter dated February 27, 2011, received here on March 2, 2011. Sorry for the delay in getting back to you.

Enclosed for your records, as you requested, are the transcripts and the circuit court records from your case. Also enclosed are the police reports and other records that I received from your former appellate attorney Gerald Lorence. I do not think that I have Donald Sims' indictment papers or the police report that Hanna Sims made regarding the shooting of her home. I do not believe that your concern over the address of the house that was shot up would provide a meritorious appellate issue. If you wish to raise additional issues in your case, you would be able to do so in a motion for relief from judgment (6.500 motion) filed in the trial court after the direct appeal is over (meaning if the Supreme Court denies our applications for leave to appeal.

Sincerely,

Jacqueline J. McCann
Assistant Defender

Enclosures
cc: File

STATE OF MICHIGAN
IN THE 3rd CIRCUIT COURT OF WAYNE COUNTY

PEOPLE OF THE STATE OF MICHIGAN

**Plaintiff,**

**Case No:** 09-3275

v.

**Hon:** Michael J. Callahan

ALLEN MARION

**Defendant,**

________________________________/

**DEFENDANT MARION'S AFFIDAVIT IN SUPPORT OF MOTION FOR EVIDENTIARY HEARING**

I, Allen Marion, being duly sworn, deposed and says as follows:

1. I am currently serving a sentence in the Michigan Department of Corrections at E.C. Brooks Correctional Facility(LRF) at 2500 S. Sheridan Dr., Muskegon Heights, MI 49444;

2. That if called, I would testify that on 3-1-06 from approximately 4:40 pm up until about 6:15 pm I was inside Mirage Jewelry Store, located in Hamtramek, MI, with a friend by the name of Charles Lewis;(see Exhibit A)

3. During this time in the jewelry store I was trying to make up my mind which ring was the best to engage my fiance, as well as haggle out a reasonable price with the jeweler: Zaher Murray;(see Exhibit B)

4. On 3-1-06, I had not been acquainted or knew of any one by the name of Joseph Day;

5. I had never shot or attempted to shoot anyone, throughout my entire life;

6. I did not murder Joseph Day;

7. It is my belief that the prosecutions lead witness, Donald "Ricardo" Sims (Mr. Sims) knowingly and intentionally told falsehood to Officer Charles

Zwicker (Officer Zwicker) that I murdered Joseph Day;

8. Although Mr. Sims' claim to have witnessed me murder Mr. Day there was 10 to 15 supposed additional witnesses who never came forward to corroborate Mr. Sims' false allegations;

9. At the scene of the crime, Mr. Sims claimed to have been interviewed (see police reports), Mr. Sims was not in the reports and never identified me on the day in question(3-1-06);(see Exhibit C)

10. Mr. Sims only came forth in a last "Ditch Effort" to bargain away a crime that Mr. Sims was being pursued by the Federal Bureau of Investigations for;

11. The two people Mr. Sims claimed would confirm his falsehood, were his younger brother Carnell Sims and a neighbor, Phillip Yeager.(TII 79, 182);(see Exhibit D)

12. At trial, Phillip Yeager testified that when Mr. Day was shot he was neither in his home as Officer Zwicker allegedly recalled, nor was he standing where Mr. Sims claimed he was standing.(TII 34, 38-40);(see Exhibit D)

13. Carnell Sims denied that he gave and signed a statement to police(TII 82-83, 85-86, 103). Carnell never ID'd me in a court line-up(TII 91, 92, 93). Carnell denied seeing the shooting and denied knowing who shot Mr. Day(TII 98-100);(see Exhibit D)

14. Phillip Yeager told Officer Zwicker that he did not see the shooting(TII 42, 74-75). Mr. Yeager testified that Officer Zwicker kept putting words in his mouth, and that he eventually just signed the statement(TII 42, 44, 48, 75-78). Mr. Yeager testified that as an example he had no recollection of what kind of van it was, but none-the-less the officer wrote in the statement that it was a Chevy Van(TII 77-78);(see Exhibit D)

15. Officer Zwicker told falsehoods about what Mr. Sims told him in his

interview on 12-8-06, as well as being in reckless disregard to the truth on what was wrote in his police reports and the information fraudulently put in front of the court to convict me;

16. Officer Zwicker falsified documents to the court in an effort to illegally convict me;

17. Officer Zwicker falsehood violated applicable Universal Declaration of Human Rights being: Article 1, 2, 3, 4, 7, 9, 10, 11(2), 17(2), and 30, as I am party to the Human Family;

18. I asked Mr. Scharg, my attorney, several times before my preliminary examination to retrieve core exculpatory discovery items that he never retrieved and never gave any adequate reasoning as to why he refused to do so;

19. I specifically asked Mr. Scharg to retrieve the Warrant and the Affidavit to that Warrant, Mr. Scharg never made the prosecution produce an Affidavit to the warrant to challenge the allegations used to procure the warrant;

20. At and before my preliminary examination I asked Mr. Scharg to submit a motion to quash the complaint and warrant, and I asked him to submit an Affidavit on my behalf challenging the allegations of the warrant and complaint, Mr. Scharg told me that "I could do that," but he never submitted the motion;

21. I asked Mr. Scharg to investigate several allegations that Mr. Sims made to contradict all the lies he told, like:

1. The Denny's Restaurant Surveillance Camera to show that I never met anyone at any time at Denny's Restaurant.

2. The phone records from my phone, Joseph Day's phone and Mr. Sims' phone, to show that I never had any back and forth phone conversation with either of these people.

22. I asked Mr. Scharg to object to the admission of Mr. Sims testifying that Carnell Sims and Phillip Yeager could corroborate his story at

preliminary examination, he refused, I also asked Mr. Scharg to adjure the hearing to investigate and go to interview these witnesses and he stated, "I will see what I could do," but did nothing;

23. I asked Mr. Scharg after I got bound over for an evidentiary hearing, he said they have no evidence against you, only Mr. Sims, I asked him before my pretrial hearing that he refused to allow the court to give before trial(see registration of action), to quash the statement against me from Mr. Sims and an Affidavit on my behalf, he refused me a pretrial hearing and allowed the court to take me directly to trial;(see Exhibit E)

24. I asked Mr. Scharg before Preliminary to interview Charles Lewis so we could have him at the hearing, he stated we need him for trial and not preliminary, I told him Charles Lewis was my alibi witness and we need to call him to testify and to submit a motion to quash and an Affidavit on my behalf to contradict the prosecution's informant witness. He wouldn't do it;

25. I asked Mr. Scharg to object several times, where he told me that "I don't object unless it's absolutely necessary," but Mr. Scharg refused to object to the prosecutor vouching for Mr. Sims' credibility as a witness that only came forth months after the crime in question, when he was facing federal charges and stood to gain favor on those charges if he successfully helped the State secure a conviction against me, Mr. Sims would say anything;

26. I ask Mr. Scharg to ask for a directed verdict of acquittal, Mr. Scharg refused and asked the court to add second degree instruction and man slaughter, the court refused the man slaughter instructions, Mr. Scharg told me he would normally ask for a direct verdict, I asked him to ask for it and told him that they have not proved that I did this crime nor have they proved 1st degree murder, he stated, "but in this case I won't ask for it.";

27. I asked Mr. Scharg to put my alibi witness on the stand to testify,

at trial, he stated he would but, rested his case and failed to call Charles Lewis to the stand, who was in the hallway waiting.

28. I asked Mr. Scharg to impeach Mr. Sims the states witness, after Carnell Simms and Phillip Yeager testified at trial right before Mr. Sims got on the stand and committed perjury claiming that Cornell Sims and Phillip Yeager could corroborate his story, which both witnesses contradicted everything Ricardo Sims said, Mr. Scharg refused to impeach him.

29. It is my belief that Mr. Scharg failure to investigate, procure core exculpatory discovery information, and his refusal to submit motions and object to obvious prosecutorial misconduct, essentially worked as a co-conspirator with the prosecutor to deprive me of my Sixth Amendment Right to effective assistance and my Fourteenth Amendment Right to due process of law, which is a law guaranteed by the United States Constitution and the Michigan Constitution, as well, Mr. Scharg participated in what essentially became "Fraud on the Court.";

30. Jacqueline J. McCann denied me effective assistance of counsel and was a party to the conspiracy to illegally convict me, when she refused to investigate and make a motion to remand to the trial court for an Evidentiary Hearing and New Trial, separate (separate motion) with my Affidavit attached telling the court under oath my whereabouts on the day of the offense, Ms. McCann refused to submit my affidavit with my appeal by right motions and my appeal by leave motions, proven that I am actually and factually innocent of the charges, she refused to compel the courts to give a direct response to these evidentiary issues not previously dealt with, thus participating in "Fraud on the Court.";

31. Ms. McCann, upon submitting my leave to appeal was totally made aware of all the facts listed in this affidavit, but refused to submit my afficavit

along with all the other witnesses affidavits verifying my whereabouts, My Affidavit had Ms. McCann simply submitted it, it would have simply denied my responsibility as the suspect, challenged the States only impeachable witness and gave an offer of proof to my whereabouts, unfortunately Ms. McCann saw to it that the court never heard my side of the story under oath, as the prosecutor's falsified theory was unobjected and challenged under oath;

32. Ms. McCann was ineffective where I made her fully aware of all the issues in this affidavit she failed to do anything as I constantly requested her to. I asked Ms. McCann to bring up ineffective assistance of trial counsel for not calling a defense, which he had and all the other above issues in this affidavit;

33. I asked Ms. McCann to inform me of the issues she was raising on my appeal and to send my transcripts she refused to notify me on the appeal issues and gave my transcripts after my appeal hindering me to raise the proper issues on appeal in my standard 4 brief(see letter attached);

34. I asked Ms. McCann to set me up for a polygraph examination to support the fact that my affidavit(had she submitted it) and my alibi witnesses affidavits were all true;

35. As previously stated, I am actually and factually legally innocent of murdering Joseph Day.

36. Petitioner made appellate counsel aware that Mr. Scharg was told of his whereabouts and given names and numbers of alibi witnesses before trial, but appellate counsel Ms. McCann stated in my leave to appeal that had Attorney Mr. Scharg been aware of this evidence at the time of trial would have caused him to run the alibi defense(see Exhibit F of statement from Ms. McCann) also(see Exhibit A, Affidavit of Charles Lewis). Charles Lewis was placed on notice of alibi witness list, and told Mr. Scharg before trial about

our whereabouts to corroborate my facts.

## SUMMARY AND REQUEST FOR RELIEF

Wherefore, for the foregoing reasons, Petitioner asks that this Honorable Court grant this motion, including but not limited to remanding for an evidentiary hearing and to allow petitioner to move for new trial.

Respectfully Submitted,

Allen Marion

James E. Jones Jr.
Notary Public, Muskegon County, MI
My Commission Expires 5/09/2018

July 12, 2012

# EXHIBIT "A"

# AFFIDAVIT OF CHARLES A. LEWIS JR.

STATE OF MICHIGAN )
)ss
COUNTY OF OAKLAND )

I, CHARLES A. LEWIS JR., being duly sworn, states that I have known Allen Marion, since about 2004, in regards to both the music business and as a friend. On March 1, 2006, at about 4 PM, I was picked up on Lauder Street, in the City of Detroit, by Allen Marion. The two of us drove to a jewelry store in Hamtramck Michigan; arriving between 4:45 PM and 5 PM Allen Marion looked at some rings. I saw him choose one and make a down payment on a ring by giving money to the owner and receiving a receipt. Over an hour after being there, we left, which was some time after 6 PM and drove to Rochelle Moore's house on Cheyenne in the City of Detroit, arriving between 6:45 PM and 7 PM. On the way home from the jewelry store, we stopped at a party store and bought some alcohol, which when we got to Cheyenne Street, we drank and socialized. I left Rochelle Moore and Allen Marion at about 7:45 PM, when they drove me to my car which was located at the home of Arnell Carmichael, on Lauder Street in the City of Detroit.

Allen Marion was continuously with me from 4 PM to 7:45 PM on March 1, 2006. All of the above information in this matter was told to Steven Scharg, the Attorney representing Allen Marion, prior to his trial.

Further, Deponent sayeth not.

Charles A. Lewis Jr. (signature)
Charles A. Lewis Jr.

Subscribed and Sworn to before
me, this 14th day of Dec, 2009

Jennifer A. Moore (signature)
Jennifer A. Moore Notary Public
Oakland County, Michigan
My commission expires: 3.26.2015

Exhibit "B"

**STATE OF MICHIGAN**
**IN THE COURT OF APPEALS**

**PEOPLE OF THE STATE OF MICHIGAN**

Plaintiff-Appellee

**Court of Appeals No. 293440**

**Lower Court No. 09-3275-01**

-vs-

**ALLEN MARION**

Defendant-Appellant.
______________________________/

**AFFIDAVIT**

STATE OF MICHIGAN )
) ss.
COUNTY OF WAYNE )

**ZAHER MURRAY,** being first duly sworn, deposes and says that:

1. I am the owner of Mirage Jewelry, located at 9710 Joseph Campau in the city of Hamtramck, MI;
2. I have recently been shown a copy of a receipt from my store and a photograph of a woman wearing a diamond ring (see attached);
3. Regarding the receipt: I can say that the handwriting on the receipt is mine. I can also say that the receipt had to date before 2009 because we have changed the look of our receipts since then;
4. The receipt describes a diamond ring and what was paid for it. The diamond ring the woman in the photograph is wearing is consistent with the description on the receipt and its cost and is also consistent with the rings I was selling at the time and still carry in my store;
5. I was also shown a photograph of the defendant, Mr. Marion and recognized him as a customer of my store.

[signature]
**ZAHER MURRAY**

Subscribed and sworn to before me
this 15 day of [illegible], 2010

[signature]
______________________________
Notary Public, Wayne County, Michigan
My commission expires: 6/23/2013

# Mirage Jewelry

9701 Joseph Campau • Hamtramck, MI 48212
Phone: (313) 875-9671 • Fax: (313) 872-3009

NO REFUNDS • EXCHANGE ONLY • NO EXCHANGES AFTER 30 DAYS • NO EXCHANGES ON EARRINGS OR SILVER
NO REFUNDS OR EXCHANGES ON SPECIAL ORDERS OR REPAIRS • NO EXCHANGES ON BROKEN ITEMS
20% RESTOCKING FEE ON LAYAWAY ITEMS

CUSTOMER'S ORDER #
DATE 03-1-06

NAME Allen MARION.

ADDRESS

PHONE NUMBER

| SOLD BY | CASH | C.O.D. | CHARGE | RETURN | PAID OUT |
|---|---|---|---|---|---|
| | | | | | |

| QTY. | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| 1 | 14 KT white Gold Diamond | | |
| | Ring w/ 1.10 CTS in Diamond | | |
| | VSI H. Color. #2455 | | 1350.00 |
| | | SUB TOTAL | |
| | | TAX | |

RECEIVED BY

TOTAL

All claims and returned goods MUST be acc

Thank You



Exhibit "C"

# POLICE DEPARTMENT CASE REPORT

DETROIT POLICE DEPARTMENT

Case No. 0603010423
Report No. 0603010423.3
Report Date: 3/1/2006

1



Subject: EASTERN-COBRA 33- SHOOTING OF - CD 10

Case Report Status: S - SUBMITTED
County: 82 - WAYNE
City/Township: 99 - DETROIT
Occurred On: 3/1/2006 5:40:00 PM
(and Between):
Location: F/O 19614 PELKEY
CSZ:
Census/Geo Code: 5033
Grid: E1 - 0501
Call Source: CAD/DISP
Vehicle Activity:
Vehicle Traveling:
Cross Street:
Means:
Other Means:
Motive:
Other Motives:

Date Entered: 3/1/2006 7:14:54 PM
Entered By: 230264 - AMOS, MARK
Date Verified:
Verified By:
Date Approved:
Approved By:
Connecting Cases:
Disposition: ACTIVE
Tactical Actions:
Clearance Reason:
Date of Clearance:
Reporting Agency: DETROIT POLICE DEPARTMENT
Division: 5th/Eastern District
Notified: HOMI- SHELBY, NOT&CONT -SGT. HUGHES, ED DESK- SGT CHANEY, ED IOD BORKOWSKI.

Reporting Officer: 230264 - AMOS, MARK
Assisted By: 230264 - AMOS, MARK
Assist Agency:

Report Narrative:

PO MARK AMOS 3405
PO MARK ESTRADA 70

WRTS RECEIVED A POLICE RUN TO PELKEY / MANNING ON A "SHOOTING". WRTS MADE LOC AND OBS THE COMPL LYING ON THE SIDEWALK IN F/O 19614 PELKEY COMPLAINING OF A GSW WOUND TO THE LEFT SIDE OF HIS STOMACH. MED 13 MADE LOC AND CONV HIM TO ST. JOHNS HOSPITAL UNDER THE CARE OF DR. LOWE TEMP SERIOUS, CHART# 026768764/6060. WRTS T/T WITNESS #1 WHO STATED HE WAS INSIDE OF HIS HOUSE AT13453 MANNING WHEN HE HEARD APPROX 3-4 SHOTS, HE LOOKED OUT OF HIS WINDOW AND SEEN THE COMPL LYING IN FRONT OF 19614 PELKEY. WRT RECOVERED 3 9MM SPENT SHELL CASINGS LAYING ON THE SIDEWALK JUST NORTH OF WHERE THE COMPL WAS LAYING. WRTS CANVASSED AREA, NO WITNESSES AT THIS TIME. SPENT SHELL CASINGS ON EVID#E16604504,E16604604,E16604704.

## Offense Detail: 1304 - AGG/FEL ASSAULT - NON-FAMILY - GUN

Offense Description: 1304 - AGG/FEL ASSAULT - NON-FAMILY - GUN
IBR Code: 13A - AGGRAVATED ASSAULT
IBR Group: A
Crime Against: PE
Offense File Class: 13002 - AGGRAVATED/FELONIOUS ASSAULT
PACC:
Local Code:
Using:
Criminal Activity:
Weapons: 12 - HANDGUN

Location: 20 - RESIDENCE/HOME
Offense Completed?: YES
Hate/Bias: 00 - NONE (NO BIAS)
Domestic Violence: NO

No. Prem. Entered:
Entry Method:
Type Security:
Tools Used:

## Suspect S1: UNKNOWN SUSPECT

Suspect Number: S1
Name: UNKNOWN SUSPECT
AKA:
Alert(s):
Address:
CSZ:
Home Phone:
Work Phone:

DOB:
Age: 00
Sex: U - UNKNOWN
Race: U - UNKNOWN
Ethnicity: U - UNKNOWN
Ht.:
Wt.:
Eye Color:
Hair Color:
Hair Style:

Place of Birth:
SSN:
DLN:
DLN State:
DLN Country:
Occupation/Grade:
Employer/School:
Res. County:
Res. Country:
Resident Status: U - UNKNOWN

EXHIBIT "D"

COPY

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

-v-

Case No. 09-003275-01

ALLEN MARION,

Defendant.
_______________________________/

JURY TRIAL
VOLUME II

Proceedings had before the Honorable MICHAEL J. CALLAHAN, Judge of the Third Judicial Circuit of Michigan, 703 Frank Murphy Hall of Justice, Detroit, Michigan 48226, on June 30, 2009.

APPEARANCES:

MS. ATHINA SIRINGAS
Assistant Prosecuting Attorney

On behalf of the People

MR. STEVEN E. SCHARG
Attorney at law

On behalf of the Defendant

Jeffrey B. Goldsmith
Official Court Reporter
CSMR-0037

RECEIVED
DEC 23 2009
APPELLATE DEFENDER OFFICE

10-15094

March 1st of the year 2006. Did you know a person by the name of Joseph Day?

A Yes.

Q How did you know Mr. Day?

A From my mother's neighborhood.

Q And where did your mother reside back in March of 2006?

A Pelkey and Manning.

Q On Pelkey?

A And Manning.

Q And Manning, did she, do you have, well, in relation to the corner, where did your mother live?

A On the corner.

Q On the corner? And did you visit that neighborhood frequently because your mother lived there?

A Quite frequently.

Q And did you, how did you get to know Joseph Day?

A Just from over there.

THE COURT: Can you talk louder?

Q You've got to speak up.

A Just from over there.

Q Okay, did he, was he associated with a house, did he live at a house near that neighborhood?

A I don't know if he lived over there or not.

Q But he was there?

A Yes.

hours?

A I wasn't hours, probably less than twenty minutes, I'm guessing. I'm not sure of the time. I'm not sure what time of day it was. It was daytime.

Q Do you know what car that Joseph Day drove? Are you familiar with his car?

A Yes.

Q What kind of car did he have?

A A white Benz.

Q Do you remember if that white Benz was in the driveway or the field on the day of the shooting?

A I'm not sure. They asked me that before. I don't recall that.

Q I'm sorry?

A I don't remember where it was at.

Q Okay, you're going to have to --

A Speak up.

Q Speak up and slow down maybe a little bit so the jury can understand what you're saying, alright. Now you've been subpoenaed to be here, right?

A Yes.

Q And you're not all too happy about being here, are you?

A No.

Q And sir, on the day of the shooting, okay, you said you'd been there about twenty minutes. Did you ever make it over

to your mother's home?
A No.
Q Did you stop and talk to some people on the street?
A Yes.
Q Who were you speaking to?
A I was talking to my friend, Boosie (ph).
Q Boostie?
A Boosie. He had stopped me when I got over there, talking about a car.
Q Did you drive over there?
A I think I did. I'm not sure what I drove but I'm be [illegible] so.
Q And so where were you when you were talking to your friend?
A Towards the corner of the block.
Q Towards the Manning corner?
A Yes.
Q On the south. Did you see Ricardo Sims out there, sir?
A I think I seen him down the street. I never made it down, you know, that far to talk to him.
Q You're saying before the shooting you never made it down there, right?
A Correct.
Q After the shooting, you went down there, right?
A Correct.
Q So after the shooting you saw people there, right.

A Yes.

Q Is it fair to say that before the shooting, there were a number of people that were outside?

A I think there was more after the shooting than before. I'd say that.

Q Alright, but there were a number of people and you said it was a nice day?

A Yeah.

Q This was March 1[illegible], but you remember it was a nice day, correct?

A Correct. I don't remember if [illegible] for March.

Q Okay, so people are hanging outside?

A Correct.

Q Daylight.

A Daylight.

Q Do you notice anybody working on a car, fixing a car?

A I can't say for sure.

Q Do you remember what you were talking to your friend about?

A Not three years ago, not exactly. I was talking [illegible] I stopped and talked to him, didn't make it [illegible] house.

Q Now when, where were you standing when the shooting happened?

A Towards the corner of the block on the sidewalk.

Q Alright, did you see any cars [illegible] across the street from where you were? Your mother's [illegible] the east [illegible] street, right?

Zwicker, right?

A Correct.

Q And did you tell him the truth?

A Yes. I mean honestly, when I -

Q Let me show you the statement.

A I seen the statement.

Q Your signature's on it, right?

A Correct. When I went to the house to make the statement, like I told him, I didn't see anything. I didn't know what happened. So we over there, he's talking, he's asking questions. Basically, I'm not saying he was saying it for me but he's asking me questions that I really couldn't answer. Did you see anything? I know I seen, you know, began shooting, I ran. I didn't see what happened. I seen, he said what kind of vehicle was it? I seen a van pull in the street. I mean what more can I say. He asked me to describe it. I really couldn't describe anything. I wasn't paying attention to it.

Q Did you answer him, though, a little Chevy van?

A A Chevy van. He asked what color is it? I don't know.

Q Okay, but -

A I wasn't down that far, yes.

Q Okay, but you saw a van, right?

A Yes.

Q And did you see another kind of car parked behind the van?



PENGAD/INDY, MUNCIE, IN 47302

block.

Q Were you standing mid-block?

A I was at the corner.

Q Oh.

A Which is right across from my mother's house.

Q Now how far away would you say you were from Joseph Day when the shooting started?

A About three houses down. I don't know the approximate feet.

Q Okay, did you give Officer Zwicker some information about a Delta that was, did you tell Officer Zwicker there was a van, a Cadillac and a Delta across the street?

A I told him I seen the van. And I told him I went to the house when he asked me to make a statement, they were asking about the cars. And that's when he said it was a Cadillac. I don't know. I don't remember whether it was a Delta or a Cadillac behind it. Yes, I understand the statement.

Q So now you don't remember, right?

A Ma'am, I didn't remember then.

Q Okay, alright. And in your statement you said there was some guys talking and you said you were outside talking about a car, right?

A Correct.

Q Is that true now? You were talking about a car?

A Yes ma'am.

Q Okay, and that was to your friend?



PENGAD/INDY. MUNCIE, IN 47302

Then I saw a guy come from around the van with a gun in his hand. When he started shooting, we ran." Is that right?

A If that's what the statement says, yes.

Q Did that happen?

A Yes.

Q "After the car sped away from back and called 911." Right?

A Yes.

Q You used your cell phone to call?

A Yes.

Q "Can you describe the guy with the gun? Answer: I didn't see him. short, black. What kind of van was it? A little Chevy van, I don't remember the color." Is that what you told Officer Zwicker, sir?

A If that's what the statement says, yes.

Q Is that true? Did that happen?

A I seen the van speed away, yes. I mean I didn't see, heard, I seen a little van in the street. I don't know what color. I don't know if it was a Chevy. When I was doing the statement, once again, at the house, the officers asked me a question I couldn't answer. It was a van. It was a small van.

THE COURT: Anything else?

Q After you made the call, sir, you came back around, right?

A After I came back out, I made the call.

Q Okay, you came back to the street?

with Ricardo?

A By myself.

Q And Ricardo was already there at his grandmother's house, correct?

A Correct.

Q And the officer asked you to sit down so he could ask you some questions of what happened in regards to the shooting of March 1st, 2006, correct?

A Correct.

Q Prior to March 1st, 2006, did you continuously see Mr. Sims in the neighborhood?

A Yeah, when I went to, not every day that I go over there that he would be there but I would see him down the street. Not every visit. I'll put it that way.

Q Alright, so two years prior to making your statement everything was back to usual. You'd go down to see your mom and occasionally you'd see the Sims family there?

A Correct.

Q Okay. And I'm sure there's always been conversation about the shooting on March 1st, 2006?

A Possible.

Q Okay. And when you came to the grandmother's house and talked to this officer, he wrote, the officer wrote the statement?

A Correct.

Q But you signed your name?

A Correct.

Q Did you tell him that some of the information in that statement was not right?

A No, I told, when I got there when they asked me the questions as I stated before, when they asked me the questions I'm saying I don't remember. What color was I don't know. Did you see the guy? I don't know how he looked. That's they're whole ... a question to me was like ... I saw the person do it ... know he ... did ... I didn't see it. I didn't get down that far.

Q Where did they get the information that the person was short?

A They asked me questions I can't answer. I don't know.

Q Okay, so you didn't tell them that?

A No. I ... what does the statement say? How does he ... I don't know.

Q It says ... really didn't see him, short and black.

A I'm 6' 1". Everybody's short to me basically.

Q Okay, and did you ever tell him that you didn't remember anything else on this that wasn't correct?

A ... told him the whole time I was there I told him I don't really remember. You're asking me something two years after. And he says he asking, his reason was get your version. I don't have a version.

Q Then why would you sign a statement that wasn't true?

A No, it's not so much, they asked me to sign it. I mean ...

Q This statement, sir, that [illegible] Officer [illegible], there's really three questions that you answered, right? He asked you [illegible] I mean he asked you [illegible] happened? [illegible] went through what you told the officer [illegible] you [illegible] what [illegible] he [illegible] was true, right? The [illegible] the [illegible], correct?

A [illegible] yes.

Q Okay, so everything that's in this statement [illegible] true [illegible] recollection is, correct?

A [illegible]

Q Okay. [illegible] there's not [illegible] there [illegible] you're saying, right?

A Right. I can't give a statement about something [illegible] don't [illegible] about. He's asking questions that [illegible] really [illegible] and that's what I explained to you. When I was over

Q Okay. Let me stop you. Alright [illegible] asked you to describe the guy with the gun and you [illegible] thing [illegible] knew was that he was short and black [illegible] you didn't [illegible] anything else, right? And that's what your answer says. I really didn't see [illegible] short and black.

A I can't give [illegible] height detail [illegible] the street.

Q Okay, but that was true and Officer [illegible] wrote it down as you gave it to him, correct?

A He wrote down the statement.

Q Alright. And he wrote a very [illegible] statement [illegible]

what [illegible] recollect. I don't know

Q Did you have a chance to read [illegible] before you signed [illegible]

A No. When they contacted me [illegible] subpoena, [illegible] know [illegible] didn't [illegible] ask them, I don't [illegible] anything [illegible] ever talking about it. It's a waste of time.

Q Sir, one last question for you is Ms. Siringas asked you when you came back to the scene after the shooting and [illegible] saw Mr. [illegible] on the ground [illegible] asked did you hear him say anything? You didn't hear him say [illegible] get me [illegible] or [illegible] up?

A She didn't ask me that.

Q I'll ask, did you, Mr. Day ask you to get him up off the ground?

A No.

Q Did you hear him say anything?

A No, he was laying on the ground [illegible] I don't remember --

Q The question is did you hear him say anything?

A No, I didn't hear him.

Q Alright, nothing further.

THE COURT: Anything else

MS. SIRINGAS: Just a couple, sir.

THE COURT: I'll limit you to three minutes.

MS. SIRINGAS: Yes your honor.

REDIRECT EXAMINATION

BY MS. SIRINGAS:

you gave him, correct?

A No, he wrote a statement based on what he asked me.

Q Alright. He asked you three questions that you answered. And then he asked you what kind of van? And you just said a little Chevy van. I don't remember the color. And that's true, isn't it?

A Correct. I don't remember if it was a Chevy van. I mean he wrote it down. I don't remember saying what kind of van it was.

Q Okay.

A But yes, it was a van.

Q It was a van?

A Yes ma'am.

Q And you don't remember the color?

A No.

Q Okay, alright, so that's all he wrote, right?

A Correct.

Q He didn't write four pages down of stuff you didn't answer, right?

A Correct.

Q This is the only statement that he took is the one you signed?

A Correct.

Q And yours is three questions? Right?

A Correct.

Q And you had a chance to look at it, right?
A No, he asked me to sign it and I signed and I left. I didn't want to go through it.
Q Alright, you didn't want to go do it, right?
A No.
Q Okay, and you don't want to be here, right?
A No, I missing work. I was called, I'm supposed to go back to work.
Q That's fine, I understand. Okay, thank you sir.

MR. SCHARG: Nothing further your Honor.

THE COURT: Thank you, you can step down and you're free to go. Call your next witness.

(Whereupon the witness was excused at 11:14 a.m.)

CARNELL SIMS

having been duly sworn on his oath at 11:14 a.m. was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SIRINGAS:

Q Sir, give us your name, please.
A Carnell Sims.
Q Mr. Sims, how old are you?
A Twenty four.
Q And who's Ricardo Sims?
A My brother.

THE COURT: Can you speak louder, please?



PENGAD/INDY. MUNCIE, IN 47302

Q Did you live there at any point?
A When I was young.
Q Did you visit your grandmother there?
A Yeah.
Q How often did you visit your grandma?
A Not that much
Q Is that a place, sir, that back on January 18th of the year 2008 you met up with a Police Officer Zwicker? No?
A I don't remember
Q You don't remember?
A Um-hm.
Q Okay, let me show you a four page statement and ask you if you see your signature on this statement, sir.
A I just told him I didn't see my signature on there.
Q I'm sorry?
A I just told him I didn't see my signature.
Q Let me show you, just -
A Alright.
Q It's a four page statement -
A No.
THE COURT: Take it.
Q Take the statement.
THE COURT: Look at the pages.
A No.
Q That's not your signature at the bottom?



PENGAD/INDY. MUNCIE, IN 47302 SF-EKL

A Um-hm.

Q No? You have to answer verbally.

A No, I did not remember, no

Q No, you do not remember?

A No.

Q You don't remember what your signature looks like?

A No, that ain't my signature.

Q This isn't your signature on the bottom here?

A You just asked me that.

Q Okay. Alright, so page one is a four page statement, right? You see the top of the statement, it says Carnell Sims, right?

A Um-hm.

Q That's a yes?

A Yes.

Q Okay, and that's you, right?

A Yeah.

Q Does it have your date of birth on this statement?

A Yeah.

Q Is that accurate on the statement, your date of birth?

A Yes.

Q That's your right date of birth, right?

A Yes.

Q What about your social security number? Does it have your social security number on there?



SF LRI PENGAD/INDY MUNCIE, IN 47302

Q And do you have a child?
A Yeah.
Q And how old is your child?
A Seven.
Q Okay. And what's your child's name?
A Ryan.
THE COURT: I can't hear you.
A Ryan.
Q So you have one child, Ryan, right?
A Yeah.
Q And is that what this statement says, that you have a child, Ryan?
A Yeah.
Q So that's accurate, right?
A Yeah, you all know all that.
Q Okay, what about Latonya Sims, that's your sister, right?
A Yeah.
Q Is this Latonya's phone number on here?
A Yep.
Q Okay, were you asked, sir, this question by Officer [illegible] and did you give this answer? You had an opportunity to look at the statement, right?
A I don't need to look at it.
Q You don't need to look at it? Do you want to look at it?
A Nope.

Q Well, why don't you look at [illegible] for procedure, okay, just look at it.

THE COURT: Counsel, for the record I told him to do that about six minutes ago and he took the top page [illegible] hand and said I don't remember and did not look at any of the other pages. Go ahead.

A Thank you.

MS. SIRINGAS: Thank you, your Honor.

Q So the [illegible] information, the [illegible] information [illegible] on this statement, right?

A Yes.

Q Okay. And were you asked, sir, this question back on January 18, 2008 by Officer Zwicker and did you give this answer?

Q Can you tell me what happened the day JJ got shot?

A I was over on Pelkey Street. My brother and JJ were sitting in a car. We all went into the house and talked for a while. JJ -

Q Now is JJ Joseph Day?

A Yes.

Q Okay.

A And for the record, I don't remember none of that.

Q Okay.

THE COURT: That's not the question.

A Alright, go on.

A JJ was about to leave when he got a call. He said he



PENGAD/INDY, MUNCIE, IN 47302

A No.

Q Where do you know him from?

A The [illegible] Black.

Q No.

Q No?

A He can tap me on my shoulder [illegible] couldn't [illegible] you who he is.

Q I'm sorry?

A I said he can tap me on my shoulder [illegible] couldn't even be able to tell you who he is.

Q Who, this person that you're referring to as Black, right?

A Yes.

Q I'm going to show you, sir, what I've had marked as People's proposed exhibit number 7. [illegible] People's proposed exhibit number 7, sir, and ask you to look at this exhibit. Have you seen this before?

A Um-hm.

Q You have to say yes or no.

A No.

Q No, right? You haven't seen that before? Do you see the third person that's on this [illegible]?

A Yes.

Q Who's the third person?

A [illegible] look like him right there.

Q So the third person, number three, is Black, right?

A No. I didn't say that. I said it look like him right there.

Q Okay. So you agree with me that the picture on this photo array on this exhibit number -- number three is this Defendant. Do you agree with me there?

A No, you asked me who it looked like. I said it looked like him.

Q So this number three is a photograph of the Defendant [illegible]

A Of that Defendant, if that's him.

Q He looks like this gentleman [illegible] in the beige suit, correct?

A Yeah, he look, you know what I'm saying, yeah.

Q You can look at that and see that that's him, right?

A Yeah.

Q And you agree with me that this the third person -- one, two, three, in the photo array. Do you agree with that?

A Yes, in the row, yes.

Q Okay. And the question that Officer Zwicker, he asked you this question.

Q I'm showing you what's called a photo array. Do you recognize anyone?

Q And you said,

A Yes, number three.

Q And where do you know him from?

A That's [illegible]

Q Correct?
A No.
Q You don't remember that?
A No.
Q You don't remember that happening?
A Um-hm.
Q That's a no?
A That's a no.
Q Okay.
Q Is this one of the men who shot JJ?
A Yeah.
Q Do you know the shooter with the whiskey bottle?
A No, my first time seeing him.
Q Do you know the guy who shot at you?
A No, he was tall and slim.
Q Did JJ say anything to you after he was shot?
A Get me up. Get me up. We were going to take him to the hospital but somebody said wait for EMS.
Q Did you see Black and the others flee the area?
A No, I just heard the tires squealing.
A What.
Q Did that occur, sir?
A I don't remember.
Q You don't remember?
A No.

Q You didn't know that? After all the years you've known him, you never knew that?
A That ain't my business.
Q Oh. And what about your brother, Ricardo? You didn't know what he was doing either?
A Not my business neither.
Q Okay, so you never knew your brother was selling drugs either?
A No, not my business.
Q And on the day of this murder you were outside with a bunch of other people, correct?
A Yes.
Q And you said, Korim Sims, is that your cousin?
A Who?
Q Karey.
A Um-hm.
Q Is that your cousin?
A Yes.
Q He was out there, too, wasn't he?
A I don't quite remember.
Q You don't remember if he was there or not?
A Um-hm.
Q And you do remember or you don't remember seeing a person shoot Joseph Day?
A I don't remember seeing anybody. I heard a shot and I don't



SF-TRL PENGAD/INDY, MUNCIE, IN 47302

remember who shot what.

Q Okay, and do you know whether or not you had a weapon that day?

A I know for sure I didn't have no weapon.

Q Okay, do you know whether anyone else had a weapon that was outside with you that day?

A No, I don't remember.

Q Did Joseph Day carry a weapon?

A I don't check everybody. I don't know.

Q Did you see him pull out a weapon?

A No.

Q Did you see your brother --

A If I would I seen that, I would have seen somebody else pull out one.

Q Did you see your brother, Ricardo Sims, pull out a weapon?

A No, I don't know. I didn't, what you don't understand, I don't remember.

Q So you don't remember anything on that day other than you were outside. There was a bunch of people outside. You saw your brother-in-law get murdered?

A I didn't see it. I know he got shot.

Q Okay, you know he got shot. Were you inside the house when he got shot?

A No, I was like down the street a little bit.

Q Okay, how far down the street were you?



5F-FRL PENGAD/INDY. MUNCIE, IN 47302

A I don't know.

Q Were you closer to Manning or were you closer to Seven Mile?

A I don't quite know. I don't know. I just know I wasn't right there.

Q And after you heard shots fired, did you come back to the scene to see if your brother-in-law was okay?

A Yeah, yeah, yeah.

Q And why did you do that?

A Why wouldn't I?

Q Because you cared about him, didn't you?

A Yeah

Q And you wanted to see if he was okay, didn't you?

A Yeah.

Q And he wanted to get up, didn't he?

A I don't know.

Q Oh, you don't know if he said that or not?

A No.

Q And you cared so much about him that you went with EMS to the hospital with him, didn't you?

A No.

Q No? You didn't care that much about him, you didn't want to go to the hospital with your --

THE COURT: Counsel, the witness is mumbling and you asked him another question before he finishes a question. So I don't know how we're going to deal with this. I've told him

A I ain't talked to no police, no.

THE COURT: I can't hear anything he said.

A No, I ain't talked to no police.

Q You did not talk to any police officer at all?

A I talked to them but I didn't tell them I seen no. Black, none of that, no.

Q So when you spoke to a police officer, you indicated that was at least two years later, correct?

A I guess, I ain't good with time.

Q Well, did anybody from the Detroit Police Department contact you after the shooting?

A Yeah, they said that they had somebody said I was out there and they needed to talk to me. Yeah, that's it.

Q Do you know how long ago that was after the shooting?

A Not right offhand.

Q Well, if you haven't spoken to an officer in two years, would that have been the time that you spoke to that officer?

A Probably so, you could say that.

Q And they contacted you. You didn't call them, correct?

A No.

Q You already forgot about the shooting at that point, right?

A Yeah.

Q And when somebody from the department contacted you to talk to you, did you go to the police station to talk to them or they came to your house?

December 8, 2006, did you tell Sergeant Zwicker that you have other people that confirm your story

A Yeah, they knew there were some other people out there.

Q That's not the question I asked you. I said did you personally give Sergeant Zwicker or did you tell Sergeant Zwicker during -

A Yeah, I told him there were other people out there, their names.

Q And which people did you tell him?

A I think I told him, you know, the names you just mentioned.

Q So the only names you gave him were your cousin, your brother and Phillip Yaeger?

A Yeah.

Q And you said that they could confirm what you just told him about -

A There was some more guys, I didn't know their names, you know, that Phillip Yaeger was talking to.

Q Okay, you didn't know Boosie?

A Who?

Q A guy named Boosie?

A That's my nephew.

Q So was he out there that day?

A No.

Q Are you sure?

A I'm positive. That was his daddy that got shot. He was not



PENGAD/INDY. MUNCIE. IN 47302 SF-ERL

EXHIBIT "E"

*Held*

02/26/2009 **Calendar Conference** (Judicial Officer: Callahan, Michael J)
Resource: Court Rpt/Rec 37 Goldsmith, Jeffrey
Resource: Courtroom Clerk C5918 Artis, Beulah
*Held*

03/20/2009 **Final Conference** (Judicial Officer: Callahan, Michael J)
Resource: Court Rpt/Rec 37 Goldsmith, Jeffrey
Resource: Courtroom Clerk C5918 Artis, Beulah
*Held*

03/20/2009 Motion (Judicial Officer: Callahan, Michael J )
*FOR DISCOVERY -- WITHDRAWN BY DEFENSE;*

05/01/2009 *CANCELED* **Pre-Trial**

05/07/2009 **Pre-Trial** (Judicial Officer: Callahan, Michael J)
Resource: Court Rpt/Rec 37 Goldsmith, Jeffrey
Resource: Courtroom Clerk C5918 Artis, Beulah
*Adjourned at the Request of the Prosecutor*

05/07/2009 Request to Reschedule (Judicial Officer: Callahan, Michael J )

05/11/2009 *CANCELED* **Jury Trial**

06/29/2009 **Jury Trial** (Judicial Officer: Callahan, Michael J)
Resource: Court Rpt/Rec 37 Goldsmith, Jeffrey
Resource: Courtroom Clerk C5948 Parsons, Patricia
*In Progress*

06/30/2009 **Jury Trial in Progress** (Judicial Officer: Callahan, Michael J)
Resource: Court Rpt/Rec 37 Goldsmith, Jeffrey
Resource: Courtroom Clerk C5948 Parsons, Patricia
*In Progress*

07/01/2009 **Jury Trial in Progress** (Judicial Officer: Callahan, Michael J)
Resource: Court Rpt/Rec 37 Goldsmith, Jeffrey
Resource: Courtroom Clerk C5948 Parsons, Patricia
*In Progress*

07/02/2009 **Jury Trial in Progress** (Judicial Officer: Callahan, Michael J)
Resource: Court Rpt/Rec 37 Goldsmith, Jeffrey
Resource: Courtroom Clerk C5948 Parsons, Patricia
*Held*

07/02/2009 Found Guilty By Jury (Judicial Officer: Callahan, Michael J )

07/02/2009 Refer to Probation For Pre-Sentence Report (Judicial Officer: Callahan, Michael J )

07/02/2009 Order For DNA Sample (Judicial Officer: Callahan, Michael J )

07/02/2009 **Disposition** (Judicial Officer: Callahan, Michael J)
1. Homicide - Murder First Degree - Premeditated
Not Guilty - Found Guilty of Lesser Offense

Exhibit "F"

# STATE APPELLATE DEFENDER OFFICE

**Main Office**: SUITE 3300 PENOBSCOT • 645 GRISWOLD • DETROIT, MICHIGAN 48226-4281
Phone: 313.256.9833 • Fax: 313.965.0372
CLIENT CALLS 313.256.9822

**DAWN VAN HOEK**
DIRECTOR
DETROIT/LANSING

**JONATHAN SACKS**
DEPUTY DIRECTOR
DETROIT

**LANSING OFFICE**
101 NORTH WASHINGTON
14TH FLOOR
LANSING, MICHIGAN 48913-0001
**Phone**: 517.334.6069 · **Fax**: 517.334.6987

**Website: www.sado.org**

April 28, 2011

Mr. Allen Marion
No. 252103
Earnest C. Brooks Correctional Facility
2500 S. Sheridan Drive
Muskegon Heights, MI 49444

Dear Mr. Marion:

I am writing in response to your letter dated February 27, 2011, received here on March 2, 2011. Sorry for the delay in getting back to you.

Enclosed for your records, as you requested, are the transcripts and the circuit court records from your case. Also enclosed are the police reports and other records that I received from your former appellate attorney Gerald Lorence. I do not think that I have Donald Sims' indictment papers or the police report that Hanna Sims made regarding the shooting of her home. I do not believe that your concern over the address of the house that was shot up would provide a meritorious appellate issue. If you wish to raise additional issues in your case, you would be able to do so in a motion for relief from judgment (6.500 motion) filed in the trial court after the direct appeal is over (meaning if the Supreme Court denies our applications for leave to appeal.

Sincerely,

Jacqueline J. McCann
Assistant Defender

Enclosures
cc: File

EXHIBIT "F"

UNITED STATES POSTAGE

$ 0

MAILED FROM ZIP CODE

Priority Mail
ComBasPrice

# CIVIL COVER SHEET FOR PRISONER CASES

| | | |
|---|---|---|
| **Case No.** 12-13127 | **Judge:** Victoria A. Roberts | **Magistrate Judge:** Laurie J. Michelson |

| | |
|---|---|
| **Name of 1st Listed Plaintiff/Petitioner:**<br>ALLEN MARION | **Name of 1st Listed Defendant/Respondent:**<br>MARY BERGHUIS |
| **Inmate Number:** 252103 | **Additional Information:** |
| **Plaintiff/Petitioner's Attorney and Address Information:** | |
| **Correctional Facility:**<br>Earnest C. Brooks Correctional Facility<br>2500 S. Sheridan Drive<br>Muskegon Heights, MI 49444<br>MUSKEGON COUNTY | |

**BASIS OF JURISDICTION**
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question

**NATURE OF SUIT**
- ☒ 530 Habeas Corpus
- ☐ 540 Mandamus
- ☐ 550 Civil Rights
- ☐ 555 Prison Conditions

**ORIGIN**
- ☒ 1 Original Proceeding
- ☐ 5 Transferred from Another District Court
- ☐ Other:

**FEE STATUS**
- ☒ IFP *In Forma Pauperis*
- ☐ PD Paid

---

**PURSUANT TO LOCAL RULE 83.11**

1. **Is this a case that has been previously dismissed?**
   ☐ Yes ☒ No
   ➢ **If yes, give the following information:**
   **Court:** ____________________
   **Case No:** ____________________
   **Judge:** ____________________

2. **Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)**
   ☐ Yes ☒ No
   ➢ **If yes, give the following information:**
   **Court:** ____________________
   **Case No:** ____________________
   **Judge:** ____________________